**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| **ROBERT BAKER,** | § | **Civil Action No. 2:18-cv-02574-RMG-MGB** |
| | § | |
| *Plaintiff,* | § | **SECOND AMENDED COMPLAINT** |
| | § | |
| **v.** | § | **JURY TRIAL DEMANDED** |
| | § | |
| **THE BOEING COMPANY, INC.,** | § | **ADA DISCRIMINATION** |
| | § | |
| *Defendant.* | § | **BREACH OF CONTRACT** |
| | § | |
| | § | |
| | § | |

COMES NOW, Plaintiff Robert Baker, in his SECOND AMENDED COMPLAINT, by and through undersigned counsel, complaining of Defendant herein, and alleging as follows:

## INTRODUCTION

Plaintiff Robert Baker is a disabled veteran of the United States Navy, and served his country as a naval officer both on active duty and in the United States Naval Reserves.  Baker, with a lifelong passion for planes, became a pilot and flight instructor as a teenager, and has worked in the aviation industry for nearly 40 years, after obtaining his degree in aerospace engineering from the University of Washington.  Boeing failed to reasonably accommodate, wrongfully terminated, and retaliated against Baker under the Americans with Disabilities Act of 1990, as amended ("ADA").  He also brings in this Second Amended Complaint state law claims, including for breach of contract, arising from for the same conduct, based on documents recently produced and recent deposition testimony.

Baker first worked for Boeing from 1979-1992.  He was at the forefront of computer aided design ("CAD"), and developed extensive experience in composite materials like those in the 787, having worked on composites used in the 757, 767, B-2 bomber, V-22 "Osprey," and "Black

Condor", a composites-only drone. Baker left Boeing in 1992 to work as an auditor in the aerospace industry, becoming an ISO 9001 and AS9100 Registered Lead Auditor and a qualified material review board designee ("MRBD), dealing with nonconforming production. Boeing rehired Baker in 2012 to work in composite fabrication ("Composite Fab") in Charleston, as a Quality Systems Specialist Level IV ("QSS IV") (Level V being the highest). Quality engineers in Composite Fab are tasked with documenting that composite materials used to create structural components (e.g., composite "stringers" which run the length of the fuselage and strengthen it) meet their design specifications, since if they don't a failure could be catastrophic--"there are no do-overs at 30,000 feet."

Following a number of complaints by Baker about Boeing's failure to implement mandatory "on the job training" ("OJT"), an area in which Baker had substantial prior expertise, in 2014 Boeing transferred Baker (at age 65) from a sedentary/cubicle position in Composite Fab to a substantially different job in "Final Assembly and Delivery", specifically the Material Review Segregation Area ("MRSA" "Cage")--a position requiring manual labor. Boeing supervisors Tidmore and/or Timms retaliated against Baker and "set him up to fail"—Baker was humiliated to be demoted from a position of knowledge, competence, and experience to a position of ignorance, incompetence and inexperience.

Baker has a disability of imbalance/peripheral neuropathy that posed no issues in Composite Fab but precluded him from doing manual labor required in the "Cage." After several falls in June, 2015, and continuously thereafter until he was forced to retire, Plaintiff requested reasonable accommodation—and specifically a transfer back to Composite Fab, or to a similar desk job without manual labor. Defendant refused, however, and from June, 2015 until November 1, 2016 never performed the mandatory reassignment review. Only once during that

time did Boeing engage Baker for temporary, two month "light duty" in the "Cage". Boeing's decision to refuse reassignment was purportedly based on a specious, *unwritten* "internal HR policy" mandating accommodation only in the disabled employee's "home department", not reassignment "nationwide" as required by ADA and Boeing's own *written* policy mandating affirmative action for disabled employees. Baker's "home department" was still Composite Fab, since Boeing had not yet changed his title from QSS IV (Composite Fab) to "QPS IV" (Cage).

Boeing forced Plaintiff on June 29, 2015 to take a leave of absence ("LOA") rather than reassign him. Boeing's LOA policy allowed for 3 months of salary at 80%, followed by 3 months of salary at 60%, after which Baker got *no* salary. As a matter of law, LOA was not an "effective" "accommodation"--particularly when there were suitable vacant positions—but was rather "undue hardship" to Baker. There is nothing in the ADA or in Boeing's principal reassignment policy mandating that an employee's disability be "permanent" as opposed to "temporary" prior to reassignment, allowing restriction of choice vacant positions to "insiders," or arbitrarily restricting the time limit for mandatory preference--such would violate the clear remedial purposes of the ADA and Boeing policy.

Boeing failed to follow the ADA as well as its own internal policies mandating affirmative action for disabled employees, who are entitled to reassignment review when they cannot perform the essential physical functions of their position with or without an accommodation, and do not have to "compete" for vacant positions they can perform, unless there is "undue hardship" to Boeing. Boeing failed to reasonably accommodate Plaintiff, misled him about his rights under the ADA and Boeing internal policy, and did not even consider him for reassignment until November 1, 2016, almost 18 months after they were obligated to. When they finally did, Boeing failed to *even consider* Baker for numerous suitable and vacant positions,

3

much less give him ***mandatory preference as a disabled employee (and veteran)***.[1]  Boeing's "preference" favored "*active*" rather than "disabled" employees. Boeing told Baker suitable positions were "internal only," "not open," "no post" or were already "spoken for" (quotes from recent Boeing discovery production) with most such positions not listed on Boeing's hiring/job website ("Careers@Boeing").  Boeing HR Manager Pamela Williams' offhand comment to Baker "I don't know much about the ADA" aptly summarizes Boeing's actions.

## PARTIES

1.     Plaintiff Robert Baker ("Baker") is a citizen and resident of Charleston County, South Carolina.

2.     Defendant The Boeing Company, Inc., d/b/a Boeing ("Boeing"), is a Delaware corporation with its principal office in Chicago, Illinois, doing business at its North Charleston facilities in Charleston County, South Carolina.

## JURISDICTION & VENUE

3.     This Court has personal jurisdiction over Boeing because the cause of action arose within this District as a result of Boeing's conduct within this District.

4.     This Court has subject matter jurisdiction over the ADA claims pursuant to 28 U.S.C. § 1331 as this is an action arising under 42 U.S.C. § 12111, *et seq.*; and over the FCA claim pursuant to 31 U.S.C. § 3730(h)(2).

5.     It is appropriate for this Court to exercise supplemental jurisdiction over Plaintiff's state law breach of contract claims. 28 U.S.C. § 1367(a) ("[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action with such original jurisdiction that they

---

[1] Baker does not herein allege any relief based on his status as a "veteran" (e.g., Vietnam Era Veterans' Readjustment Assistance Act of 1974, 38 U.S.C. § 4212).  That said, Baker is a disabled veteran.

form part of the same or controversy under Article III of the United States Constitution"); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966) (Supplemental jurisdiction allows parties to append state law claims over which federal courts would otherwise lack jurisdiction to federal claims, so long as "[t]he state and federal claims . . . derive from a common nucleus of operative fact.").

6.     Venue is proper in the District of South Carolina pursuant to 28 U.S.C. § 1391 because this is a judicial district where a substantial part of the events or omissions giving rise to the claims occurred and because Defendant resides in this District.

## ADA COVERAGE

7.     At all relevant times, Defendant was an employer continuously employing fifteen or more employees for each working day in each of the twenty or more calendar weeks in the current or preceding calendar year, in an industry affecting commerce, and is subject to 42 U.S.C. § 12111, *et seq.*

## EXHAUSTION OF ADMINISTRATIVE REMEDIES REGARDING THE FILING OF BAKER'S INTIAL COMPLAINT *PRO SE* FOLLOWING HURRICANE FLORENCE

8.     The Court has previously found that equitable tolling applies to the filing of Baker's complaint in the aftermath of Hurricane Florence, and thus counsel omits from this complaint the section explaining the basis for such equitable tolling found in the previous complaint.

## FACTUAL ALLEGATIONS

9.     After Baker's first stint with Boeing ended in approximately 1992, while he was working as an auditor, Baker supervised the implementation of an on the job training ("OJT") program at Long Beach Naval Shipyard in California.   He also implemented Personnel

Qualification Standards, similar to OJT, while in the Navy. See, generally, Baker C.V., **Exhibit 1** Boeing/B_001517-24).

10.     Plaintiff's second stint at Boeing was from January 20, 2012 to August 25, 2017. In total he worked for Boeing for over twenty-five years, and was intimately familiar with the connection between Defendant's quality system and its FAA quality-system certification, both of which are compulsory to the maintenance of Boeing's FAA issued airplane production certificate.

11.     The composites which form approximately 80% of the 787 by volume, and which account for its light weight, fuel economy and popularity, are delivered to Charleston by vendors--sometimes as raw materials, and other times as pre-constructed "parts." Composites are heated and "cured" in an enormous, high pressure, high temperature oven called an "autoclave" ("Composite Fab")—and it is during this process that they obtain their tremendous strength. Proper heating and curing is fundamental to the 787's structural integrity.   Baker worked in Composite Fab as a QSS IV beginning in 2012.  Composite Fab also includes numerous other specialized production equipment, including the automated tape layer and stringer former.  Each of these has its own "Boeing Process Instruction ("BPI") and Manufacturing Process Control Documents ("MPCD")(both part of Boeing's required Quality System) and should (but does not) have its own OJT protocol.

12.     As would be expected in any manufacturing process, sometimes nonconforming production occurs, not each "product and article" made complies with specifications, material gets dropped or broken, and the like.  It is for that reason that OJT--proper, documented training of all employees--is so critical—so that employees building planes in which the public flies are of demonstrable, tested and proven competence.  OJT is not an academic exercise, as "[r]ecent investigations have identified non-compliances with: [i] Stamping Before Work is Completed [ii]

Unauthorized Rework/Repair [iii] Unauthorized Part Removal." **Exhibit 2** Boeing/B_002868; (see also n. 3 below). Producing critical structural components of the 787 which comply with the BPIs and MPCDs, proper auditing, supervision, and quality control, including the recognition, testing and removal of non-conforming products by Quality Engineers like Baker, are some of the critical jobs done in Composite Fab, an integral part of Boeing's Quality System required for its production certificate. As a Boeing supervisor stated, "[a]s a quality manager at Boeing, you're the last line of defense before a defect makes it out to the flying public."[2]

13.    Beginning almost immediately upon his rehire by Boeing in 2012, Baker became concerned that employees tasked with critically important functions were not being sufficiently trained, any training being done was *ad hoc*, undocumented and not systematized, employees did not have to demonstrate proficiency and competence in their employment tasks by written exams, and Boeing was not maintaining records of training, performance, and competence for employees, as required in a BPI called "OJT" specifically for Composite Fab, by MPCDs;[3] the Code of Federal Regulations, and AS9100. Boeing seemed to believe that new hires were sufficiently trained or could "learn by osmosis." By contrast, the OJT program designed by Baker would

> provide employees assigned to a specific job, function, location, or critical task with practical and task oriented aspects of training. OJT is . . . to ensure that personnel are trained and qualified in a comprehensive and controlled manner. This method of training is considered to be "hands-on," i.e. the trainee uses actual equipment, appropriate methodology, and performs specific (measurable) tasks under the close guidance and control of a designated trainer from the workforce.

**Exhibit 5** Boeing/B_002844. Baker actually implemented such training with a protocol for "written test and hands on Demonstration Of Proficiency" for the training of inspectors in

---

[2] New York Times, April 20, 2019, "Claims of Shoddy Production Draw Scrutiny to a Second Boeing Jet," attached as **Exhibit 4.**
[3] (Section 1.3 "Training" states "[e]mployees operating or inspecting this process shall be trained by means of formal and practical training consisting of written and on the job development") **Exhibit 3** Boeing/B_002880 (last par.)

Composite Fab, and for multiple other groups of employees.  **Exhibit 6** Boeing/B_002919 is an

email to Tidmore describing the OJT program Baker created:

> While working under Andy Timms I put together the structure for the OJT program for NDI, PROCESS MONITOR, QAI, QS, QT, QT AFP, QT CR, QT MATL, QT TL, SITE MRB personnel. Now that I am no longer associated with the QT's I would like to continue the effort by working on OJT for QS and possibly for QAI personnel.

14.     Baker viewed Boeing's failure to do OJT as a critical passenger safety issue of the

highest importance, and complained repeatedly. He ultimately provided a "thumb drive" with

documentation of his proposed OJT program, including a spreadsheet with a "skills matrix", to

Tidmore and/or Timms (see, e.g., **Exhibit 7**, Boeing/B_002833-2885), but Boeing did nothing

with it.  Unfortunately for Baker, as noted by the New York Times, Boeing culture "often values

production speed over quality," while employees in Charleston have complained of retaliation for

flagging safety issues.  A recent article noted "pressure to not report violations," "weak oversight"

that "threatened to compromise safety," and "facing long manufacturing delays, Boeing pushed

its workforce to quickly turn out Dreamliners [in Charleston], at times ignoring issues raised by

employees."[4]  Similar issues have been noted with regard to the 737-Max, raising ominous

---

[4] New York Times, April 20, 2019, "Claims of Shoddy Production Draw Scrutiny to a Second Boeing Jet:" attached as **Exhibit 4:**

"Workers at a 787 Dreamliner plant in South Carolina have complained of defective manufacturing, debris left on planes and ***pressure to not report violations*** . . . .";

"the [Charleston] factory, which makes the 787 Dreamliner, has been ***plagued by shoddy production and weak oversight*** that have threatened to compromise safety . . . . ";

"A New York Times review of hundreds of pages of internal emails, corporate documents and federal records, as well as interviews with more than a dozen current and former employees, reveals a ***culture that often valued production speed over quality. Facing long manufacturing delays, Boeing pushed its work force to quickly turn out Dreamliners, at times ignoring issues raised by employees*** . . . ."

"Regulators and lawmakers are taking a deeper look at Boeing's priorities, and ***whether profits sometimes trumped safety*** . . ."

"Workers sometimes made ***dangerous mistakes***, according to the current and former Boeing employees . . . . Faulty parts have been installed in planes. . . ."

"***As a quality manager at Boeing, you're the last line of defense before a defect makes it out to the flying public***," Mr. Barnett said. "***And I haven't seen a plane out of Charleston yet that I'd put my name on saying it's safe and airworthy***." . . . .

"The ***787 was already running years behind schedule*** because of manufacturing hiccups and supplier delays. The labor shortages in North Charleston only made it worse. . . .

concerns of systemic problems at Boeing.[5] Given the issues cited as to the 787, the recent crashes of the 737-Max, and the scrutiny on *its* production flaws, Baker's complaints should have been heeded, not swept under the carpet.

15.     Boeing's failure to comply with on-the-job-training ("OJT") requirements of Defendant's quality system calls into question its FAA production certificate, per 14 C.F.R. Secs. 21.146(b), 21.140, and 21.135(b). Plaintiff communicated this failure to his supervisors. His supervisors, including Mike Tidmore, at first assigned Plaintiff to be the OJT "focal" after an audit team from Seattle flagged the lack of OJT as a "nonconformance." See spreadsheet attached as **Exhibit 8**, which cites specific MPCDs requiring OJT (First Part Qualification FPQ-9 On-The-Job Training Nonconformance . . . Action: Training Program to be instituted to ensure that operations are aware of the MPCD requirements"). Upon information and belief, this nonconformance was removed by Boeing employees without curing it, which constitutes falsification of documents, a dismissal offense. Baker cited this illicit, illegal action in his "Ethics" complaint (par. 49 below), but no one from "Ethics" or HR ever investigated, since according to HR Lewis there was "nothing to investigate" (see par. 52 below).

16.     Upon information and belief Boeing Charleston at this time was under intense pressure from upper level executives, and internally, to increase production speed for the popular 787, and avoid doing anything that would slow down production or increase expense (e.g. OJT). One manifestation of the same is a tendency to "anti-training" in Boeing's executive and corporate

---

"Mr. ***Barnett was reprimanded in 2014 for documenting errors***. In a performance review seen by The Times, a ***senior manager downgraded him for "using email to express process violations," instead of engaging "F2F," or face to face***. He took that to mean he shouldn't put problems in writing. The manager said Mr. Barnett needed to get better at "working in the gray areas and help find a way while maintaining compliance." (emphasis supplied).

[5] New York Times, January 9, 2020 "Boeing Employees Mocked F.A.A. and 'Clowns' Who Designed 737 Max," attached as **Exhibit 10** ("In another set of messages, employees questioned the design of the Max and even denigrated their own colleagues. "***This airplane is designed by clowns, who are in turn supervised by monkeys***," an employee wrote in an exchange from 2017.") (emphasis supplied).

culture, which likely contributed to the squelching of Baker's OJT complaints and his transfer to MRSA as a first step to forcing him out, and likely explains Boeing's failure to reassign Baker. This bias had devastating effects on Baker--after appointing Baker as an "OJT focal," he was later removed from this role, likely on instruction from Tidmore or from higher up, told to have no further contact with Tidmore, then Tidmore transferred Baker soon thereafter to the "Cage," (**Exhibit 9**, Boeing/B_000506—(Tidmore . . . moved several people from [Composite Fab] to MRSA ["Cage"])(4th par. from bottom).  Then Baker had his file shunted between at least eight HR/DMR employees, put on the "back burner" and ultimately was forced to retire to obtain his pension to live on.  Boeing's anti-training bias has also been documented with regard to the Boeing 737-Max.[6]

17.      Boeing's zeal for "cost cutting" (at the expense of OJT) does not extend to executive compensation, which is robust.[7]

18.      Following several complaints about Boeing's failure to implement OJT, Baker was informed by supervisor Wes Murphy that Boeing supervisor Mike Tidmore had instructed Murphy to lower Baker's performance evaluations, and when Murphy questioned which

---

[6] New York Times, January 9, 2020 "Boeing Employees Mocked F.A.A. and 'Clowns' Who Designed 737 Max," attached as **Exhibit 10** ("Several employees seemed consumed with limiting training for airline crews to fly the plane, a significant victory for Boeing that would benefit the company financially. In the development of the Max, Boeing had promised to offer Southwest a discount of $1 million per plane if regulators required simulator training. In an email from August 2016, a marketing employee at the company cheered the news that regulators had approved a short computer-based training for pilots who have flown the 737 NG, the predecessor to the Max, instead of requiring simulator training.

"You can be away from an NG for 30 years and still be able to jump into a MAX? LOVE IT!!" the employee says, following up later with an email noting: "This is a big part of the operating cost structure in our marketing decks." Requiring simulator training can be costly for airlines and even after the crashes, Boeing told the F.A.A. it was not necessary. It was It was not until Tuesday that Boeing said it would recommend simulator training for pilots who fly the Max.")(emphasis in original).

[7] New York Times, January 10, 2020, "Fired Boeing C.E.O. Muilenburg Will Get More Than $60 Million," attached as **Exhibit 11** ("Dennis A. Muilenburg, who was ousted as Boeing's chief executive last month as the company contended with the biggest crisis in its history, will depart with more than $60 million, the company said Friday.  Mr. Muilenburg will not receive any additional severance or separation payments in connection with his departure, and Boeing said he had forfeited stock units worth some $14.6 million. But the value of the other stock and pension awards he is contractually entitled to receive is worth $62.2 million, the company said. Mr. Muilenburg also has stock options that could be worth many millions more.")

evaluation, Tidmore (acting "F2F" of course) said "you pick." Upon information, Murphy brought a grievance against Tidmore for similar conduct regarding Murphy's own evaluations.

19.     Baker had a "desk job" in Composite Fab. See job description attached as **Exhibit 12**, Boeing/B_000012. His days were spent on his computer, reviewing inspectors' reports of sometimes damaged incoming material (or which failed to meet specifications), suspect composite parts from vendors or fabricated in house by Composite Fab, and making determinations as to what should be scrapped, returned to vendor, or be repaired and reused. Quality Engineers in Composite Fab were referred to as "Quality Systems Specialists" ("JACD").

20.     Boeing, via Tidmore, transferred Baker in 2014, at age 65, from his cubicle in Composite Fab to a substantially different job in a different subgroup under "Final Assembly and Delivery" (but still under Tidmore's management)--the MRSA "Cage" (literally screened off behind chain link fencing, **Exhibit 13** Boeing/B004373.  Quality engineers in the "Cage" are called "Quality Production Specialists" ("QPS"—"JACF"), and had the same level designations (I-V).  The job in the "Cage" involves parts from all over the airplane and production facility, e.g., seats, toilets, ovens, carpet, etc.

21.     The "Cage" position requires substantial manual labor.  Baker describes it:

> The work there involved mainly checking nonconforming product in and out, and stocking it on shelves, requiring the climbing of ladders, lifting of heavy objects, and ***pulling of heavy pallets of material to other areas***. There was not a word of explanation of the reason for this move.

**Exhibit 14**, Boeing/B001095 (par. 3)(emphasis supplied).

22.     The Essential Job Function And Physical Demand Summary is attached hereto as **Exhibit 15**, Boeing/B_001502-1507 (emphasis supplied), though the real preeminence of the physical aspects of the job (e.g., "pickup/return parts") is better shown in Cage Manager Shouse's briefer summary of the job.  **Exhibit 16**, Boeing/B000828-829.   Page 3/6 of **Exhibit 15** at

11

Boeing/B_001504, demonstrates in fact how different the "Cage" was from Composite Fab—you spend much of your day in the "Cage" "lif[ting]" "carry[ing]" and "push/pull[ing], doing "check in check out, moving parts--"the majority of the parts coming in are within the [0-10 lb range], altho [sic] it can vary day-to-day. Placed on shelves or carts for disposition." At least once a day it would be required to lift, carry, or "push/pull" parts from "25-50 lbs.," although in Baker's experience he was frequently asked to handle parts heavier than that, including as the form states "Pushing various panels into vertical cart. Moving pallet jack with parts."  Baker states he pushed "massive" pallet jacks both in the Cage and while on loan to Materials Management.  Page 3/6 is inaccurate and misleading on its face, since as to "ladders," the box marked "none" is checked, although the reference states "no ladders only a three step stool." A "three step stool" would likely (e.g., on the concrete floor of the Boeing factory) be of greater danger to the disabled employee than a ladder, which at least has handholds. This page also demonstrates that Cage employees frequently are working above their heads, at shoulder level, and bending over to place parts.

23.    Baker was able to perform such work as a young man, but not at age 65 with his disability.  It is suspicious that Tidmore and Timms gave no consideration to Baker's ability to do the "Cage" job prior to his transfer, despite Boeing orthodoxy, particularly for "Quality" Engineers, requiring such consideration:

Before starting your next task, ask yourself these questions:

• Do I have the knowledge to perform the task?
. . .
• Am I currently trained, qualified or certified . . .  to perform the task?
• Am I mentally prepared to perform the task?
• Am I physically prepared to perform the task?
. . .
*If you answered "no" to any of these questions, then you could be placing yourself, your company and the flying public in jeopardy*

**Exhibit 17**, Boeing/B_002876, "Boeing Product Quality, Compliance and Integrity." (emphasis supplied).

24.    Initially, and continuing even after Baker first requested reasonable accommodation and transfer from the "Cage" in June, 2015, Baker was still designated as a QSS IV, and had not yet been designated a QPS IV, which occurred on or about 1/22/16 (and was in effect a demotion).    Baker's "home department" at the time of his transfer request was still Composite Fab. **Exhibit 18,** Boeing/B_0000896 (rows 2-3--change from QSSIV to QPS IV was subsequent to 11/5/15). Tidmore, responsible for transferring Baker to the Cage, knew at the time of Baker's complaints about OJT, knew later of Baker's ethics/retaliation complaint against Tidmore when Baker requested transfer back to Composite Fab, knew Baker was requesting reasonable accommodation, and likely torpedoed Baker's reassignment request while acting "F2F" (see **Exhibit 37** at Boeing/B_000580—email 6/30/15, top of page, "I have talked with my peers and we are not able to come up with any type of desk work for him").    Such retaliatory treatment violates both the ADA and Boeing's general non-retaliation policy, one of the terms of Baker's employment with Boeing.

25.    Baker had always had excellent work reviews ("meets" or "exceeds" expectations) in Composite Fab, where he had substantial expertise (at least until Tidmore instructed Murphy to lower his scores, likely in 2013 or 2014). His former boss Brad Vaughan, in Baker's review dated January 4, 2013, lists Baker as "exceeding" expectations in "Quality." Vaughan wrote:

> Baker reviews all NCR's for the correct processing, ***and is my go to person when memos, MPCDs need reviewing***. . . .Bob meets or exceeds in all of the above noted categories, he scores well above average in customer satisfaction is a good corporate citizen. ***He has a keen understanding of safety concerns and requirements in the bond fabrication area. Bob is our senior quality specialist and provides training, instruction and assistance when required to quality, managers, and M/ts. When it comes to quality documentation and compliance his record is impeccable, when generating reviewing documents he is very clear***

*and concise and always gives positive feedback.… [Bob] complete all tasks and assignments in a timely manner and doesn't require any supervision, can be dependent upon to lead, teach, and mentor other Q/T's and M/T's*. We can depend on Bob to continuously find ways to improve quality, cut costs and reduce cycle times.… He helps to identify and solve problems, and determines the root cause of numerous issues. Communicates well and has enhanced technical skills, knowledge and pays attention to details. *Bob is an asset to my team and our quality organization."*

**Exhibit 19,** Boeing/B_000063. Tidmore claims in his statement "I don't recall any performance issues with Baker when he worked for us but there were complaints from others that he had a strong personality…" **Exhibit 20** at Boeing/B_000504 (3ʳᵈ par. from bottom).

26.    Not surprisingly, given his inexperience in Final Assembly and Delivery, Baker had some negative reviews subsequent to his transfer.  Baker disputed his lower performance evaluations after his transfer to the "Cage":

> I must dispute the validity of all ratings of 2 (Met Some Expectations) *I have been placed in a position where any expectation of technical proficiency at the expected QS4 level is completely unrealistic.*
>
> *I was transferred in August 2014 from a responsible position in Composite Fabrication where I essentially single-handedly ran the second shift in a fast-moving production environment.* In this role I was recognized by the people I worked in all organizations (Quality, Production, Liaison Engineering, Shipside Support, Manufacturing Engineering, BR&T, etc.) at all levels for my knowledge, hard work, attention to detail and knowledge of the computer systems, production cell activities, the composite fabrication process and a dedication to supporting the production schedule, while remaining in compliance with all requirements.
>
> *My transfer was to Final Assembly & Delivery MRSA. This was a wholly unfamiliar environment for me. I had little or no experience with the many different software platforms … and their specific applications, nor with the FAD organizations and build process,* No explanation has ever been provided to me for this reassignment. I was removed from a position where I was productive and where we were understaffed, to one where productivity would be long in coming.
>
> *This would be analogous to a Navy commander of a nuclear submarine who had dedicated his career to the mastery of his chosen field being reassigned without explanation to the command of an aviation squadron, where he would still be expected to perform at the level of an aviation squadron commander.* He would be expected to "excel in the aviation squadron commander job role, to perform at a

high level, to understand and to master the aviation squadron commander processes, to be efficient and productive, and to be a coach to his subordinates".

Since *he would be the least competent person in the squadron:*

• Leadership: Nobody would come to him for coaching
• Productivity, Technical Skills and Knowledge: He would need years to develop efficiency, skills and knowledge of an aviation commander who had dedicated a lifetime to learning his trade.

*Our first priority is to not "accept, create, nor pass on defects". I will not sacrifice this for speed, and my First Pass Quality rating reflects this.*

**Exhibit 21,** BOEING/B_000077-78.

27.    Baker also disputed Murphy/Tidmore's lowering of his performance evaluations, and stated to Ethics advisor Cheryl Gannon:

One area of possible **retribution** is my recent Performance Management Interim Assessment. *Since approximately October 2013 when I first became assigned to Mr. Tidmore I have been assigned lower assessments than I have ever experienced.* In this Interim Assessment I received 7 ratings of Does Not Meet, 7 ratings of Meets Some, 4 ratings of Meets Expectations, and no ratings of Exceeds or Far Exceeds. *It's amazing that nobody ever noticed how inferior I was until I started working for Mr. Tidmore, or that I ever became an Aeronautical Engineer, a Naval officer, a Boeing Sr. M&P Composites Specialist Engineer, an ISO9000/ AS9100 Registered Lead Auditor, and a Materials Review Board Designee.*

**Exhibit 22,** Boeing/B_001059. (emphasis supplied).

28.    Baker's disability became an issue after his transfer, when he suffered several falls beginning on or about June 8, 2015.

29.    As disclosed recently in documents produced by Boeing, unknown to Baker prior to such production, Defendant made express contractual promises to its disabled employees, including Plaintiff, in Boeing's "Reasonable Accommodation Policy":

if there is not an *effective* reasonable accommodation in an employee's current position, *reassignment to a vacant position will be considered* . . . [and]

15

if an employee meets the qualifications for a vacant position with or without reasonable accommodation, the ==*employee must be placed in that position (i.e, the employee does not compete with other applicants for the position*==) as long as he/she can perform all the essential functions of the position with or without reasonable accommodation . . . [and]

the employee's preference [if there are multiple vacancies] should be considered.

**Exhibit 23,** (Boeing's Reasonable Accommodation Policy, Boeing/B_000330-46 at Boeing/B_000339, Section b(i), b(ii) and b(iii)(emphasis supplied)). There is no stated time limit or expiration to this policy.

30.    Defendant's mandatory, affirmative action policy for disabled employees is also confirmed by Boeing's "Equal Employment Opportunity Policy" (Policy POL-5), also recently produced and unknown to Baker previously,[8] by which Boeing made an express contractual promise to its employees, including Plaintiff:

It is the policy of The Boeing Company to attract and retain the best qualified people available without regard to race, color, religion, national origin, gender, sexual orientation, gender identity, age, *physical or mental disability*, genetic factors or military/veteran status. This nondiscrimination policy applies to applicants as well as employees and covers all terms and conditions of employment, including recruiting, hiring, *transfers*, promotions, terminations, compensation and benefits. *Discrimination or harassment based on any of the above factors is prohibited, as is retaliation against a person who has made a complaint* or given information regarding possible violations of this policy. The *Boeing Company is also committed to undertaking affirmative steps to promote the employment and advancement of minorities, women, people with disabilities, and covered veterans*.

**Exhibit 24,** Boeing's Equal Employment Opportunity Policy at Boeing/B_000298 (emphasis supplied).

---

[8] Boeing failed to engaged in good faith in the "interactive process" and give Baker these documents when he needed them most, at the time he was disabled, and requested an accommodation.

16

31.    Boeing also has a mandatory Code of Conduct, recently produced, which includes contractual promises, requiring *both* the reporting of illegal actions, and prohibiting retaliation against the "whistleblower":

> Without exception, I will comply with all applicable laws, rules and regulations.
> I will promptly report any illegal or unethical conduct to management or other appropriate authorities (i.e., Ethics, Law, Security, EEO).
> Every employee has the responsibility to ask questions, seek guidance and report suspected violations of this Code of Conduct. Retaliation against employees who come forward to raise genuine concerns will not be tolerated.

**Exhibit 25,** Boeing/B_000036.

32.    The mandatory particulars of Boeing's reassignment process are described further at **Exhibit 26,** Boeing/B_000392-399, also recently produced and unknown to Baker prior to such production, by which Boeing made an express contractual promises to its employees, including Plaintiff, in cases where disabled employees are "Unable to Perform Base Job With or Without Accommodation." The "Process Flow" is described in the diagram at Boeing/B000393, and mandates that Boeing perform the following steps for its disabled employees:

(1)    Determination: EE Unable to Perform Base Job With or Without Accommodation [e.g., inability to perform physical requirements of job];

(2)    Document Base Job Accommodation Review;

(3)    Discuss Reassignment Process, Options, and Outcomes with [disabled] Employee;

(4)    Conduct Accommodation Review of Contractual Job Rights, if applicable;

(4a)    Can EE [Employee] perform EJFs [Essential Job Features] of Contractual Job?;

---[if] No [then]

(5)    Perform Vacant Position Review(s)

33.     Each of these steps and the commensurate contractual obligations required of Boeing is described in further detail at **Exhibit 26,** Boeing/B_000392-99; (see also **Exhibit 27,** Boeing/001432-1443, recently produced and previously unknown to Baker, for a "line by line" description of these mandates.   In particular, the first step (Accommodation Determination) requires an "interactive discussion with the [disabled employee] to determine his/her abilities and limitations as they relate to the essential job functions" (Boeing/B_000393, Section C 1, first bullet point), and that Boeing document "review findings in a timely manner." (Boeing/B_000393, last bullet point).

34.     The third step ("Reassignment Process") requires Boeing to review Baker's "skills, knowledge, abilities, prior job experience, education, training, and certifications to assist in review of vacant positions," and to "Ask employee if s/he would like to be considered for vacant positions ***nationwide***.   The employee's response should be documented . . ." **Exhibit 26,** Boeing/B_000395, Section 3, 2nd and 5th bullet points (emphasis supplied).

35.     There is yet a 5th document recently produced and previously unknown to Baker containing important, mandatory provisions regarding Baker's rights under the ADA and/or under written Boeing policy, which is also a contractual promise.   Specifically, attached **Exhibit 28**, Boeing/B_000553 states:

> reassignment is considered when there are no accommodations available to enable the individual to perform the essential functions of their current job, ***or if the only effective accommodation would cause undue hardship***."

(emphasis supplied). Under Boeing policy (and ADA) "undue hardship" goes both ways.  Perhaps Boeing employees thought LOA was "effective" for Baker (despite the cuts in salary with zero salary after 6 months), or perhaps they were unaware when they put him on LOA that it led to salary cuts.  At any rate, Boeing failed to consider whether the leave of absence would cause

Baker "undue hardship" or was "effective." Cutting a disabled employee's salary to zero after 6 months is "undue hardship" and not "effective" as a matter of law, and Baker was entitled to reassignment review.[9]

36.    There is a split in the Circuits, with the majority holding that the mandatory affirmative action described in the preceding paragraphs is required by the ADA. *Aka v. Washington Hospital Center*, 156 F.3d 1284 (D.C. Cir. 1998)("reassign" must mean more than allowing an employee to apply for a job on the same basis as anyone else"); *accord Smith v. Midland Brake, Inc.,* 180 F.3d 1154, 1165 (10th Cir. 1999); *Jackan v. New York State Dep't of Labor*, 205 F.3d 562, 565 (2nd Cir. 2000); *EEOC v. United Airlines*, Inc. 693 F.3d 760 (7th Cir. 2012). The minority view, adopted by 8th and 11th Circuits, holds that the ADA is not an affirmative action statute, but only "levels the playing field." *See United States Equal Employment Opportunity v. St. Joseph's Hospital, Inc.*, 842 F.3d 1333 (11th Cir. 2016); *Huber v. Wal-Mart*, 486 F.3d 480, 483 (8th Cir. 2007). The Fourth Circuit has not taken a position on this issue, nor has this Court. *See EEOC v. McLeod Health, Inc*., 271 F. Supp.3d 813, 825 (D.S.C. 2017). To the extent that this Court, or the 4th Circuit, sides with the minority, and holds that Boeing's affirmative action policy for disabled employees goes beyond what the ADA requires,

---

[9] Enforcement Guidance (see par. 87 below) states, at p. 4/54: "An accommodation also must be effective in meeting the needs of the individual. See *US Airways, Inc. v. Barnett*, 535 U.S., 122 S. Ct. 1516, 1522 (2002). The Court explained that "in ordinary English the word 'reasonable' does not mean 'effective.' It is the word 'accommodation,' not the word 'reasonable,' that conveys the need for effectiveness." Id. In the context of job performance, this means that a reasonable accommodation enables the individual to perform the essential functions of the position. Similarly, a reasonable accommodation enables an applicant with a disability to have an equal opportunity to participate in the application process and to be considered for a job. Finally, a reasonable accommodation allows an employee with a disability an equal opportunity to enjoy the benefits and privileges of employment that employees without disabilities enjoy." Baker's LOA did none of that, whereas a transfer back to Composite Fab or some other position would have. See also 29 C.F.R. pt. 1630 app. § 1630.9 (1997).

it is conceivable that Baker's remedy for Boeing's violation of that policy is under state law, and Baker would have no "existing remedy" under federal law.

37.     Despite Baker's disability and multiple requests for accommodation/transfer, no such reassignment/full accommodation review, "interactive" process, search of "vacant" positions or consideration of "employee's preference" occurred between June, 2015 and November 1, 2016. Nor did any Boeing employee tell Baker of or provide him with the previously described documents, a breach of the "interactive process." Boeing actively (intentionally or negligently) botched the reassignment process, misled Baker and/or misstated his rights. Boeing thereby breached its obligations to Baker under the ADA and its own written policy as a matter of law. HR Ilderton typifies Boeing HR staff's flawed "tribal knowledge" in her belief that:

> ***Under reasonable accommodation we do not look at other jobs for an employee, only [the ones] they are currently assigned to*** and if they are able to perform all the essential functions of that job only. We also do not place people in jobs they request…

**Exhibit 29,** Boeing/B_000497(2nd to last par) (emphasis supplied).

38.     Ilderton also apparently wrongly believed it was the *employee's* responsibility to request "assistive devices" rather than Boeings responsibility to inquire as to the same as part of a reasonable accommodation review/interactive process, and wrongly believed Baker didn't submit the right "paperwork." Her confusing statement and lack of knowledge as to "Baker's old job" (the subject of his accommodation request) are disconcerting but not surprising. She claims:

> [Baker] never asked for any assistive device to do his job. Rather, he just said that he wanted his old job back that he had several years ago. HRG Debbe Schunaman [sic] might know what that old job was [*because Ilderton clearly did not*]… **Baker never submitted any paperwork indicating that he wanted his old job as an accommodation though** [c.f. HR Watson's statement contra, par 65] . . . . The reasonable accommodation process does not place someone in a job they request as that is not considered a reasonable request so even if he had an RAR on file with that request it would have been denied.

**Exhibit 29,** Boeing/B_000497 (3rd par. from bottom). Even worse however is Ilderton's lack of understanding of the definition of "disability". Incredibly, she actually writes:

> *[t]here is nothing on file indicating that Baker had a disability. The only thing we have from him were medical restrictions which were determined to prevent him from performing the essential functions of his job.*

**Exhibit 30,** Boeing/B_000499 (8th par. from bottom) Ilderton's statement is shocking and disturbing. Medical restrictions as here describing Baker's "chronic disequilibrium" and "peripheral neuropathy" requiring his "sedentary" work and preventing him from performing his job in the Cage are the *very definition* of disability! One can deduce Ilderton never reviewed those medical restrictions (see par. 44-45, below) or his medical file, or she would have known the nature of Baker's disability. See e.g., **Exhibit 31,** – supra, Boeing/B_1366; 1406-7 ("Chronic disequilibrium"-1407 under "Impression") and ("peripheral neuropathy" - 1406 at line 11). One rightly questions Ilderton's (and Boeing "team's") ADA training, knowledge and experience.

39.    In a recent deposition, former Boeing HR employee Pearline Peterson confirmed that Boeing typically does not provide disabled employees like Baker with the documents described above (e.g., POL-5/Affirmative Action; Procedure PRO-784 "Reasonable Accommodation", and Reassignment Process Flow, Boeing/B_000393-99) at the time they need them most, when they are in the reasonable accommodation process. **Exhibit 32**, Peterson, p. 44, lns. 2-16). That position was unknown to Baker prior to this deposition. Given the other evidence described herein that Boeing employees misstated/did not understand Boeing's obligations under the ADA and Boeing internal policy, such failure constitutes further proof that Boeing "actively" (either negligently or intentionally) misled Baker as to his rights.

40.    Nowhere in these three documents (or in the ADA) does it state that reassignment to a vacant position can only be considered if the disabled employee's disability is "permanent"

21

as opposed to "temporary,"[10] that a company can limit its search of vacant positions to the disabled employee's "home department," or arbitrarily limit the preference period to "usually . . . around 60-90 days for South Carolina employees" **Exhibit 33**, Boeing/B_000783(5th par. from bottom). Plaintiff suspects the preference period may be longer for union and/or other employees. Indeed, such limitations clearly conflict with the broad remedial scope and purposes of the ADA and Boeing policy, and there appears to be significant discretion with HR to keep the preference period open.

41.    Each of these documents is effective as of 2016, and each appears to "supersede" a prior document.  Baker alleges however that Boeing failed to accommodate him beginning in June, 2015.  Accordingly, plaintiff has requested the above stated documents effective June, 2015. However, as of April 23, 2020, no such documents have been produced.

42.    POL-5/Affirmative Action contains no disclaimers, whereas the disclaimers found in Procedure PRO-784 "Reasonable Accommodation", and Reassignment Process Flow, Boeing/B_000393-99 and other documents cited above do not meet the requirements of S.C. Code Ann. § 41-1-110.

43.    Beginning on or about June 8, 2015, while working in the "Cage", or while on loan to "Materials Management" from the "Cage," (but still pushing  huge "pallet jacks" and performing other similar manual labor), Boeing literally forced 66 year old Baker to his knees, and had him  "crawling a lot"—see **Exhibit 34** -- Boeing/B_001289--(note by Lisa Strickland, 7/8/15 at 1:02 pm).  Baker fell a number of times, because of his imbalance/neuropathy, perhaps related to recently developed diabetes, a disability "substantially limiting" one or more major life activities.  Boeing put Baker on "light duty" effective June 11, 2015.

---

[10] But see **Exhibit 35,** Boeing/B_000838, with exceptions as noted at Boeing/B_000839.

44.     Baker was seen by Boeing medical personnel on or about June 26, 2015. **Exhibit 36**, Boeing/B_000416-7 is a Boeing Form entitled "Active Medical Restrictions by Visit Date w/ Return to Work."   This form states under "Medical Restrictions" "from 06/24/2015 To: 07/24/2015 . . . "NO WORKING," but the second page of that form indicates that Baker had no restriction on sitting, could occasionally stand and walk, had no restriction on carrying up to 10 lbs., and could carry 10-20 lbs. occasionally.  In other words, he was capable of doing his former desk job in Composite Fab, or a similar desk/computer job, as he had been telling Boeing HR continuously, although the restrictions would not allow him to continue his job in the "Cage." The "no working" reference should be interpreted as a reference to his position in MRSA "Cage" and not a prohibition from returning to his old job.

45.     That conclusion is supported by Baker's medical review by his ENT physician, Dr. Hester, performed on October 14, 2015.  Dr. Hester's report states Baker has

> underlying peripheral neuropathy and has recently developed diabetes. He describes a familial history of peripheral neuropathy but feels this may have increased with the onset of his diabetes. He works as an engineer at Boeing. ***He states that prior to the injury he basically worked in a cubicle-type environment***, doing engineering work. When he returned to work after the injury, he states that they had him working in a different environment, in what ***he describes as a cage where he was doing a lot of lifting and climbing***. He states that he had significant difficulty with this. [p.2]
> . . .
> IMPRESSION: (1) ==*Chronic disequilibrium*==. . . . .He has ==*peripheral neuropathy*== and does demonstrate somatosensory difficulties on his sensory organization testing . . . . ==***I do believe that the patient should be able to return. to work, but he would need to return into a more office-based or sedentary.   I do not believe, at this point, he would be able to handle rapid movements, lifting or climbing safely***==. **[p.3]**

**Exhibit 31,** Boeing/B_001406-7. (emphasis supplied)

46.     On June 29, 2015, Boeing HR employee Christine Watson met with several of Baker's supervisors, and also corresponded with him.   Despite the mandatory reassignment review (see par. 29) and the mandatory consideration of "undue hardship" for the employee (see

par. 35) her notes (part of the recently produced HR "History Detail Report") misstate and are misleading as to Boeing's written policies and the mandate of the ADA:

> Spoke to Mr. Baker today regarding no light duty work in his department. ***He was upset that he couldn't go back to composite fab and work at a desk***. I told him I did not have light-duty work here [in the "Cage"] as his restrictions were temporary and this would not be a perm move for him back to his old job. ***Generally if the home department doesn't have light-duty work we do not look outside of the department*** unless there is a need/request from a different department for a special project.

**Exhibit 37**, HR History Detail report, Boeing/B_000556-582 at 581(1st par.) (emphasis supplied).

47.    Watson's statement is clear evidence that Boeing as a matter of law violated both the ADA and its contractual obligations to Baker, which say nothing about initially limiting reassignment to the "home department."  Watson's statement, and similar statements cited below, are indicative of HR "tribal knowledge" at variance with actual written policy. Also, Watson was mistaken since Baker's actual title, QSS IV, still made his "home department" Composite Fab.

48.    Boeing's "home department" policy seems to be of selective, arbitrary application. Boeing had no problem sending Baker to the Cage, then loaning him to "Materials Management" (another job he knew nothing about), but as soon as he was disabled and requested a transfer Boeing became rigid in its "home department" policy.  Former Composite Fab employee Wes Murphy stated Boeing "can get real selective when they want to."

49.    In June of 2015 Plaintiff filed an ethics grievance with Defendant concerning Boeing's failure to meet OJT requirements as well as retaliatory and hostile acts Defendant had allegedly taken against Plaintiff, citing actions which violate the Boeing Code of Conduct and are dischargeable offenses. See **Exhibit 38**, Boeing/B_000551, which includes statements by the Ethics Advisor confirming that Baker complained about Tidmore's retaliatory transfer of him to the Cage, which related to his complaints about OJT, to "set him up to fail," that Tidmore took

Baker off the OJT project, and Tidmore's telling Murphy to lower Baker's performance evaluations.

50.     From this time until January of 2017, Defendant ostensibly was processing the complaint, but failed to act on it, failed to tell Baker the "result," or do a reasonable investigation. See **Exhibit 39,** Boeing/B_001010 (Baker's notes of the obvious flaws in the process, and the perfunctory investigation done); **Exhibit 40,** Boeing/B_001041(Ethics only forwarded the file to HR for "informational" and "conflict resolution" (i.e. "can't we all just be nice to each other") and *not* "investigatory" purposes, never telling Baker that or giving Baker a written summary of findings, the "result" **Exhibit 41** Baker/B_001045 (4/6/16, 1st par., email "[Baker] stated he never had anyone from HR contact him with the result");  or doing a "formal investigation"; and **Exhibit 42,** Boeing/B_001059 (telling Baker [bottom par.] only that his charges of retaliation were "best handled" by HR).  In fact, upon information and belief the "Ethics" department simply transferred the complaint to "HR" after only a week without investigating it, or performing a perfunctory "whitewash," and/or was under instructions from Boeing executives to "deep six" it; and no HR employees had the proper training or experience to be able to address OJT claims. **Exhibit 43**, Boeing/B_000104-105 (11/30/16 email to HR Schuneman).  One Ethics investigator with whom Baker spoke made blatantly inaccurate comments regarding OJT, that it was not "mandatory" and that Boeing had sufficient "checks and balances" without requiring expensive, time consuming OJT. Baker asks that the Ethics file be reopened in April, 2016, with similar results. See **Exhibit 41**, supra Baker/B_001045.

51.     Ethics employee Gannon seems to have known *in advance* that Baker's ethics claim would not be addressed: her June 17, 2015 email to HR Kate Lewis states:

I met with Robert Baker yesterday. I am going to write up his case today and get it to the IRT, **my guess is that they'll reject it for an investigation and send it over to you** . . . Cheryl Maselli Gannon, Office of Ethics and Business Conduct

**Exhibit 44**, supra, Boeing/B_001069-70 (email of 6/17/15).  "Ethics" indeed.

52.    HR Kate Lewis had the same dismissive attitude as Gannon, stating in an April 8, 2016 email to Ethics Advisor Culp, as to her "investigation" and "report":

> **I did not complete an investigation report as there was nothing to investigate. His management team made appropriate decisions per his performance.**

**Exhibit 45**, supra, Boeing/B_001144. (emphasis supplied).  Lewis' statement about Baker's alleged "performance" "issues" (and Shouse's similar statement, see par. 59) conflict with Tidmore's statement (see par. 25 *supra*) that Baker did *not* have any performance issues in Composite Fab, and are evidence that Baker's transfer to the "Cage" was in fact a demotion/negative employment action as Baker claimed all along.  If that is the case, Baker was entitled to the benefits of Boeing's mandatory "progressive discipline" policy, one of the contractual terms of his agreement with Boeing.  Baker disputes any "performance" issues— Tidmore and/or Tims were trying to get rid of Baker and his OJT complaints, which Boeing executives had decided was not happening—and the first step was to (literally) lock Baker up in the "Cage."  Tidmore, at a higher level, knew better than Shouse and Lewis than to put "issues" on paper, since such matters should instead be handled "F2F" (face to face)—see, *supra*, n. 4 final paragraph--as matters handled "F2F" would not entail pesky "progressive discipline."

53.    Baker could not perform the manual labor required in the Cage, because of his disability, and thus could not perform an essential function of the position with or without an accommodation--which was as true in 2015 as today.  Had there been an accommodation possible

regarding the physical demands of the "Cage", Boeing was obligated to do it in 2015. There was none, so they didn't, rushing to put Baker on LOA instead and cutting his salary.[11]

54.     Regardless of whether such disability is "temporary" or "permanent," if an "effective" reasonable accommodation cannot be found "in an employee's current position, (and even if an "effective" accommodation can be found, if it is not "effective" or causes employee "undue hardship") reassignment to a vacant position *will be considered*." **Exhibit 23**, *supra*, Boeing/B_000339; **Exhibit 26**, *supra* at Boeing/B_000393. Baker was entitled beginning in June, 2015 through November 1, 2016 to a reassignment review, but Boeing failed to do it.  Placing Baker on LOA and cutting his salary (ultimately to zero on or about April 1, 2016) is not an "effective" reasonable accommodation, and is also "undue hardship," as a matter of law, particularly when there were other vacant positions available "nationwide" at Boeing that Baker could perform, with or without accommodation, with no salary cut.

55.     Despite the wording of its *written* policy, and in contrast with its fluid transfer policy for "active" rather than "disabled" employees, in practice Boeing's *unwritten* policy was *not* to consider disabled employees for reassignment to vacant positions "nationwide" if they proved unable to do their job.  It was rather, at best, to only consider them for vacant positions in their "home department," or more likely, put them on LOA, shuttle them through multiple "relatively new" HR representatives and hope they give up and quit.  That position violates both the ADA and Boeing's own written policy.

56.     Watson had made a perfunctory request of supervisor Mike Tidmore and John Barnett for open positions in quality (not a full-fledged, "nationwide" reassignment and

---

[11] Upon information and belief, and/or in the alternative, Boeing did not appropriately seek reasonable accommodation within MRSA either.  Boeing's lack of good faith is demonstrated by the fact that at least one MRSA employee performed his position from a wheelchair. Plaintiff has requested documentation of the same, but as yet has received nothing.

accommodation review, as required), in an email to Tidmore asking "do you have a desk job for

Baker anywhere in quality?":

> Light duty work. John [Barnett, "Cage" Manager] doesn't and Mr. Baker thinks he should be here [in Composite Fab] working. ==*I do not want to place out of department and create light duty work if it's not available*==.… John and I felt LOA was appropriate. If you have something else that he can do let me know… I am also concerned for his safety given he admitted he tends to fall and is being evaluated for this.

**Exhibit 37** at Boeing/B_000580 (email of 6/29/15 at 3:53 p.m.).  Boeing has not produced

Tidmore's response, if there was one.

57.     But then Watson warned that any transfer of Baker back to Composite Fab "==*will still come out of your budget, so I leave it up to you*==." Id. (emphasis added), email Watson to

Barnett, June 29, 2015 4:50 p.m.  The requirements of the ADA and/or Boeing's affirmative

action policy may be expensive, and increase the "budget," but they are mandatory.

58.     Tidmore claims in his statement that he was "not aware of Baker making such a

request [to be moved from the Cage back to Composite Fab]", and that he was "not aware of

Baker ever asking for any type of reasonable accommodation"(Ex. 20, Boeing/B_000505 final

four par.), ***despite the clear evidence to the contrary*** in Watson's email to him cited in the

previous paragraph.  In contrast with Shouse and Lewis, Tidmore claims in his statement that

Baker was moved to the "Cage" for ***business needs*** to process a number of MRSA nonconforming

parts and get them processed for completion." **Exhibit 20**, supra, Boeing/B_000504-5 (3rd par.)

59.     MRSA manager Stephen Shouse, however, writes in his statement: "==*Tidmore told me that Baker had an issue in the composite fabrication department*== where he had been working

in [but] didn't tell me what that issue was. **Exhibit 46**, supra, Boeing/B_000509 (4th par.)

(emphasis supplied).

60.    At the time of Baker's request to be transferred back to Composite Fab, in June of 2015, Tidmore was aware that Baker had filed an ethics complaint against him regarding OJT and did not want Baker, the disabled "skunk at the picnic" back in Composite Fab. See **Exhibit 40,** Boeing/B_001041; **Exhibit 44,** Boeing/B_001065 last line ("conversation with Mike [Tidmore] can take place"); **Exhibit 47,** Boeing/B_004407 (9/28/15 email from EA Gannon to HR Kate Lewis and HR Shelly Bolt) describing the ethics "investigation" that:

> involved allegations by Bob Baker that Mike Tidmore was treating him in a humiliating and unacceptable/harassing manner. He believes he is essentially being retaliated against for his insistence that our training program for new mechanics is not up to par and is therefore dangerous . . . He firmly believes the way he is being treated is retribution for his opinions . . . *If I recall, Kate spoke with Mike [Tidmore—about the Ethics/HR complaint] and there was no indication Mike even had anything to do with Bob's current assignment changes, etc*.

Either Lewis talked to Tidmore about Baker's Ethics/HR complaint about Tidmore in June 2015, meaning Tidmore knew about it at the time of Baker's transfer request that same month, or Lewis did not even talk to Tidmore (the subject of Baker's complaint), and only did a perfunctory "investigation" of Baker's complaints.  Which is it?

61.    Rather than do the compulsory reassignment review, and consider Baker for *all* vacant positions, Watson instead placed Baker on LOA on June 29, 2015, ultimately cutting his pay to zero by April 1, 2016, a financial catastrophe for Baker.  **Exhibit 37**, Boeing/B_000580.

62.    Boeing's LOA policy allows for 3 months of salary at 80%, followed by 3 months of salary at 60%, after which there is no salary. Moreover, Boeing requires one week of "assessment" in between LOA stages, during which the employee does not receive salary. Baker lost two weeks salary in that manner. When Baker ultimately applied for long-term disability, his application was wrongfully denied by AETNA, ironically on the basis that Baker could do "sedentary" work and thus was not "disabled."  Yet again, Boeing botched that process.

63. On July 9, 2015, Watson had a meeting with Baker, MRSA ("Cage") supervisor John Barnett, and Composite Fab supervisor Mike Tidmore. Baker was "concerned about why he had to stay on LOA when he was sure there was something he could do or be moved permanently…". In reviewing Baker's "Active Medical Restrictions by Visit Date w/ Return to Work", **Exhibit 36**, *supra*, Watson first confirms that Baker was not physically able to do even light duty in the MRSA "Cage":

> "[Christine] Watson reviewed the TMR's [temporary medical restrictions] with the group and ***outlined why [Baker] wouldn't be able to work even light duty in MRSA***. The no over the shoulder and no squatting were new and would hinder even light duty in the department. We looked at other areas in quality that might be viable but came up with nothing that would constitute light-duty within his restrictions. Other quality teammates to have to go on the plane on an occasion and Mr. Baker is not able to perform this function with no stairclimbing . . . . I also indicated that ***it was our policy that we would not generally look outside the department unless we had a special request*** or project from another area who needed light duty.

**Exhibit 37**, *supra*, at Boeing/B_000579 (emphasis supplied).

64. Watson's conclusion that Baker "wouldn't be able to work even light duty in MRSA" should have ***immediately*** triggered a full-fledged reassignment review and search for vacant positions, under both the ADA and Boeing written policy, not to mention the mandatory analysis of whether the manner and method of going "on the plane on an occasion" could be restructured to accommodate Baker. Neither happened. Similarly, Watson (and Tidmore's) rush to put Baker on LOA should have been preceded by a consideration of the "effectiveness" and "undue hardship" to Baker from the cut in salary, but there is no mention of it being performed. Her statement to Baker that "we would not generally look outside the department" violates the ADA, is thus misleading, and breached the terms of Boeing's agreement with Baker. At any rate, Baker would not have needed "light duty" work had he simply been transferred back to his old job, a desk/computer job in "Composite Fab," or had he been considered for desk job positions

in internal audit, in which he had years of experience.  Baker did not spend his time "stairclimbing" in Composite Fab, and that was not an "essential feature" of his former job in Composite Fab.  He sat at his desk and worked on his computer, not "pushing pallet jacks."

65.     At some point after July 9, 2015 and before July 20, 2015, while on forced LOA at diminished pay, Baker called Boeing "Corporate Accommodation Services" who "forwarded the voice message to C. Watson." **Exhibit 37**, *supra*, at Boeing/B_000578 (7/20/15 email par. 3). On July 20, 2015, Watson initiated a telephone call with Baker, Mike Tidmore, Boeing HR employees Shelley Bolt and Kate Lewis. Id.   Despite the statement at **Exhibit 48,** Boeing/B_000447 that "Applicants requesting an accommodation should contact Global Staffing, who will refer applicants to SSG Accommodation Services for assistance," HR "tribal knowledge" rears its head again:

> The purpose of the meeting was to find out what [Baker] was contacting accommodation services for. ***[Baker] stated that he has been with Boeing for many years and had skill sets to assist in ma[n]y different areas in the Boeing Company. He is requesting a position or a desk job as an accommodation***." ***Chris[tine Watson] informed him that an accommodation doesn't work that way***. Each case is different and it would depend on the restrictions, the length of the restrictions and whether or not we could make accommodations for him to stay in MRSA.  ***We always try to keep in home department***. Chris[tine Watson] did explain that i[f] perm restrictions were received and accommodations could not be made in home department then reassignment might be necessary. . . . Chris[tine Watson]  indicated we were not at  this stage yet as the restrictions were very temporary in nature.

**Exhibit 37**, *supra*, at Boeing/B_000578, par. 3 (emphasis supplied).

66.     Watson's view of the "temporary" nature of Baker's restrictions is inaccurate, and biased against disabled and older employees.  Baker didn't have a broken arm, or condition which one might reasonably expect to be alleviated in the short run—it was "chronic disequilibrium" and "peripheral neuropathy" (par. 45, supra). Baker was 66, with neuropathy, imbalance and episodes of falling. See Boeing disability notes, **Exhibit 49**, Boeing/B_001295 (4th entry) ("scores

31

below age related norms for composite and sensory analysis with poor balance making for high fall risk"). These conditions are not of the type one would reasonably expect be "temporary," and she should have known that, and would have had she not been fixated on the "home department," the rush to LOA, had she investigated the matter sufficiently, or simply listened to Baker or looked closely at his medical records. Moreover, his medical documents dated 7/28/15 indicate this condition as "chronic disequilibrium (off balance)" and the "certification" start and end dates are "6/11/15" to "6/11/16." **Exhibit 50,** Boeing/B_001346.

67.    Boeing could have "effectively" accommodated Baker *with no salary loss*, and no "undue hardship", simply by making the reassignment review and transfer in June, 2015.

68.    Boeing brought Baker back for "light duty" in the "Cage" from July 22, 2015 until September 30, 2015 doing data entry work. **Exhibit 37**, *supra*, at Boeing/B_000578. Watson's notes from July 28, 2015 confirm Baker again requested on that date transfer "back to his old job in 88-19 and not back to MRSA [Cage]." **Exhibit 37**, *supra*, at Boeing/B_000575 par. 5.

69.    Boeing/B_000575, dated August 5, 2015, contains an email where Boeing HR employee Rosalia Scott and Christine Watson mistakenly tell Baker that he was not cleared to return to work until 10/24/15, despite the fact that **Exhibit 51,** Boeing/B_001370-71 ("Active Medical Restrictions by Visit Date w/Return to Work") lists multiple activities Baker is capable of doing (like at his old job). The visit date is listed as "08/07/2015" and the "return to work" is "n/a."

70.    **Exhibit 52,** Boeing/B_001367 lists Baker's return to work date as "7/24/15" (see, also, **Exhibit 53,** Boeing/B_001423—"return to work 07 23 2015")  and gives temporary restrictions on certain actions (but not on sitting), and is "updated" as of "8/7/15." **Exhibit 51** is a return to work dated at least 8/7/2015 through 10/24/15.

71.    The light-duty project ended on or about September 30, 2015. **Exhibit 37**, *supra*, at Boeing/B_000574. Despite the fact that Baker was cleared to return to work, could perform his old job in Composite Fab, or a similar desk job, could sit, had no restriction on carrying up to 10 lbs, and could occasionally carry up to 25 lbs,,[12] Watson's notes state "there is no light duty work in the home department nor out of the department with the current restrictions. The [employee] was asked to apply for LOA as a form of accommodation until his restrictions change or he is able to come back to work full duty", again failing as above to do the "undue hardship" analysis as to Baker's loss of salary. This action is clear evidence of the "anti-reassignment" bias of Boeing HR. Since she only looked at "light duty," there is no evidence that Watson performed a full-fledged vacant position review "out of the department" or "nationwide' as required (compare with par. 91 below, when Vickie Crawford did just that in November, 2016), or did any of the other mandatory functions set out at **Exhibit 26**, *supra*, at Boeing/B000393, Reassignment Process Flow—like accommodation reviews. The LOA decision had already been made, spelling disaster for Baker, who lost his salary on or about April 1, 2016.

72.    Baker remained on LOA from October 1, 2015 through May 20, 2016. Sherry Ilderton, a subsequent disability management representative ("DMR"), and reasonable accommodation focal ("RA") confirms that during this time period there was no consideration of reassignment—Baker's only options were "***to remain on LOA until his [medical] restrictions were modified or until he could come back to work full duty***." **Exhibit 29,** Boeing/B_000497, 3d par. Ilderton was unaware when she took over Baker's file whose responsibility it was to provide updated medical restrictions. *Id*. at par. 4. The temporary restrictions described at **Exhibit**

---

[12] See also **Exhibit 54**, Expert Report of Cassandra Townsend", p. 8 ("Baker maintains the ability to perform this non-physiically-demanding position of Quality Systems Specialist-4."

**52**,  ended as of October 24, 2015, but no one from Boeing did anything to update Baker's work restrictions, engage in the "interactive process" or try and return Baker to work, again failing to meet the obligations of the ADA and its own written policy, when upon information and belief there were numerous vacant positions (as yet not produced by Boeing though requested) that Baker could have performed.

73.     For example, had Boeing at that time "automated" a "quality" position, JACDP 1-4 (Quality Systems Specialist, Level 1-4), and JADBP1-4, positions search on its own website ("Careers@Boeing") on a "nationwide" or "worldwide" basis, with daily automated searches, it would have likely found multiple suitable vacant positions for Baker (except of course for the "internal only", "spoken for", "no post" and "not open" positions not found on "Careers@Boeing" (see infra)). By failing to do so, Boeing breached the ADA and its own policy, which resulted in economic catastrophe for Baker and termination of his beloved career.  Boeing is obligated to produce all evidence of such vacant positions, and what the results of "automated" searches would have disclosed beginning June, 2015, but to date has not yet done so.

74.     **Exhibit 37**, *supra*, at Boeing/B_000573-5 discloses that Baker's file at Boeing bounced between Christine Watson, to Rosalia Scott, to Sherry Ilderton, to Pat Vincent, to Shelly Bolt, and to Deborah Schuneman (see **Exhibit 55,** Boeing/B_000492) between August 5, 2015 and May 20, 2016.  As one would expect, each new person like "relatively new" employee Schuneman had to "come up to speed" which would delay the process, and it appears at least some or most them never actually met Baker in person. **Exhibit 55,** Boeing/B_000492 par. 4 (Schuneman).  Upon information and belief, Boeing employees Pamela Williams (HR Manager) and Pearline Peterson (later asked to leave) were also involved.[13]  Baker's salary went to zero on

---

[13] **Exhibit 56**, at Boeing/B_103 ("8/26/16 (last par. of entry) . . . If Pearline is back would probably be good to have her on the call if reassignment is the final outcome for Robert.")

or about April 1, 2016.  Boeing arbitrarily and capriciously shunted Baker between different HR representatives, who were either unaware of or mistaken as to Boeing's mandatory affirmative action policy for disabled employees, the necessity of an "undue hardship" / "effectiveness" analysis as to the employee on LOA, and the requirement of offering vacant positions "nationwide" if not "worldwide" (not just in the "home department"), or who actively (either intentionally or negligently) withheld such information from Baker.

75.     HR employees were defensive and dismissive of Baker's valid concerns that he had suffered retaliation, that he had not been told the results of his Ethics complaint, that the investigation had been sent to HR simply to string Baker along, and moreover that by April 1, 2016 Baker had no salary and was in fear of losing his "house" and "retirement." HR Shelly Bolt confirms on 4/7/16 that she dropped the "hot potato" Baker (who had not been told the referral to HR was only for "conflict resolution") and "stopped working with Baker on his "LOA issues":

> He told me it was offensive that his concerns were transferred to HR, because they were too major to be handled by a mere HRG. I asked him if he could provide the information to me, and he never followed back up. *I also stopped working with him directly on his LOA issues* and referred him to a person in Leave Management, because he was extremely confrontational and rude, and continued to make offensive comments about HR.

**Exhibit 57,** Boeing/B_001049 (emphasis supplied). Baker denies that he was "offensive", "confrontational" or "rude".  He was firm, direct, insistent, in desperate financial condition, facing the forcible termination of his career, and frustrated by his treatment.

76.     Boeing HR employees lack of awareness and knowledge as to Baker's file is telling, disconcerting, but not surprising, given the treatment of Baker described herein. For example, Schuneman's statement includes her admission: "I don't know if Baker's job in Comp Fab went away though." **Exhibit 55,** Boeing/B_000492 par. 2.  That was the accommodation Baker was requesting, and the HR rep tasked to help him did not even bother to check if it was

open!  Similarly, Schuneman was unaware of Baker's request for "accommodation" or Boeing

policies critically important to accommodation, and states:

> [In response to the question] "***did Baker request an accommodation at some point
> in relation to a disability?***" [Her response is] "***I am not aware of that*** . . . The
> process was to look at the job he was presently assigned to determine if we could
> accommodate his medical restrictions so that he could return to work in that job. ***I
> would have to defer to a DMR as to which specific Boeing policy that calls for
> that practice***. . . . I don't know at what point an employee like Baker would be
> placed in the reassignment process.

**Exhibit 58,** supra at Boeing/B_000493 par. 5-6.   Another consistent theme is that HR insists that

Baker try his luck with the flawed, difficult to use, and restricted "careers" website. (see par. 101)

77.    Pat Vincent's HR notes indicate on May 19, 2016 that Baker again tells Boeing that

"he is no longer eligible for [short term disability] leave and while he's in the process of applying

for LTD, he would prefer to return to work. He has concerns about the last position he held

["Cage"], which had physical duties and would like to return to a prior position he held for a

number of years [Composite fab]."  **Exhibit 37**, at Boeing/B_000573.

78.    Unfortunately for Baker, Boeing continued its illegal actions and its unwritten

"internal policy" at odds both with the ADA and its own written policy, refusing Baker

consideration for vacant positions outside of the "Cage."   Specifically, in an email from HR

employee Sherry Ilderton to HR employee Deborah Schuneman on May 20, 2016, Ilderton writes:

> I received the email [preceding par.] below about Robert Baker, who has been out
> on medical leave since 10/1/15. I'd like to talk with you Monday if you have some
> time, about his prior job. ***It's not really something I can answer him since the only
> thing I can work with him on is the job he is assigned to*** and if temporary light
> duty is available.

**Exhibit 37**, *supra*, at Boeing/B_000573 (emphasis supplied).   As with Watson, Ilderton misstates

the ADA and Boeing's written policy, leaving Baker unaware of his actual rights. Baker

reasonably relied, but to his detriment, on Boeing HR employees, who actively (either negligently or intentionally) misled him as to his rights.

79.     Boeing HR employees also continued their dilatory pattern of requesting "updates" and "clarifications" of Baker's medical restrictions in 2016, despite the fact that he had been previously cleared to return to work (see par. 45 *supra*), and his inability to meet the physical demands of the "Cage" job was well known.  This pattern continued until 11/1/2016, when Baker was finally considered for reassignment.

80.     **Exhibit 37**, *supra*, at BOEING/B_000572 contains further evidence of Baker's complaints, dated June 2, 2016.  Boeing HR employee Sherry Ilderton writes Baker:

> [d]*idn't understand why no one had been working his case since last year*. I explained to him that I took over his case was trying to figure out what his status is for returning to work. *He complained about the process and also stated he was in a financial bind because he has been out of work for so long*.  [*Baker's cut salary/disability payments had run out on or about 4/1/16*] I allowed him to vent about his concerns and then explain what my role is and how we will proceed from this point forward. I advised him we do not have any current medical on file for him. That the last update came over in October 2015 which is for temporary restrictions and no permanent restrictions on file as he stated there should be.

(emphasis supplied).  To add insult to injury, a Boeing HR employee (likely Schuneman) admits at **Exhibit 59**, Boeing/B_000102 (8/10/16 entry, line 6), to trying to prevent Baker from going "over the heads" of those providing him with "assistance", evidence of bias and/or malice: Baker:

> is now wanting me to send him an org chart. I am not comfortable doing that-first of all, it is an internal Boeing document that I don't believe should be shared outside of the company' (not sure what Boeing's policy is on this), second, *I can see that Robert will possibly use it to contact leadership and I don't believe that will serve anyone well*.

81.     Boeing received permanent work restrictions on Baker on August 24, 2016. **Exhibit 60**, *supra*, at Boeing/B_000316; Boeing/B_001962. As with Dr. Hester's report in October, 2015, these also clear Baker to return to work, and were substantially the same as what

had long been in Baker's file—ie., "sedentary position with limitations", "may occasionally lift/carry up to 25 pounds", "no climbing ladders", "no overhead work." In a shocking, disturbing statement, HR Schuneman emails others, including Boeing counsel Rawl on 6/30/17, later describing Baker's "crystal clear" restrictions, that Baker "has returned to work with permanent restrictions *we cannot accommodate*." **Exhibit 61**, Boeing/B_001834. directly refuted by multiple medical documents in Baker's file and cited herein. See, e.g., *supra*, par. 45.  A more accurate statement would have been "Baker has returned to work with permanent restrictions we cannot accommodate (in the Cage) and *will not accommodate elsewhere.*"

82.    Continuing Boeing's dilatory treatment of Baker, Ilderton finds things to quibble with on these restrictions, requesting clarifications and causing further delay. **Exhibit 37**, *supra*, at Boeing 000571.  These purported "clarifications", coming in the first entry dated 8/29/16, would almost be comic if Baker's situation had not been so dire.  Baker had no income, risked losing his house, but was not ready to "give up" and start his retirement, despite Boeing's continuing intransigence.  Incredibly, Ilderton's notes actually pose the following questions:

> *confirm if "sedentary position" means "sedentary work"* and
>
> *does "no overhead" mean he cannot reach above his shoulders* to place or pick parts/items from a shelf."
>
> *[Baker] said he would get those and then asked why we had not worked this for him earlier than now.  He has been out of work since [September] 2015 and doesn't understand what took us so long*. I explained again that I could not speak to what occurred before my involvement. . . *[Baker said if] work was available then we should have brought him back*.

**Exhibit 37**, *supra*, at Boeing/B_000571, 2ⁿᵈ par. (emphasis supplied).  How many vacant positions did Boeing fail to consider Baker for while September, 2016 passed, as HR awaited confirmation that "sedentary" means "sedentary?"  One HR note, likely from Schuneman, states that Baker told HR on or about September 28, 2016 that he is "ruined and that he has had to

borrow from his 401k and that is now gone and that he wants to see Boeing go the extra mile."
**Exhibit 56,** Boeing/B_000103.

83.     In despair Baker tried "exhausting his options" on or about Monday, August 7, 2016 by contacting supervisors, such as Glenn Freeman, "Boeing South Carolina Site Training & *Regulatory Compliance*, Boeing South Carolina Team Ambassador," on or about Monday, August 8.  As a "Regulatory Compliance" specialist, one would think Freeman would be sensitive to Baker's OJT/flight safety issues posed in his Ethics complaint and his claims of retaliation/demotion.   Unfortunately for Baker, Boeing's dismissive attitude and likely anti-training bias is evident:

> I suppose he called me due to my previous position as Site Ambassador and he was ***exhausting all his options***. He said he needed to speak with someone so he can get the ball rolling for his return. ***I don't want to get in the middle of it*** but he has done that. I know you are in workshops today but can someone at least call him to truly understand what he needs? ***If not he is going to keep calling me and I can't answer his questions nor do I want to***.

**Exhibit 62,** at Boeing/B_001117 par. 1. (emphasis supplied). HR Schuneman emails HR Manager Williams on 1/23/17 that "Freeman is someone that [Baker] has pestered a lot."  **Exhibit 63,** Boeing/B_001697.

84.     Finally, on or about October 18, 2016, **Exhibit 37**, *supra*, at Boeing/B_000569, Baker is referred to reassignment with "Vickie Crawford," on information and belief an "SGS" third party contractor, not a Boeing employee, sitting in Seattle, Washington, and not Charleston), at least the 7th HR person to handle Baker's file in a little more than a year.  Interestingly, HR files had been transferred from *actual* Boeing HR employees in Charleston to third party contractors in Washington, a likely sign something was amiss in Charleston.

85.      During that time Baker and his wife asked a Boeing executive and his wife to come to dinner with the Bakers. Baker voiced frustration about being out of work and not getting

anywhere with Boeing HR, and that his file had been transferred to Boeing HR in Washington State. The executive informed Baker that a number of Charleston HR employees "were not doing their jobs," and/or were "overwhelmed", including "Pearline Peterson," (the very first time Baker had heard that name) and a number of files had to be transferred to Washington. Upon information and belief, Peterson was asked to leave Boeing, or was informed her position would not be continued. In later conversations with Vicki Crawford, Crawford confirmed to Baker that Boeing had had problems with Boeing HR Charleston, which was not "pulling its weight."

86.    Baker's first call with Crawford was on or about October 28, 2016. At that time Baker was visiting with his father in Washington state, just prior to his father passing away.

87.    Baker's epiphany came some days after his initial call with Ms. Crawford, on or about "10/28/16" as disclosed at **Exhibit 37**, *supra*, at Boeing/B_000569 (third entry from bottom "Rec'd t/c from [Baker] today. Introduced myself . . .").  Baker had been out of work since June 29, 2015 (with only the 2-month data entry job in between), had been without income for more than 6 months, and was fed up with Boeing's intransigence and delay, wanting to return to work and the career he loved.  Up until that time Baker had trusted Boeing and its HR employees to deal with him honestly and competently, and reasonably relied on them to apprise him of his rights under the ADA [and company policy]. By October, 2016, however, Baker began to suspect the *bona fides* and/or competence of those "assisting" him. Accordingly, after speaking with Crawford he began researching Boeing's obligations under the ADA.  He was *still* unaware of Boeing's internal written policies until the same were recently produced, those policies having not been provided to Baker when he was hired (see **Exhibit 64**, Boeing/B_000016-19), or by any of the HR employees with whom he had worked. Ultimately, Baker found the *EEOC Enforcement*

Guidance: *Reasonable Accommodation and Undue Hardship under the ADA* (https://www.eeoc.gov/policy/docs/accommodation.html) ("EEOC Enforcement Guidance").

88.     When Baker first reviewed EEOC Enforcement Guidance, he "about fell out of his chair," and was thunderstruck to realize that Boeing HR employees had not even come close to meeting Boeing's obligations under the ADA, had misrepresented those obligations, had not been dealing with him in good faith, did not know the law, were malicious, or some combination thereof. (Later Boeing counsel Edward Rawl would tell Baker that Boeing "doesn't follow EEOC Enforcement Guidance, we follow the law.") At some point during this process Boeing HR *Manager* Pamela Williams made an offhand comment to Baker to the effect of "I don't know much about the ADA."

89.     In particular, EEOC Enforcement Guidance describes a Company's obligation to consider a disabled employee for vacant positions, and not just try to force him back to the job he physically could not do.  Boeing spent more than a year to ultimately conclude (again) that which Christine Watson had fairly quickly concluded in June, 2015—(that Baker could not perform the essential physical features of his job in the "Cage").  Finally on November 1, 2016, reassignment review began, although Crawford knew it would be the worst time of the year to be looking—"Of course we are going into the end of the year and jobs just seem to dry up or get frozen until after the first of the new year." **Exhibit 65**, Boeing/B_000781 (note 11/29/16 line 8).

90.     Boeing then continued to botch/torpedo Baker's reassignment, failing to disclose all vacant positions, maintaining "secret" positions not found on "Careers@Boeing" and ***failing to even consider him for suitable vacant positions***, much less give him the ***mandatory preference to which he was entitled as a disabled veteran***, on the spurious basis that the vacant positions

were "not open," "internal only," "no post" or "spoken for." **Exhibit** 37, Boeing/B_000556-569 (all direct quotes from **Exhibit 37** Boeing/B_00568).

91.     **Exhibit 37**, *supra* at Boeing/B_000569 describes Crawford's initial contacts with Baker.   The breadth of the reassignment review and the scope of the documents done contrasts sharply with what was not done, but should have been done previously for Baker, beginning in June, 2015.  She describes the different documents, including the reasonable accommodation review form (RARF), the essential job function and physical demand summary, the reassignment process form, **Exhibit 66**, at Boeing/B_000432-41.  Baker confirmed that he would like to be considered for jobs "worldwide", including internationally.  Importantly, Crawford noted that "job searches will be conducted on a regular basis and results provided to that [employee]." However, upon information and belief, Crawford did not "automate" the job search as she could have (and should have) done at that time, to give Baker weekly or even daily postings directly to his email inbox in his designated search fields.

92.     Unfortunately, in yet another devastating delict, despite the fact that Baker was at that time still a Boeing employee, Baker did not have access to all employment postings available on the careers website (not to mention the non-website positions). For example, as stated in Crawford's notes dated 11/29/16, **Exhibit 37**, *supra* at Boeing/B_000568, Crawford confirms both that she had not "automated" Baker's job search, and that he did not have access to all positions:

> [Telephone call] with [employee] today to discuss job search and process. [Employee] hasn't seen any jobs out there to apply for. I will do another review later today and send anything I find to him that falls within the quality aspect of work. [Employee] concurs. ***[Employee] is voicing his frustrati[ons] with the job prospects and difficulty in seeing all jobs out there. He is on LOA and not able to see internal [requisitions].*** Will continue to send job-search prospects to him.

**Exhibit 37**, *supra* at Boeing/B_000568 (emphasis supplied).  Crawford also remarks in a separate note of the same date "It is so frustrating if you are outside the Company and trying to find employment again even with our process, it just takes time and I wish that were different for our employees."  **Exhibit 43**, at Boeing/B_000105 (2nd to last line of entry).  She also clearly understood the "old system" of searching better than the "new system. **Exhibit 67**, Boeing/B_000566 (email of 12/9/16 2nd par.).

93.     Despite the clear and present professional risk to Baker's transfer/reassignment hopes (in which Tidmore had substantial influence) Baker also continues his efforts at that time to get Boeing to address his Ethics case, a "non-anonymous" complaint" against a senior executive, Tidmore, in an 11/30/16 email to Schuneman, HR manager Williams, and Ethics Advisor Culp:

> In June of 2015 (17 months ago) I initiated an Ethics grievance against a Senior Manager claiming retribution and a hostile work environment. ***Since retribution is a dismissal offence***, I believed that it warranted an Ethics & Business Conduct Investigation. I provided a full testimony of all relevant facts to Cheryl Masselli Gannon, the Ethics Advisor at that time.

> Some months later, when I checked back with Ethics to determine the status of the investigation, I learned from Mr. Jeffry Culp that my advisor was out on leave until November 2016, and that the ***issue had been downgraded to an HR Review, without notifying me***. ***I contacted HR to determine the status, and no one in HR had any awareness of an HR Review***. I understood at the time that a reassignment of this responsibility was being initiated. When I checked back again, my new HRG was also unaware of the review. This happened more than once.

> On April 6, 2016, Mr. Jeffry Culp, an Ethics Advisor forwarded my entire case file of information to you and stated that he would inquire as to the result of your efforts to address my concerns.

> On August 10, 2016 (4 months later) you requested a statement that "outlines what your specific concerns are so that I can investigate". The case file provided by Mr. Culp from Ethics should suffice. ***Can I infer from this that no investigation has been performed?***

> I have never heard back since then from anyone in HR about this case, and

subsequently, Mr. *Culp has advised me that the case has been closed*.

Now, in November 2016, I request answers the following questions:

- When was my case (Ethics Case No. 661496; HR Case No. 661484) transferred to HR?
- To whom was it assigned, and when?
- To which other HRG's was it assigned, and when?
- *Was any investigation or review performed?*
- If so:
    - *who conducted it?*
    - *who did they interview?*
    - *what were their findings?*
    - *Who decided to close the case?*
    - *Who approved the closure of the case?*
    - *What was the rationale for closing the case*?
    - Why was I never notified by HR of the status of the case, and of its closure?

*Boeing claims to believe that Ethics is a serious issue. It does not seem to be so in my case. Initiating an ethics charge against a Senior Manager, non-anonymously, is a very serious step to take*, *and the timeline of this "investigation/review" indicates that it was not taken seriously*. I have been harmed in several ways, and I believe that I deserve a full explanation of exactly what happened here.

Please respond within one working week.

**Exhibit 68**, Boeing/B_001120-21. By then Baker had good reason to fume at the irony of

Schuneman's email signature block:

*We are what we repeatedly do. Excellence then, is not an act, but a habit. Aristotle.*"

Id. Boeing's "repeated" and "habitual" non-performance, misleading, negligent and/or malicious

acts described herein, are anything but "excellent."

94.    Not surprisingly, Baker gets nowhere with his request. Culp responds via email

on January 18, 2017 that "no new information was presented." Baker responds:

*No new information was presented because no new investigation was conducted to find new information*. That's a pretty high (and unrealistic) standard to meet. I have no way to collect additional information since 1) it is not my job, and 2) I am on LOA and have no access.

44

Who was expected to provide new information? Was it expected to magically appear out of nowhere? I have no idea what was discovered in the initial HRG review, or if one was even conducted, since it is considered to be confidential, even to the party making the allegation. [*And although Baker did not know it at the time, his suspicion was correct--no investigation had ever been conducted by HR –see supra par 52 Kate Lewis supra statement*]

Who conducted the review? **What kind of experience or training did they have in performing reviews or investigations**?

**Was a forensic review of selected email traffic conducted, as I requested**? If so, what did it find?

**Was anybody interviewed**? **If so, what was their testimony**? I was never contacted to clarify or expand on my statements from 18 months ago.

**Were any of the documents that I identified requiring OJT reviewed to verify my claims?**

Has an OJT program been initiated?

**These are all obvious assessments that would be expected in any serious investigation. I have seen ethics investigations conducted for far less serious allegations, for which Boeing personnel received CAM's**. I am very dismayed at the entire ethics process.

I do not expect a response.

Bob

**Exhibit 69**, Boeing/B_001186-7. (emphasis supplied)

95.     A December 2, 2016 exchange between Crawford and Baker states:

Contact with [employee] today. [Employee] had left a voice message earlier and I emailed him back with updates on the 3 [requisitions] discussed earlier this week. Employee and I had exchanged emails on 11-30-16 and 12-1-16 briefly. **These 3 [requisitions] are no-post [requisitions] and are already spoken for.** T/c with Recruiter today to validate that information. Reviewed Careers@boeing.com today with search in Italy for "Quality" job and there were no openings shown. Shared this information in an email with EE today. No jobs to review today. Will continue job search activities. (vc)

**Exhibit 37**, *supra* at Boeing/B_000568 (Emphasis supplied). Another email note of that same

date from Crawford provides additional details:

I found out that all 3 of the requisitions we discussed "Qual Syst Spec 3, 4 and Qual Eng 2 are "No Post" requisitions. **They are Internal Only, but have been created to simply transfer an active employee into those positions**. In other words they technically are not available for any other purposes. I spoke with the Global Staffing Recruiter, so these jobs are **spoken for**.

**Exhibit 43** at Boeing/B_000105, 12/2/16 entry lines 5-9.  The three "spoken for" requisitions could have been done by Baker, and he should have gotten them as a mandatory preference for a disabled employee (and veteran).  Such action (i.e., "active employees" trump "disabled" employees) violates the ADA and Boeing written policy as a matter of law.

96.    As to the three "spoken for" requisitions in the preceding paragraph, in a significant admission against interest, Schuneman confirms in her statement that "active" employees got preference over inactive outsiders such as "disabled" employees on LOA like Baker, whereas the ADA and Boeing written policy *require the opposite*.  As to these three requisitions, Schuneman states:

> that might be a reference to headcount surplus activities…We tried to avoid laying off as many employees as we could by ***moving some of our internal employees and other jobs where we needed additional headcount***. We were going down in jobs in some areas because we had too many employees and we were ***moving employees to other areas where we*** ***didn't have enough headcount***. . . . We did not have an official declared surplus so these actions were not something that we could discuss openly with Baker.

**Exhibit 58** at Boeing/B_000494 1st full par.

97.    A follow up communication on 12/8/16 is equally important. Baker is now informed as to his rights under the ADA (more than independent contractor Vickie Crawford-- though still not yet as to his rights under Boeing's written policies):

> 12-07-16 - Rec'd email from EE on 12-05-16 responding to the ***issue of "no-post" requisitions and [Baker's] view of what is or should be his access to all requisitions posted or not and what is right under the Law and his questioning why he is not allowed to have visibility to "internal only" requisitions***. I explained in an earlier email (12-02-16) what "no post" requisitions are and again followed up with EE in this latest email indicating ***the company has it's policies and procedures on posting and hiring for jobs.*** We are to look for open and available positions and I will continue to provide him with data regarding any "Internal Only " posted jobs as available . . . . ***From EE's email he states he is financially stressed and frustrated at the amount of time he has been off work and is anxious to return to work***. . . .

**Exhibit 37**, *supra* at Boeing/B_000568 (3rd entry of 12/8/16).

98.      Baker's 12/5/16 email referenced in the preceding paragraph (and a subsequent

email of two days later) state his position under the ADA clearly (and accurately), and describe

his disaster:

> Vickie, It appears to me that ***Boeing, in posting vacant positions for which they
> have predetermined who will be assigned, and for which no other applicants will
> be considered, is circumventing the letter and intent of ADA and EEOC
> requirements***, Could the reason that Boeing posts vacant positions that are
> "technically unavailable" be merely a subterfuge to be able, with a straight face, to
> represent to the EEOC that all vacant positions have been posted.
>
> ***I don't see how a vacant position, even if allocated to another non-disabled
> person, is exempt from the requirement that "the employer must reassign the
> employee if there is a vacant position available for which he is qualified." So even
> if the employers original intent was to offer a vacant position to another
> employee, a vacant position is a vacant position. Even if the intent was that "these
> jobs are spoken for", they cannot be "technically unavailable for any other
> purposes".***
>
> ***Can you explain to me what "no post" means, and why I, as a Boeing employee
> (albeit on leave) am not allowed access to "internal only" vacant positions, when
> that information is crucial to identifying a reasonable accommodation***.
>
> ***I believe that I am protected by the statutes, and should be placed in the position
> we discussed***. I would like to see more detail about the QSS4 position.
>
> As far as your ongoing search for me, if it's not too much trouble, I suggest that you
> simply do a search on "All Quality Jobs", regardless of location, copy/paste the
> headers (e.g. Quality Systems Specialist (Level 4); Oklahoma City, Oklahoma,
> United States12/02/2016), and forward them to me. ***This will ensure that I get a
> chance to see all Internal jobs, and can easily sort out the best candidates***. . . .
>
> time is of the essence for me. ***After 18 months of diminished or no paychecks due
> to being placed on Leave with Short-Term Disability, and being denied Long-
> Term Disability by Aetna, my savings are rapidly diminishing. My retirement
> plans are now ruined, and it is likely that I will lose my house***. Since Boeing HR
> here in Charleston provided none of the assistance required of them in all that time,
> I think that it is reasonable for Boeing to now expedite my reassignment (which
> should have happened in June, 2015).

**Exhibit 70**, Boeing/B_000106 (emphasis supplied)

99.     Baker sends another email on Thursday, December 8, 2016 to Crawford, and referenced at **Exhibit 37,** Boeing/B_000566, and confirms that Baker does not have access to all vacant positions:

> My search for Quality Jobs with no other filters gives me only 9 hits, and you got 18 Open jobs with the ==heading filter Quality==.  Even though you do not see anything listed as Internal Only, many of these must be Internal Only, since I am only seeing the 9 above (which I show at the bottom of this reply), and you are seeing 18.
> . . .
>
> I do not see any of the 4 Quality Production Specialists but the QPS role is the one my restrictions prevent me from performing.
>
> I did not see any Supplier Quality requisitions for Germany (another clue that it is an Internal Only position that I cannot see).

**Exhibit 37**, *supra* at Boeing/B_000567 (emphasis supplied).  Baker's email also details Boeing's questionable policy of not making certain international positions "open" for non-local candidates. How many foreign vacancies were never posted on the Boeing website?  Crawford's note of December 7 (second entry, lines 6-7) confirms "I can only send you certain parts of the requisition data on "internal" only requisitions." **Exhibit 70**, Boeing/B_000106

100.     Baker sends an email to Crawford on December 16, 2016, referenced at **Exhibit 37**, *supra* at Boeing/B_000565, again requesting that he be given access to "internal" positions and describing his financial emergency:

> Have any searches been made for me in the past week for Job Classifications JACDP4 (Quality Systems Specialist, Level 4), and JADBP4 (Supplier Quality Specialist. Level 4)? *I should have been able to fill a vacant position for one of these Job Classifications for which I am qualified 18 months ago*.
>
> ==*Is there any way I can get access to the postings for Internally offered positions, so I can do my own searches? I am still a Boeing employee, and I need that resource now that I am considered disabled more than ever. If that s policy, where is it documented?*==
>
> *My total savings remaining (including funds borrowed from my VIP) are now $25.454, and ==I will be broke on approximately 4/12/17==.*

48

*Please expedite*

Bob

**Exhibit 37**, *supra* at Boeing/B_000565 (emphasis supplied).

101.    Crawford's response is fairly typical of Boeing's intransigent attitude and its continuous, active (negligent or intentional) misleading of Baker as to his rights under the ADA and under Boeing's written policy:

Hi Bob,

***You are to do your own job search*** of open positions available on the Boeing Employment Website . . . . ***I've explained this before that you will not have access to any internal only listing of jobs***. *This is not part of your ability to see right now as you are on an LOA.* ***Thats just Company policy*** *on your limited access right now. I cannot change that. This is not an arguable point*. I can send you limited information on what I find in our system that may be applicable to your skills if it is marked Internal only and I havent found any lately that are identified as such . .

**Exhibit 37**, *supra* at Boeing/B_000565 (emphasis supplied).

102.    Neither the ADA nor of the Boeing policy documents described herein say anything about a company being able to restrict or categorize "vacant positions".  Companies can make an "undue hardship" argument, but positions which are vacant must be offered to disabled employees, who get the position without competing for it if they can do the essential features. Accordingly, Crawford's statement highlighted above is actively (either negligently or intentionally) misleading as to Baker's rights.  **Exhibit 37**, Boeing/B_000565 (emphasis supplied).

103.    Crawford notes on January 4, 2017 that "active phase" of reassignment will continue to "approximately mid-February", and on January 5 that "a search of international openings for Italy did not show any job openings at this time with a detail quality." One would rightly deduce that Crawford searched only on that day in "Italy", and did not perform any other

49

search other than South Carolina. Any vacant positions in Louisiana, California, Washington state or elsewhere, for example, appropriate and suitable to Baker, passed by without Baker being given consideration, much less mandatory preference. **Exhibit 37**, *supra* at Boeing/B_000564.

104.    Crawford's note of her conversation with Baker on January 6, 2017 illustrates Baker's desperation, and the limited nature of her searches to "Italy" and South Carolina.  Either Crawford did not know it was possible to automate the job search so that it could be done "daily" as Baker wanted, or knew and purposefully failed to tell Baker:

> ***[Baker] asked about job search again and areas being searched and asked if I am looking everyday for him. I replied I frequently review on line jobs for a variety of employees*** that are currently in the reassignment process in both areas I serve. ***Advised EE that he can certainly look daily***, but right now there are no open jobs in SC to review.  Did on line search at EE's request during the phone call for the only two skill codes he is interested under Quality: JACDP4 and JACDP4. . . . Advised that I just did a review yesterday and there were no jobs in SC or Italy, for Quality which would incorporate those two codes. Advised EE that I am using the broader category of Quality just to make sure I can see the whole spectrum of jobs. . . . ***EE stated he thinks there are internal only jobs that are not being considered for him.*** . . . .

> ==***EE asked if some reqs open for like a day to two only. This is rare***==, and I have not seen that in a lo [*redacted or missing*]

> concerned we may have missed a job opening . . . .

> ***EE reminded me that he's been out for a long time and is burning down his savings and this is***\~ [redacted or missing]

> be put in this situation. I acknowledge that this must be difficult for EE . . . .

**Exhibit 37**, *supra* at Boeing/B_000564.

105.    Crawford's statement above that there were only "two skill codes [Baker] is interested under quality: JACDP4 and JACDP4," is belied by Baker's next email to Crawford, dated January 10, 2017, from which it is clear he will take an appropriate position, even if at a lower grade:

Just after we ended our phone call I thought of a way to make our Reassignment search even easier and broader.

1) Filter nothing out.
2) Enter Job Classification Code JACD (not JACDP4 that would only return hits for QSS4 s)
3) Enter Job Classification Code JADB (not JADBP4 that would only return hits for SQS4 s)

This process should take no more than a minute to cover both codes. If nothing comes up, then theres nothing available, and you're done, and you can move on to your next task for the day.

But we need to make sure first that leaving off the last 2 characters (P4) is still a valid entry.

***My rationale is that the requesting manager may be asking for at least a P3, but might be even happier to get a P4.***

Thanks, Bob

**Exhibit 37**, *supra* at Boeing/B_000563 (emphasis supplied). Frankly, it's indicative of the poor quality of the "assistance" Baker got from Boeing that Baker is instructing Crawford on the mechanics of the job search, whereas *she*, the HR "professional," with access to website search engine employees, should be providing expert assistance to *him*.

106.    Crawford's note on January 12, 2017 notes an additional "internal only" requisition, 1600021757, Id., apparently in Long Beach California. She states "this is an internal only posting." How many "internal only" positions suitable to Baker escaped Crawford's occasional searches?

107.    Another Crawford note on January 12, 2017 confirms Crawford's lack of expertise as to the careers website and how to conduct job searches, as well as *Baker's telling Crawford* of the ADA mandatory preference, rather than vice versa:

> ***Rec'd email from EE questioning again my job search information and process***. T/c from EE and reviewed the job search data and ***EE wishes to have a question asked to someone that knows more about the Careers@boeing.com site*** to answer

51

*why if sorting externally the system doesn't show the same Quality jobs by job code.* Will ask[] contact at Careers@boeing for a better explanation of the system filters etc . . . . *EE questions the system process of jobs listed and says even if a job is known about that EEOC requires us to place him in it. I explained that our process is under the ADA and a defined process which has been vetted already and we can only place him in a job that is "open" and that he is qualified to perform*, etc . . . . EE began to talk about how one sided this process is and that the company has done this to him and that no one has tried to help him over the course of this last year or so and they owe him a job and to restore him to where he was to avoid any further financial hardship on his part . . . .

**Exhibit 37**, *supra* at Boeing/B_000562 (emphasis supplied). Crawford (as with all other Boeing HR employees/contractors) failed to inform Baker that he was entitled to a ***mandatory preference*** and "undue hardship" analysis under Boeing clear written policy, see par. 29-35, *supra*, much less the ADA, which is a very significant (and misleading) omission of facts which she knew at the time, and purposefully withheld, or which she didn't know about, but should have known. In either case it is further evidence that Boeing actively (negligently or intentionally) misled Baker.

108. ***The Secret Email***. By mid-January, 2017, Baker had been without a job for 19 months, without salary for 10 months, living on his rapidly diminishing savings, and in desperate financial straits. Exasperated by the poor quality of the "assistance" he was receiving from Boeing HR/DMR, stonewalled by executives like Freeman and Tidmore, Baker reached out to one of his former colleagues in Composite Fab, supervisor Bart Giles, and called Mr. Giles on at least three occasions to seek help. Giles was uncertain and uncomfortable with these calls, being uncertain whether he was allowed to assist Baker, who was on LOA. Nevertheless, Giles was in receipt of an email sent by Boeing HR employee Shelley Bolt, with a "Quality Systems Specialist, Supplier Quality" position that sounded perfect for Baker based on Baker's lengthy experience as a QSS and with Supplier Quality. Though uncomfortable doing it, during a call with Baker at some time between Monday, January 16, 2017 and Thursday, January 19, 2017, Giles read the position description/email to Baker over the phone, while Baker took notes. Baker was elated,

since he had substantial experience in every feature of the job listed, particularly in auditing, and since it was in Charleston, was a "lateral" move, with the employee "staying in his/her current level and salary." That would have been perfect for Baker, and was a job for which he could perform all the duties. Baker referred to it as "the secret email", since it references a position that was not listed on the Boeing careers website, and therefore one which would not have been discovered in any job search performed by Baker or by Crawford. The secret email is attached as **Exhibit 71** , Boeing/B_001959-1961. Although Giles is not an addressee, he was in receipt of it.

109.    Baker's contemporaneous notes ("1/23/17") of his "c – <u>to Bart Giles</u> re - QSSfourSQS pos. not avail [call to Bart Giles regarding QSSIV supplier quality position not available]" are attached as **Exhibit 72**, (Baker 002717; Baker 002579 (Exhibit 40 to his deposition)). Baker 002717 are his notes of one of his calls with Giles, indicating the position was "not avail" but "get copy of email" (because Giles would not agree to forward the email to Baker). Baker 002579 document his attempts to follow up, his desperate plea to recruiter Jeremy Olmstead "***who can help me get HR to do their job?***", and indicate that he had had "no response from [Deborah Schuneman]" to his inquiry about the position, and has other indications of non-responsiveness from Boeing (e.g. "no RC" (return call); No Ans, LM (left message) to CB).

110.    The secret email indicates that "the deadline to express interest is Friday, January 20, 2017." Baker's email to Crawford dated the day *before* the deadline, on Thursday, January 19, 2017 at 8:50 AM is found at **Exhibit 37**, *supra* at Boeing/B_000561. It states:

> Vickie,
>
> ***It has come to my attention that there is a vacant position for which I am qualified being offered only via email internally here at Boeing South Carolina. It is not in the Careers website, and therefore has no requisition number.*** Have you been notified about it by the SSC Human Resource department that originated the email? ***It is identified as a position for a Quality System Specialist working in Supplier Quality. I have a long history in both organizations***.

The Human Resource contacts are:

Pamela Williams, Human Resource Manager 206-769-3259
Deborah Schuneman, Human Resource Generalist 843-259-8034
Shelly Bolt, Human Resource Generalist 843-261-3793

***In accordance with ADA regulations (summarized below), I expect to be offered
this position prior to the supposed deadline tomorrow, Friday January 20, 2017***.

***The ADA requires the employer to reassign the employee if there is a vacant
position available for which he is qualified, with or without reasonable
accommodation, and there is no undue hardship.***

**Exhibit 37**, *supra* at Boeing/B_000561 (emphasis supplied).

111.    Crawford's response on January 19, via email to Baker, states that the perfect

vacant position for Baker is in fact "***not open***," and suggests that Baker look instead at *entry* level

positions in Huntsville, Alabama:

Hi Bob,

I just spoke with Deb Schuneman, HRG after our phone call this morning and
briefly ***she told me that the job you are referring to is not open. So there is nothing
further that I can do here. I'm sorry about this matter***.

**Exhibit 37**, *supra* at Boeing/B_000561 1/19/17 email at 227 p.m., par. 1 (emphasis supplied).

112.    Baker sends Crawford a lengthy email that same day (copied to the HR report),

again telling her about Boeing's responsibilities under the ADA as to the "secret email" (though

still unaware of the mandate of Boeing's internal policies, having never been told by HR):

1/19/2017 Email from Bob to Vicki:

Vickie,
What are the details of this position? Did you request a copy of the email? Please
do so. What, if anything, did Ms. Schuneman say about the history of the
availability of this position? Did she even acknowledge that it existed? Why was it
not offered on Careers? How long had it been open? Why did BSC HRG not offer
it to me while it was still open? Do they take any responsibility as agents of "the
employer", Boeing, to "reassign the employee if there is a vacant position available
for which he is qualified"? Why is it no longer open? It was purportedly open until

January 20. And why do you say that "there is nothing further that I can do here"? *It does not appear to me that anyone takes the ADA [requirements] seriously, and that HRG SC is very much out of compliance with them. These are requirements, not suggestions.* Have you spoken with your management, or just taken the statement of Ms. Schuneman as gospel? If you are aware of lack of compliance, it is your duty to report it to your higher authorities.

KEY REQUIREMENT:
"Employer cannot mislead disabled employees who need reassignment about full range of vacant positions; nor can it post vacant positions for such a short period of time that disabled employees on medical leave have no realistic chance to learn about them."

I have been more than patient for 18 months waiting for someone at Boeing to provide me with a reasonable accommodation, while it appears that during that time period many vacant positions could have been offered to me. I therefore formally request answers to each of the questions above. I believe that I . . .

Email from Vicki to Bob:
Hi Bob, I can not elaborate on information regarding any job that is not a vacant position at this time and for which I do not have any further information on. *I simply verified the status with HR and that will have to be sufficient for you at this time.* We will continue our job search efforts for a few more weeks and if there is no change then this part of the process will be closed.

**Exhibit 73,** Boeing/B_000788. Baker again sends significant portions of Enforcement Guidance to Crawford, still to no avail. **Exhibit 74**, Boeing/B_001007-9

113.    Boeing HR's antagonistic attitude to Baker is demonstrated by Schuneman's email to HR Manager Pam Williams, on January 23, 2017.  Schuneman categorizes as "harassment" Baker's email to recruiter Jeremy Olmstead telling Olmstead Baker was out of work and had not been paid for months, was not being considered for jobs, had not been shown how to use the website, had not been considered for the "secret email", and Baker's sending Olmstead relevant selections from EEOC Enforcement Guidance.  Baker was begging HR to do its job, and to review the ADA and Enforcement Guidance, yet Schuneman writes Williams:

Pam- FYI-there has to be something we can do about this? He is harassing people.
Deb

**Exhibit 75** at Boeing/B_001738. Crawford's confusion and uncertainty as to the mechanics of the careers website job search platform is again manifest in her note of January 24, 2017:

> Just checking back in with you regarding the search feature on the Boeing Express when applying for jobs. I found out that the filter doesn't work for the job codes such as JACDP4 or JADBP4, as that filter for job number actually means the Requisition Number for example: 1700000623 Quality Specialist (Oklahoma). So terminology is important and can make a big difference.

**Exhibit 37**, *supra* at Boeing/B_000560.

114.    Baker sends an even more emphatic and desperate email addressing the same issues on January 25, 2017 to Vickie and the other members of the HR "Team, mentioning the "$50,000 loan" he had to take out." **Exhibit 76**, Boeing/B001004-5.  Baker notes the same issues as above, that despite his sending ADA law and Enforcement Guidance, and that Boeing is "grossly" in violation of the ADA, HR simply responds that they follow the "process" (a "process" which has destroyed Baker's career and retirement").  When she (and the "team") should have been calling in experts or reviewing the ADA and Boeing's internal policies of which their conduct proves them unfamiliar, HR Manager Pam Williams instead emails the "team"— "***Team, no need to respond to Mr. Baker***."  Id. (emphasis supplied).  HR Shelly Bolt took that instruction to heart, when Baker most needed help, responding on 2/20/17 to executive Warren Helm (who himself was passing the "hot potato" on responding to a Baker voicemail): "Hi Warren . . . ***we have been advised not to contact [Baker].***" **Exhibit 77**, Boeing/B001726 (emphasis supplied).

115.    Boeing's implicit bias against disabled employees is further demonstrated in the fact that in none of the job applications Baker filed during his attempts at reassignment was there any listing or notation of his disability and/or his mandatory preference required by the ADA and Boeing written policy, nor is there any mechanism on the careers website to provide for disability

preference or assistance.  Boeing admits the same: in its March 9, 2020 2nd supplemental

discovery responses, p. 9 last line, Boeing admits: Boeing "hiring managers do not have access

to a job applicant's medical and/or disability status." **Exhibit 78**,  How can "hiring managers"

give "mandatory preference" if they don't know the disability status of Boeing employees?

116.    Baker applied for many positions, and was not accepted for any of them, allegedly

on the basis that he was not the most "qualified." See e.g., **Exhibit 79**, Boeing/B000485-7,

describing requisition 1700010168 (the only "explanation" for any job denials provided to date).

Manager Doug French states:

> A total of 125 applicants were submitted to Careers@Boeing in response to the posting. Assessment of the these applications by the recruiter indicated that 51 of the 125 total applicants qualified as having met basic requirements for education and production experience. Eleven (11) of those 51 were existing managers, and forty (40) were nonmanagers. ***Robert Baker was included in that 51-name subset***. After intensive review of all 51 resumes by myself and the recruiter, 8 candidates were identified as potential interviewees. Criteria for selection included technical background and experience with the baseline build plan of the 787 Dreamliner at BSC or the development thereof, knowledge of the production system needs and opportunities across all MBU areas of the site, and proven project or functional leadership experience. A slightly longer list was held in reserve in case we were not successful in finding viable backfill candidates after 8 structured interviews. ***These were very clearly the 8 strongest applicants*** and  Mr. Baker was not identified as a potential interviewee.

(emphasis supplied).  French's decision and methodology conflict with the ADA and Boeing

written policy.  Nowhere in this discussion is there any mention of Baker's disability and his

mandatory preference as a disabled veteran. Baker was *entitled* to the vacant position if he could

perform the essential features, and it appears that he could, since he met "met basic requirements

for education and production experience."   EEOC uses a simple analogy--if the job requires

typing speed of 60 words per minute, and Baker can do that, he gets the job even if another

applicant types 100 words per minute.

117.   **Exhibit 80**, Boeing/B_000583; 591-4 contains numerous other examples of Boeing's failure to give Baker the ***mandatory preference*** to which he was entitled under the ADA and/or Boeing written policy as a disabled veteran.  This document includes some of the many positions for which Baker applied, including Requisitions 1700007358, 1700008198, 1700009192, 1700009193, 1700009327, 1700009770, 1700002488, 1700003128, and all state that "others more qualified" were selected rather than Baker.  Baker applied for and could have done these jobs.

118.   Crawford thereafter terminated the Reassignment on 2/20/17. **Exhibit 37**, *supra* at Boeing/B_000559.

119.    Had he known that Boeing would treat him as they did, Baker could have started his pension many months earlier.  Baker trusted Boeing to his detriment.

120.    On or about June 15, 2017, Boeing counsel Edward Rawl directed Plaintiff to have no further contact with any employee of Defendant besides him, effectively terminating Baker's chances of securing a vacant position.

121.    On or about this same date Rawl canceled Plaintiff's appointment with Defendant's management, stating that Defendant had already provided Plaintiff with a comprehensive and "robust" reassignment process, and stating (inaccurately) "Your visibility to those internal postings has always been available and I am sorry you misunderstood that process."  It was *Rawl* that was mistaken—clearly he must not have reviewed Vickie Crawford's correspondence with Baker. See, *supra*, e.g., par. 102.

122.   Boeing's failure to understand and/or negligent or willful blindness to the requirements of the ADA and its own written policy includes Mr. Rawl, its "Senior Counsel – Labor, Employment & Benefits Law Group." Rawl writes Baker on June 27, 2017:

I have also asked BSC quality leadership to reach out to hiring managers. However, I am not the hiring manager and ***no one at BSC controls whether you are deemed the most qualified candidate for a Boeing job outside of BSC***. ***Your experience and qualifications will be the determinative factor, and your alleged disability (as you describe below) won't be a relevant factor*** if you are qualified and can perform th'e job, with or without a reasonable accommodation.

**Exhibit 81** at Boeing/B_000116 (emphasis supplied). Rawl sends Baker a similar message the same day, telling him "I haven't made any promises to you about these positions and I have no idea how your qualifications compare to other applicants." Id. at Boeing/B_000117. Rawl's reference to "most qualified candidate" statement reflects Boeing's "tribal knowledge" and rigid, antagonistic approach to Baker's reassignment, and conflicts as a matter of law with the ADA[14] and Boeing's written policy. Baker does not have to be the "most qualified", only qualified. ***If Boeing's in-house counsel does not understand Boeing's own policy and the requirements of the ADA, is it surprising that Boeing executives and HR/DMR employees do not either?***

123.   Rawl's message came in response to Baker's request that Rawl inform hiring managers of Baker's disability status.   Baker became aware of the fact that Boeing Hiring Managers had no idea that he was disabled.   Rawl refused.

124.   Since Baker's pleas had fallen on deaf ears, and though distraught to give up his career, Baker was forced to retire so that he could start earning his pension and retirement, which he needed to live on.

---

[14] EEOC Q&A:

Q: "Does reassignment mean that the employee is permitted to compete for a vacant position?"

A: "No, reassignment means that the employee gets the vacant position if he/she is qualified for it. Otherwise, reassignment would be of little value and would not be implemented as Congress intended".  Enforcement Guidance, par. 29, p. 24.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES REGARDING BOEING FAILURES TO COMPLY WITH ADA FROM JUNE, 2015 TO OCTOBER 21, 2016

125.     Plaintiff filed a Charge of Discrimination (415-2017-00857) with the EEOC, **Exhibit 82, (EEOC Charge, Intake Questionnaire with Attachment)**, on August 17, 2017. Although plaintiff submits that the facts as described above constitute a "continuing pattern" of discrimination, and that he filed the EEOC charge within 300 days of his reasonable discovery of his causes of action, some courts have held (at least in Title VII cases) that charges must be filed within 180/300 days of the discriminatory act. *C.f. Ledbetter v. Goodyear*, 550 U.S. 618 (2007). The EEOC issued Plaintiff a "Right to Sue" letter on June 13, 2018, received by Baker on June 16, 2018.  Plaintiff filed a pro se Complaint on September 18, 2018, to bring a claim against Defendant for failure to accommodate a disability under the Americans with Disabilities Act of 1990 as codified 42 U.S.C. §§ 12112 to 12117("ADA").

126.     In the seminal case of *Zipes v. TWA*, 455 U.S. 385, 102 S.Ct. 1127, (1982), the Supreme Court held "filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling . . . The structure of Title VII, the congressional policy underlying it, and the reasoning of our cases all lead to this conclusion."

127.     The Fourth Circuit described equitable tolling of the 300-day filing deadline:

The doctrines of equitable tolling and equitable estoppel have a common origin; they are based primarily on the view that a defendant should not be permitted to escape liability by engaging in misconduct that prevents the plaintiff from filing his or her claim on time. As the Supreme Court explained in *Glus v. Brooklyn Eastern District Terminal*, 359 U.S. 231, 232-33, 79 S.Ct. 760, 761-62, 3 L.Ed.2d 770 (1959),

[N]o man may take advantage of his own wrong. Deeply rooted in our jurisprudence this principle has been applied in many diverse classes of cases by both law and equity courts and has frequently been employed to bar inequitable reliance on statutes of limitations.

> Equitable tolling applies where the defendant has wrongfully deceived or misled the plaintiff in order to conceal the existence of a cause of action. See *Lawson v. Burlington Industries*, 683 F.2d 862, 864 (4th Cir.1982) **. . . .**
>
> To invoke equitable tolling, the plaintiff must therefore show that the defendant attempted to mislead him and that the plaintiff reasonably relied on the misrepresentation by neglecting to file a timely charge  . . . .
>
> The statute of limitations will not be tolled on the basis of equitable estoppel unless the employee's failure to file in timely fashion is the consequence either of a deliberate design by the employer or of actions that the employer should unmistakably have understood would cause the employee to delay filing his charge.

*English v. Pabst Brewing Co*., 828 F.2d 1047 (4th Cir. 1987); *Weick v. O'Keefe*, 26 F.3d 467, 470 (4th Cir.1994)(equitable tolling justified where employer "lulled [the claimant] into inaction"); *Poteat v. Mack Trucks Inc*., 106 F.3d 391 (4th Cir. 1997); *Henderson, et al. v. AT & T Corporation*, 933 F. Supp. 1326, 1334-35 (S.D. Tx)("if, at the time of the adverse employment action, the employee did not have enough information to support filing a discrimination claim, the 300 day limitations period may be equitably tolled until the time the facts supporting a cause of action are or should be apparent to the employee" (citing *Blumberg v. HCA Management Co*., 848 F.2d 642, 644-45 (5th Cir. 1988)).

128.     Three hundred days before August 17, 2017 was Friday, October 21, 2016.

129.     Baker alleges herein that Boeing failed to comply with the ADA, and breached its agreement with him, between June 2015 and October 21, 2016 (and of course subsequent to that date as well), when, *inter alia*, it failed to consider him for reassignment and give him ***mandatory preference as a disabled veteran*** for vacant positions, and failed to consider whether LOA was "undue hardship" for Baker since it cut his salary to zero.. Because Boeing "actively" (either negligently or intentionally) misled Baker as to his rights (see, *supra*, e.g., pars. 37, 39, 46, 64, 65, 78, 102, 103, 107 and 108), equitable tolling is appropriate under *Zipes* and its progeny.  Until

his epiphany, in early November, 2016, Baker was unaware of the mandatory nature of the reassignment consideration to vacant positions required by the ADA, and Boeing HR employees consistently, continuously and "actively" (either intentionally or negligently) misled Baker as to his rights to a reassignment review, his entitlement to consideration for *all* vacant positions, and that "undue hardship" to him had to be considered prior to putting him on LOA. Had Baker known those facts actively concealed from him by Boeing during the period from June 2015 through October 21, 2016, he would have filed his charger earlier. As described above, when he investigated the law for himself, having previously relied (reasonably but mistakenly) on the *bona fides* and competence of Boeing employees, who should have been up to speed both on the ADA and Boeing's own internal written policies, and who had an obligation to assist and inform, Baker became aware of his rights. He filed his charge within 300 days of that realization, so equitable tolling is appropriate.

130.    To the extent that the court views the statute of limitations narrowly, and that the EEOC charge must be filed within 300 days of the discriminatory action by Boeing, Baker respectfully requests that based on the clear evidence that Boeing actively (intentionally or negligently) misled Baker as to his rights under the ADA, the deadline should be equitably tolled, and ADA violations occurring prior to October 21, 2016 should be considered by the Court.

## COUNT I—DISABILITY DISCRIMINATION: WRONGFUL TERMINATION
### (ADA)

131.    Each and every allegation set forth hereinabove is hereby repeated as if fully incorporated herein.

132.    Plaintiff was disabled, and Boeing knew he was disabled.

133.    Plaintiff was forced to retire, and/or discharged after requesting an accommodation and being refused.

134.    At time of discharge, Plaintiff was performing the job at a level that met Defendant's legitimate expectations, and/or could have performed one or more vacant positions for which he was not considered.

135.    The discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination.

136.    Defendant's conduct was willful, malicious, and done with reckless disregard for Plaintiff's rights under the ADA, warranting punitive/exemplary damages.

### COUNT II— DISABILITY DISCRIMINATION: FAILUIRE TO ACCOMMODATE REASONABLY
### *(ADA)*

137.    Each and every allegation set forth hereinabove is hereby repeated as if fully incorporated herein.

138.    Baker had a disability within the meaning of the ADA,

139.    Defendant had notice of Plaintiff's disability.

140.    Plaintiff was a qualified individual and could have performed the essential functions of multiple jobs for which vacancies existed with or without reasonable accommodation had he only been reassigned.

141.    Defendant refused to reassign Plaintiff to any of these vacancies, and/or to give him mandatory preference as a disabled veteran.

142.    Defendant failed to engage in the interactive process to assist Plaintiff in reasonably accommodating his disability.

Defendant's conduct was willful, malicious, and done with reckless disregard for Plaintiff's rights under the ADA, warranting punitive/exemplary damages.

## COUNT III— DISABILITY DISCRIMINATION: RETALIATION
### *(ADA)*

143.    Each and every allegation set forth hereinabove is hereby repeated as if fully incorporated herein.

144.    Plaintiff engaged in protected activity by requesting reasonable accommodation in the form of reassignment.

145.    Because of and very soon after engaging in this protected activity, Defendant refused to reassign Plaintiff and discharged Plaintiff.

146.    Defendant's conduct was willful, malicious, and done with reckless disregard for Plaintiff's rights under the ADA, warranting punitive/exemplary damages.

## COUNT IV—BREACH OF CONTRACT – REASONABLE ACCOMODATION, REASSIGNMENT & AFFIRMATIVE ACTION POLICY
### (South Carolina Law )

147.    Each and every allegation set forth hereinabove is hereby repeated as if fully incorporated herein.

148.    Defendant made one or more express contractual promises to its employees, in exchange for valid consideration, including the services of Plaintiff, in multiple documents, including without limitation Procedure PRO-784 that if there is not an ***effective*** reasonable accommodation in an employee's current position, for example if an employee cannot perform the essential physical features of his job, then reassignment to a vacant position will be considered.  This "affirmative action" policy means what it says--If an employee meets the qualifications for a vacant position with or without reasonable accommodation, the employee ***must*** be placed in that position as long as there is no "undue hardship" to the Company. Boeing's POL-5/Affirmative Action and Reassignment Process Flow, Boeing/B_000392-99", and other policies referenced supra par 29-35, contain additional contractual promises breached by Boeing

as described herein.  For example, employees are entitled to "undue hardship" and/or "effective accommodation" analysis prior to being placed on LOA.  Plaintiff incorporates herein by reference the discussion supra at par. 36 regarding the split in the Circuits, and if the Court finds that Boeing's policies go further than the ADA requires.

149.    Defendant's policies do not contain a conspicuous and appropriate disclaimer that meets the requirements of S.C. Code Ann. § 41-1-110.

150.    Defendant was notified in June 2015 of Plaintiff's imbalance disability that prevented him from working outside of an office environment, and prevented him from performing the essential physical tasks in the "Cage."  Boeing was also well aware that Plaintiff requested reassignment as early as June, 2015 on that basis.  Boeing failed to meet its contractual obligations, including that of mandatory reassignment, consideration for all suitable vacant positions, and undue hardship and/or "effective accommodation" analysis. Boeing failed to timely consider Baker for reassignment, and when they finally did, more than 18 months after they were obligated to, they botched it badly and breached their obligations to Baker, with devastating repercussions.

151.    Plaintiff applied to numerous job vacancies, for each of which he was qualified and the essential functions of each of which he could have performed, but Defendant did not reassign Plaintiff to any of these.  There were also many vacant positions for which Plaintiff could have performed the essential features, but which were never made available to Plaintiff, on the spurious basis that the vacant positions were "not open," "internal only," "no post" or "spoken for."  Under the terms of his agreement with Boeing, Baker was entitled to mandatory preference for these positions as disabled veteran, but did not receive the same.

152.     As a direct and proximate result of Boeing's breach of its contractual promises, including to reassign Plaintiff to a vacant position he was qualified for, and to consider him for *all* available and suitable positions, Plaintiff has suffered and continues to suffer lost wages and benefits, and lost advancement opportunities.

## COUNT V – BREACH OF CONTRACT – ANTI-RETALIATION POLICY
### (South Carolina State Law)

153.     Each and every allegation set forth hereinabove is hereby repeated as if fully incorporated herein.

154.     Defendant made an express contractual promise to its employees, including Plaintiff, in Boeing's "Anti-Retaliation Policy" that prohibits retaliation against persons who in good faith report a matter they believe to be a violation of law or ethics.   (**Exhibit 83,** Boeing/B_001066 - 001067); see, also, supra, par. 31.

155.     Defendant's policies do not contain a conspicuous and appropriate disclaimer that meets the requirements of S.C. Code Ann. ¬ß 41-1-110.

156.     Plaintiff complained in June, 2015 about Tidmore ordering Wes Murphy to lower Baker's performance evaluations, which was the "reporting of unethical conduct." See par. 31, supra.  Baker was thereby engaging in a state law and/or Boeing policy analogue of "protected activity."

157.     Tidmore and/or other supervisors were aware that Baker had made such complaints, and, in retaliation for such "protected activity," took negative employment action against Baker, including his transfer to the "Cage," and the failure to transfer him back to the Cage when Baker requested a transfer.

158.     Such negative employment action substantially damaged Baker. Defendant Boeing instead put Plaintiff on mandatory leave of absence, and then forced him out.

159.     As a direct and proximate result of Boeing's breach of its contractual promise not to retaliate against persons who in good faith report a matter they believe to be a violation of law or ethics, Plaintiff has suffered and continues to suffer lost wages and benefits, and lost advancement opportunities.

### COUNT VI – BREACH OF CONTRACT – PROGRESSIVE DISCIPLINE
### (South Carolina State Law)

160.     Each and every allegation set forth hereinabove is hereby repeated as if fully incorporated herein.

161.     Defendant made an express contractual promise to its employees, including Plaintiff, as consideration for their services, that they are entitled to progressive discipline, including warnings prior to the taking of negative employment action.

162.     Defendant's policies do not contain a conspicuous and appropriate disclaimer that meets the requirements of S.C. Code  Ann. ¬ß 41-1-110.

163.     Boeing supervisors and HR employees, as described above, viewed Baker's transfer to the "Cage" as a demotion and/or negative "issue," which in fact it was. See, supra, par. 52 and 59.  He was entitled to progressive discipline, including warnings, prior to such action, but Boeing failed to do the same.

164.     As a direct and proximate result of Boeing's breach of its contractual promise of progressive discipline, Plaintiff has suffered and continues to suffer lost wages and benefits, and lost advancement opportunities.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for judgment against Defendant, and for legal, equitable, compensatory, special, consequential, and punitive damages, including injunctive relief

to curb Boeing's discrimination, and including front pay and back pay and liquidated damages, tangible and intangible damages (such as emotional suffering, mental anguish, and loss of enjoyment of life), together with the costs of this action and attorneys' fees, as provided by federal law **and state law**, prejudgment and post judgment interest, and for such other and further relief as this Court may deem just and proper.

Plaintiff requests that these claims be tried by a jury.

Dated:  July 21, 2020                    Respectfully submitted,

 /s/ Ben Le Clercq
Ben Le Clercq
(S.C. Bar #65754, U.S. District Court # 7453)
David D. Ashley
(S.C. Bar #76206, U.S. District Court #10220)
Le Clercq Law Firm
708 South Shelmore Blvd. #202
Mount Pleasant, SC 29464
Phone (843) 722-3523
Fax (843) 352-2977
Ben@LeClercqLaw.com
David@LeClercqLaw.com
*Counsel for Plaintiff*

I, Robert Baker, do hereby declare under penalty of perjury, that the allegations set out in this complaint and true to the best of my knowledge, information and belief.

Date 4/20/2020 RBBaker