**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| Robert Baker,[1] | ) | Civil Action No. 2:18-02574-RMG-MGB |
| | ) | |
| Plaintiff, | ) | |
| | ) | **ORDER AND** |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| The Boeing Company, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff filed this action alleging failure to accommodate under the Americans with

Disabilities Act ("ADA") and later amended his complaint to include discriminatory

discharge and retaliation under the ADA, and state-law breach of contract claims. (Dkt.

No. 1; Dkt. No. 14; Dkt. No. 135.) This matter is before the Court upon the parties' cross-

motions for summary judgment,[2] (Dkt. No. 206; Dkt. No. 221), Defendant's Motion to

Strike (Dkt. No. 256), and Defendant's Partial Motion for Summary Judgment as to

Plaintiff's breach of contract claim (Dkt. No. 275). Pursuant to the provisions of Title 28,

United States Code, Section 636(b)(1) and Local Rule 73.02(B)(2)(g), D.S.C., all pretrial

matters in employment discrimination cases are referred to a United States Magistrate

Judge for consideration. For the reasons set forth below, the undersigned orders that

Defendant's Motion to Strike (Dkt. No. 256) be granted, and recommends that Defendant's

---

[1] On May 12, 2021, Plaintiff's counsel entered a Suggestion of Death of Plaintiff Robert B. Baker. (Dkt. No. 283.) In this filing, Plaintiff's counsel explained that they are working with Plaintiff's family members to appoint a personal representative. (*Id.* at 1.) Plaintiff's counsel also claimed that the causes of action asserted in this lawsuit survive Plaintiff's death. (*Id.*) The undersigned issues this Order and Report and Recommendation under the assumption that Plaintiff's claims survive him. The undersigned notes that Plaintiff's counsel has 90 days following the date on which the Suggestion of Death was served to file a motion for substitution. Fed. R. Civ. P. 25(a)(1). If Plaintiff's counsel does not file such motion within the required timeframe, Plaintiff's action will be dismissed. *Id.*

[2] Plaintiff's Motion for Summary Judgment (Dkt. No. 221) argues for summary judgment in Plaintiff's favor solely with respect to Plaintiff's failure to accommodate claim.

1

Motion for Summary Judgment (Dkt. No. 206) be granted in part and denied in part, Plaintiff's Motion for Summary Judgment (Dkt. No. 221) be denied, and Defendant's Partial Motion for Summary Judgment (Dkt. No. 275) be granted.

## PROCEDURAL HISTORY

Plaintiff filed his initial complaint against Defendant on September 18, 2018, alleging failure to accommodate under the ADA. (Dkt. No. 1.) On December 11, 2018, Plaintiff filed an amended complaint to add wrongful termination and retaliation claims. (Dkt. No. 14.) Defendant filed an answer to Plaintiff's amended complaint on February 12, 2019. (Dkt. No. 22.) The next day, the Court issued a conference and scheduling order for the case. (Dkt. No. 25.)

After requesting and receiving leave to further amend his complaint, Plaintiff filed a Second Amended Complaint on July 21, 2020. (Dkt. No. 135.) On August 4, 2020, Defendant filed its Answer to Plaintiff's Second Amended Complaint, along with a Partial Motion to Dismiss, and a Motion to Strike certain portions of the Second Amended Complaint. (Dkt. No. 152; Dkt. No. 153; Dkt. No. 154.) On September 2, 2020, the undersigned issued an Order and Report and Recommendation ordering that Defendant's Motion to Strike be granted in part and denied in part and recommending that Defendant's Motion to Dismiss be granted in part and denied in part. (Dkt. No. 152.) On September 23, 2020, U.S. District Court Judge Richard M. Gergel adopted the undersigned's Report and Recommendation and, in doing so, dismissed Plaintiff's state-law breach of contract claims in their entirety. (Dkt. No. 180.) Plaintiff subsequently filed a Motion for Reconsideration of Judge Gergel's September 23, 2020 Order and Opinion. (Dkt. No. 185.)

On October 29, 2020, the parties filed a Joint Motion for Leave to File Excess Pages and Establish a Modified Briefing Schedule with respect to their dispositive motions. (Dkt. No. 198.) The Court granted the motion in part on November 3, 2020. (Dkt. No. 201). On November 6, 2020, Defendant filed a Motion for Summary Judgment on Plaintiff's ADA claims (Dkt. No. 206) and a Motion for Summary Judgment on Defendant's counterclaim (Dkt. No. 209). Plaintiff filed a Motion for Summary Judgment on his failure to accommodate claim on November 6, 2020 but was instructed by the Court to refile the Motion because Defendant could not access Plaintiff's Memorandum in Support. (Dkt. No. 220.) Plaintiff refiled his Motion and Memorandum in Support on November 13, 2020. (Dkt. No. 221.) The parties requested and received a further modified briefing schedule. (Dkt. No. 223; Dkt. No. 224; Dkt. No. 226; Dkt. No. 227.)

On December 1, 2020, Plaintiff filed his responses to Defendant's Motions for Summary Judgment (Dkt. No. 233; Dkt. No. 237) and Defendant filed its response to Plaintiff's Motion for Summary Judgment (Dkt. No. 236). On December 11, 2020, Defendant filed its replies to Plaintiff's responses to its Motions for Summary Judgment (Dkt. No. 248; Dkt. No. 249) and Plaintiff filed his reply to Defendant's response to his Motion for Summary Judgment (Dkt. No. 251). On December 22, 2020, Plaintiff filed a Notice of Reliance on Supplemental Authority which included a new exhibit, an amended exhibit, and examples of cases that cite to certain Enforcement Guidance from the Equal Employment Opportunity Commission ("EEOC"). (Dkt. No. 255.) Defendant filed a Motion to Strike the Notice of Reliance on December 21, 2020, arguing that the filing constitutes an impermissible sur reply. (Dkt. No. 256.) Plaintiff filed a response to

Defendant's Motion to Strike on January 14, 2021 (Dkt. No. 259), to which Defendant timely replied (Dkt. No. 260).

On March 19, 2021, the Court ordered that Plaintiff's Motion for Reconsideration be granted in part, and that Plaintiff's state-law breach of contract claim with respect to Defendant's internal anti-retaliation policy (Count V of the Second Amended Complaint) be reinstated. (Dkt. No. 262.) Because the parties' cross-motions for summary judgment did not address this claim, the Court instructed Defendant to file a supplemental motion for summary judgment limited to this reinstated claim by April 19, 2021. (Dkt. No. 263.) Defendant timely filed its supplemental Partial Motion for Summary Judgment. (Dkt. No. 275.) Plaintiff filed his response on April 26, 2021. (Dkt. No. 278.) Accordingly, the motions before the Court are ripe for disposition. As the Court finds that the issues have been adequately briefed, it has determined that oral argument is not necessary. *See* Local Civ. Rule 7.06 (D.S.C.).

## **FACTUAL SUMMARY**[3]

This action arises from Plaintiff's employment with Defendant from 2012 to 2018. (Dkt. No. 135 at 2−3.)[4] During that time, Plaintiff performed various engineering-related jobs, including as a composite fabrication quality systems specialist and as a final assembly and delivery employee. (*Id*.) Plaintiff has a disability which posed no issues in his job as a composite fabrication quality systems specialist but precluded him from doing the manual labor required as a final assembly and delivery employee. (*Id*. at 2.) Plaintiff requested a reasonable accommodation on account of his disability. (*Id*. at 2−3.) He contends that

---

[3] The facts set forth herein are mutually agreed upon, except where otherwise noted.
[4] This Report and Recommendation reflects the pagination assigned by the Court's automated docketing system.

Defendant failed to properly accommodate him under the ADA and its own internal policies. (*Id*.) Plaintiff further contends that Defendant discriminated and/or retaliated against him by demoting him and requiring him to take a leave of absence that led to the end of his employment. (*Id*. at 7−10.)

More specifically, Plaintiff began working for Defendant as a Quality Systems Specialist, Level 4, ("QSS4") in the composite fabrication department in January of 2012. (Dkt. No. 206 at 5; Dkt. No. 221-2 at 9.) In this role, Plaintiff processed nonconforming materials and determined whether the materials should be accepted, reworked, returned to the supplier, or scrapped. (Dkt. No. 206 at 5.) This was an "exempt" position that did not require manual labor. (Dkt. No. 221-2 at 9.) Plaintiff was reassigned to Defendant's material review segregation area ("MRSA") in August of 2014.[5] (Dkt. No. 206 at 6; Dkt. No. 221-2 at 9.) His new role required manual labor, including moving boxes and pushing "pallet jacks." (Dkt. No. 206 at 8; Dkt. No. 221-2 at 12.)

In June of 2015, Plaintiff fell while working and suffered an occupational injury. (Dkt. No. 206 at 9; Dkt. No. 221-2 at 12.) Soon after, Plaintiff submitted documentation of medical restrictions (including, *inter alia*, peripheral neuropathy and chronic disequilibrium) that prevented him from working in MRSA.[6] (Dkt. No. 206 at 9.) He requested that Defendant transfer him back to the composite fabrication department or to a similar position that did not require manual labor. (Dkt. No. 221-2 at 12.) Instead,

---

[5] Defendant contends that Plaintiff, along with several colleagues from the composite fabrication department, was reassigned "due to a new business need." (Dkt. No. 206 at 6.) Defendant claims that Plaintiff was selected for reassignment because he was "uniquely qualified" for the position "due to his experience working with non-conforming parts." (*Id*.) Plaintiff, however, contends that he was reassigned in retaliation for his complaints about safety issues and inadequate on-the-job training procedures. (Dkt. No. 135 at 9−11; Dkt. No. 221-2 at 9−11.)

[6] Defendant contends that the documentation Plaintiff submitted in June of 2015 detailed temporary medical restrictions. (Dkt. No. 206 at 9.) Plaintiff contends that the documentation indicated long term medical conditions and, therefore, permanent restrictions. (Dkt. No. 221-2 at 12−14.)

Defendant assigned him to "light duty" work in MRSA.[7] (Dkt. No. 206 at 10.) This "light duty" work did not require Plaintiff to perform any of the activities prohibited by his physician. (*Id.*)

Plaintiff provided Defendant with additional documentation regarding his medical restrictions on June 25, 2015.[8] (*Id.*) Plaintiff was then placed on a medical leave of absence. (Dkt. No. 206 at 10; Dkt. No. 221-2 at 19.) When Plaintiff returned from his leave of absence, he was assigned to a "light duty" project. (Dkt. No. 206 at 12; Dkt. No. 221-2 at 19.) The project ended on October 1, 2015, at which time Plaintiff was placed back on medical leave. (Dkt. No. 206 at 12; Dkt. No. 221-2 at 19.)

In August of 2016, Plaintiff submitted further documentation regarding his medical restrictions. (Dkt. No. 206 at 14; Dkt. No. 221-2 at 19.) This documentation explicitly stated that Plaintiff's restrictions were permanent. (Dkt. No. 206 at 14; Dkt. No. 221-2 at 19.) Upon receipt of this documentation, Defendant asked Plaintiff to clarify his restrictions.[9] (Dkt. No. 206 at 14; Dkt. No. 221-2 at 19.)

In late October of 2016, Plaintiff was referred to a "Reassignment Focal" (Vickie Crawford) to begin the reassignment process. (Dkt. No. 206 at 15; Dkt. No. 221-2 at 20.) For ninety days,[10] Plaintiff worked with Ms. Crawford to find a suitable position for his

---

[7] Defendant states that it provided light duty work "to accommodate his temporary medical restrictions" from June 10, 2015 to June 24, 2015. (Dkt. No. 206 at 10.) Plaintiff does not mention this in his factual summary. (Dkt. No. 221-2 at 9−26.)

[8] Again, Plaintiff does not mention this in his factual summary. (Dkt. No. 221-2 at 9−26.) However, he does not contest that he gave this additional documentation to Defendant. (*See id.*) Defendant states that this documentation noted that Plaintiff was precluded from working through July 24, 2015. (Dkt. No. 206 at 10.) On the other hand, Plaintiff contends that he was "cleared for work from June 29, 2015 forward." (Dkt. No. 221-2 at 18.)

[9] Defendant states that Plaintiff's restrictions were unclear as to his ability to perform overhead work and to lift/carry certain weights, and as to his need for sedentary work. (Dkt. No. 206 at 15, n.11.) Plaintiff, on the other hand, contends that his medical restrictions were quite clear and that Defendant's request for clarification that "sedentary means sedentary" was a dilatory tactic. (Dkt. No. 221-2 at 19.)

[10] Plaintiff contends that this period lasted only sixty days. (Dkt. No. 221-2 at 7.) However, the record reflects a ninety-day reassignment period. (*See generally* Dkt. No. 206-18.)

reassignment. (Dkt. No. 206 at 16.) At the end of the ninety-day reassignment period, Plaintiff had not secured a new position. (*Id*. at 22.) As a result, Defendant placed Plaintiff on extended medical leave and instructed him that he could "continue to perform his own job searches and submit applications while he remained on leave of absence." ( *Id*.)

In June of 2017, Plaintiff received a layoff notice explaining that his position with Defendant "would be suppressed" in August; however, Plaintiff's effective layoff date was delayed because he was on medical leave. (Dkt. No. 206 at 24; Dkt. No. 237 at 65.) Before his layoff took effect, Plaintiff retired.[11] (Dkt. No. 206 at 24; Dkt. No. 237 at 20, 39, 55.)

## **LEGAL STANDARD**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When a party fails to establish the existence of an element essential to that party's case, there is no genuine issue of material fact and the movant is entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

---

[11] The parties seem to disagree regarding when and how Plaintiff's employment with Defendant ended. Defendant argues that "Plaintiff officially resigned from his position in March of 2018, taking his full retirement benefits retroactive to January 1, 2018." (Dkt. No. 206 at 24.) Plaintiff argues that he was "forced to retire and to get money from his pension to survive." (Dkt. No. 237 at 61.) Plaintiff argues that he continued to seek reassignment and seems to contest Defendant's characterization that he retired in March of 2018. (*Id*. at 66, n.36.) However, Plaintiff's testimony confirms that he retired in March 2018, retroactive to January 2018. (Dkt. No. 206-1 at 39.)

In ruling on a motion for summary judgment, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in that party's favor.'" *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999) (quoting *Anderson*, 477 U.S. at 255); *see also Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123–24 (4th Cir. 1990). "Although the Court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013) (citing *Anderson*, 477 U.S. at 252; *Stone v. Liberty Mutual Ins. Co.*, 105 F.3d 188, 191 (4th Cir. 1997)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. "When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal citations omitted). Thus, "each movant bears the burden of establishing that no genuine issue of material fact exists." *Shaw Constructors v. ICF Kaiser Engineers, Inc.*, 395 F.3d 533, 538–39 (5th Cir. 2004).

## **DISCUSSION**

### I.     **Cross-Motions for Summary Judgment**

As noted above, Plaintiff has twice amended his original complaint to encompass a total of six causes of action under the ADA and South Carolina state law. (Dkt. No. 1; Dkt. No. 14; Dkt. No. 135.) This Court dismissed all of Plaintiff's state-law causes of action, (Dkt. No. 180), but subsequently reinstated Plaintiff's state-law breach of contract claim

with respect to Defendant's anti-retaliation policy (Dkt. No. 262). Accordingly, Plaintiff's

remaining causes of action are:

- Count I for discriminatory discharge in violation of the ADA;[12]
- Count II for failure to accommodate in violation of the ADA;
- Count III for retaliation in violation of the ADA; and
- Count V for breach of contract in violation of South Carolina state law.

(*See generally* Dkt. No. 135.)

Defendant asserts that it is entitled to summary judgment as to all of Plaintiff's

remaining claims. (Dkt. No. 206 at 4.) Specifically, Defendant argues that: (1) certain of

Plaintiff's claims are subject to dismissal because they fall outside of the statute of

limitations; (2) Plaintiff's retaliation claim is subject to dismissal because Plaintiff failed

to administratively exhaust such claim prior to filing this civil action; (3) Plaintiff's claims

of discriminatory discharge and retaliation are legally insufficient because Plaintiff has not

provided evidence of pretext; and (4) Plaintiff's breach of contract claim is untimely and

not based on an enforceable contract. (*Id*.; Dkt. No. 275 at 1.) In contrast, Plaintiff asserts

that genuine issues of material fact preclude this Court from granting summary judgment

in Defendant's favor. (Dkt. No. 237 at 66.)

Plaintiff further contends that he is entitled to summary judgment as to his failure

to accommodate claim.[13] (Dkt. No. 221-2 at 5.)  Plaintiff argues that he must prevail on

---

[12] Plaintiff describes this claim as "Disability Discrimination: Wrongful Termination" in his Second
Amended Complaint. (Dkt. No. 135.) However, Plaintiff's allegations and legal arguments make clear that
he intends to bring a cause of action for discriminatory discharge under the ADA. (*See generally* Dkt. No.
135; Dkt. No. 237.)

[13] The undersigned notes that Plaintiff's Response in Opposition (Dkt. No. 237) to Defendant's Motion for
Summary Judgment (Dkt. No. 206) repeatedly states that genuine issues of fact exist with respect to
Plaintiff's failure to accommodate claim. (*See, e.g.*, Dkt. No. 237 at 66, stating "at a minimum, there are
genuine issues of material fact with regard to Plaintiff's ADA claims for *failure to accommodate*,
discriminatory discharge, and retaliation . . . ." (emphasis added).) As noted herein, summary judgment
shall be granted only "if the movant shows that there is no genuine dispute as to any material fact . . . ."
Fed. R. Civ. P. 56(a). Plaintiff's assertions that there are genuine issues of material fact regarding his
failure to accommodate claim undermine the arguments set forth in his Motion for Summary Judgment

this claim as a matter of law because Defendant failed to provide him with an effective reasonable accommodation. (*See generally id*.)

The undersigned considers the parties' arguments, below.

## A. ADA Claims[14]

### 1. Exhaustion and Timeliness

#### a. Retaliation Claim

As noted above, Plaintiff brings three causes of action under the ADA: discriminatory discharge (Count I), failure to accommodate (Count II), and retaliation (Count III). (Dkt. No. 135.) Defendant argues that Plaintiff failed to administratively exhaust his claim for retaliation under the ADA and is therefore barred from asserting such claim in this litigation. (Dkt. No. 206 at 25−28.) Defendant notes that Plaintiff asserted a single claim of disability discrimination for failure to accommodate in the charge he filed with the EEOC without checking the box for retaliation or delineating a retaliation claim in the narrative explanation of his charge. (*Id*. at 26.) In response, Plaintiff claims that Defendant incorrectly contends that Plaintiff did not file a charge for retaliation which "checked the box" for discrimination. (Dkt. No. 237 at 14.) Plaintiff argues that he filed a

---

(Dkt. No. 221) (*i.e.*, that no genuine issues of fact exist as to his failure to accommodate claim and he should therefore be granted summary judgment.) Nonetheless, the undersigned has construed Plaintiff's assertions in his Response in Opposition (Dkt. No. 237) to be arguments in the alternative to those set forth in his Motion for Summary Judgment (Dkt. No. 221) and has considered them accordingly.

[14] At the outset, the undersigned notes that Plaintiff makes various allegations relating to Defendant's on-the-job training policies throughout his complaint and briefings. (*See generally* Dkt. No. 135; Dkt. No. 221; Dkt. No. 237.) Plaintiff filed an AIR21 complaint alleging that Defendant failed to implement federally mandated on-the-job training procedures, but it was denied as untimely. (Dkt. No. 209 at 9.) Plaintiff also filed complaints with the Federal Aviation Administration and the Occupational Safety and Health Administration relating to Defendant's alleged infractions. (Dkt. No. 233 at 7.) Although the undersigned recognizes Plaintiff's frustration with his lack of a federal remedy for Defendant's supposed infractions, the undersigned emphasizes that the current litigation relates *solely to Defendant's alleged violations of the ADA*. (Dkt. No. 135.) As such, any violations of federally mandated safety procedures, and any mistreatment Plaintiff experienced as a result of his complaints regarding such violations, is outside the scope of this lawsuit.

charge for retaliation because he checked the "retaliation" box on the second page of his Intake Questionnaire Form. (*Id*.) Plaintiff further contends that "the pattern of conduct described in [his] EEOC intake submission attachment when read together with his check marks for discrimination and retaliation reasonably demonstrates a claim for retaliation." (*Id*. at 15.)

The ADA prohibits an employer from discriminating "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). The ADA requires that a plaintiff exhaust his administrative remedies by filing a charge of discrimination with the EEOC before filing suit. *Sydnor v. Fairfax County, Va.*, 681 F.3d 591, 593 (4th Cir. 2012). The Supreme Court recently held that administrative exhaustion is not a jurisdictional prescription delineating the adjudicatory authority of courts; however, exhaustion remains mandatory in the sense that a court must enforce the rule if a party properly raises it. *Fort Bend County, Tx. v. Davis*, 139 S. Ct. 1843, 1849−51 (2019).

The Fourth Circuit has explained:

The filing of an administrative charge is not simply a formality to be rushed through so that an individual can quickly file his subsequent lawsuit. Rather, Congress intended the exhaustion requirement to serve the primary purposes of notice and conciliation.

First, an administrative charge notifies the employer of the alleged discrimination. This notice gives the employer an initial opportunity to voluntarily and independently investigate and resolve the alleged discriminatory actions. It also prevents the employer from later complaining of prejudice, since it has known of the allegations from the very beginning.

Second, the exhaustion requirement initiates agency-monitored settlement, the primary way that claims of discrimination are resolved. . . . The EEOC's role . . . is thus critical because it can promote voluntary settlement in a manner that a more adversarial process cannot.

*Chacko v. Patuxent Inst.*, 429 F.3d 505, 510 (4th Cir. 2005) (internal citations omitted). Therefore, as a general rule, the scope of a subsequent lawsuit "is defined by the scope of the administrative charge from which it arises and from any findings that arise out of the investigation of the charge." *EEOC v. General Elec. Co.*, 532 F.2d 359, 365 (4th Cir. 1976); *see also Johnson v. Mabus*, No. 2:16-cv-2073-RMG, 2017 WL 3037373, at *3 (D.S.C. July 18, 2017) ("Thus, the allegations encompassed in an EEOC charge determine the scope of a plaintiff's subsequent federal lawsuit."). Accordingly, only those claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent lawsuit. *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 962–63 (4th Cir. 1996) (sexual harassment and discriminatory pay and benefits claims dismissed because EEOC complaint alleged only a failure to promote); *see also Chacko*, 429 F.3d at 509 (noting that "factual allegations made in formal litigation must correspond to those set forth in the administrative charge").

The Fourth Circuit has carved out a limited exception to the general exhaustion requirement. The exception allows a plaintiff to "raise a retaliation claim for the first time in federal court without exhausting his administrative remedies if the discrimination complained of is 'like or related to allegations contained in the charge and growing out of such allegations during the pendency of the case before the Commission.'" *Mezu v. Morgan State Univ.*, 367 F. App'x 385, 389 (4th Cir. 2010) (quoting *Nealon v. Stone,* 958 F.2d 584, 590 (4th Cir. 1992)). In turn, district courts may hear claims for the first time if they are "reasonably related to the original complaint" and "developed by reasonable investigation

of the original complaint." *Stewart v. Iancu*, 912 F.3d 693, 706 (4th Cir. 2019) (quoting *Chacko*, 429 F.3d at 506).

Here, the undersigned finds that Plaintiff's retaliation claim was not properly exhausted. First, Plaintiff did not check the retaliation box on his EEOC charge. (Dkt. No. 206-37 at 2; Dkt. No. 238-32 at 1.) On his Intake Questionnaire Form, he checked the disability, age, and retaliation boxes, then crossed out the age and retaliation boxes and drew a large square around the disability box. (Dkt. No. 206-37 at 6; Dkt. No. 238-32 at 5.) Defendant asserts that these actions show a "mindful decision to forgo pursuing a retaliation claim." (Dkt. No. 249 at 4, n.3.) Plaintiff, on the other hand, argues that there is no testimony in the record as to who crossed out the age and retaliation boxes and drew a square around the disability box. (Dkt. No. 237 at 14−15.) Plaintiff asserts that "even assuming it was Baker, the interpretation and 'weighing' of such evidence is for the jury." (*Id.* at 15.) However, contrary to Plaintiff's assertions, "any claims raised in the initial questionnaire but not in the actual administrative charge itself . . . are not properly exhausted" as a matter of law. *Toro v. Sci. Applications Int'l Corp.*, No. 2:12-cv-1833-DNC-BM, 2012 WL 7176826, at *2 (D.S.C. Dec. 7, 2012), *adopted*, 2013 WL 652568 (D.S.C. Feb. 21, 2013) (citing *Middleton v. Motley Rice, LLC*, No. 2:08-cv-3256-CWH, 2010 WL 3167360, at *6 (D.S.C. Aug. 9, 2010)).

As for the narrative description in Plaintiff's EEOC charge, Plaintiff does not mention retaliatory actions or intent. (Dkt. No. 206-37 at 2−3; Dkt. No. 238-32 at 1−2.) Instead, Plaintiff's EEOC charge centers around Defendant's failure to accommodate him.[15] (*See generally* Dkt. No. 206-37; Dkt. No. 238-32.) Plaintiff wrote that he was

---

[15] Plaintiff's Intake Questionnaire and the attachments thereto also center around Defendant's failure to accommodate him. (Dkt. No. 206-37 at 4−15; Dkt. No. 238-32 at 3−14.) Still, Plaintiff argues that "the

involuntarily transferred in 2014 and that he requested to be placed back in his old position. (Dkt. No. 206-37 at 2; Dkt. No. 238-32 at 1.) He explained that he went on short-term disability in 2015 and began applying for different positions in 2016. (Dkt. No. 206-37 at 2; Dkt. No. 238-32 at 1.) He described that he applied for twenty to thirty positions with only one call back. (Dkt. No. 206-37 at 2; Dkt. No. 238-32 at 1.) He stated that he was denied the reasonable accommodation of a transfer and that management did not give him a reason for their failure to accommodate him. (Dkt. No. 206-37 at 3; Dkt. No. 238-32 at 2.)

Finally, Plaintiff does not argue that he was retaliated against for filing his EEOC charge. Rather, he contends that he was retaliated against on account of his request for an accommodation. (Dkt. No. 135 at 64.) He requested an accommodation well before he filed his EEOC charge. (Dkt. No. 206-37 at 2; Dkt. No. 238-32 at 1.) Plaintiff also received notice of his termination in June of 2017, prior to filing his EEOC charge in August of 2017. (Dkt. No. 206-37 at 2; Dkt. No. 237 at 59; Dkt. No. 238-32 at 1.) Accordingly, Defendant could not have retaliated against Plaintiff on account of Plaintiff filing his EEOC charge. Because Plaintiff was fully aware of the facts underlying his retaliation claim when he filed his EEOC charge, he cannot utilize the Fourth Circuit's limited exception allowing a retaliation claim to be brought for the first time in district court. *See Phillips v. Georgetown County*, No. 2:16-cv-1612-PMD-MGB, 2018 WL 3119234, at *7 (D.S.C. Jan.

---

pattern of conduct described in Plaintiff's EEOC intake submission attachment when read together with his check marks for discrimination and retaliation reasonably demonstrates a claim for retaliation." (Dkt. No. 237 at 15.) Because Plaintiff's Intake Questionnaire and the attachments thereto relate exclusively to Defendant's failure to accommodate Plaintiff, the undersigned disagrees. (*See generally* Dkt. No. 206-37; Dkt. No. 238-32.) Regardless, "any claims raised in the initial questionnaire but not in the actual administrative charge itself . . . are not properly exhausted." *Toro v. Sci. Applications Int'l Corp.*, No. 2:12-cv-1833-DNC-BM, 2012 WL 7176826, at *2 (D.S.C. Dec. 7, 2012), *adopted*, 2013 WL 652568 (D.S.C. Feb. 21, 2013) (citing *Middleton v. Motley Rice, LLC*, No. 2:08-cv-3256-CWH, 2010 WL 3167360, at * 6 (D.S.C. Aug. 9, 2010)).

24, 2018), *adopted*, 2018 WL 1324502 (D.S.C. Mar. 15, 2018) ("The *Nealon* exception does not apply to Title VII retaliation claims where a plaintiff 'had knowledge of the factual basis for [his] retaliation claim before [he] filed h[is] charge with the EEOC.'" (quoting *Tonkin v. Shadow Mgmt., Inc.*, 605 F. App'x 194 (4th Cir. 2015))).

In sum, Plaintiff did not check the retaliation box on his EEOC charge, crossed out the retaliation box on his Intake Questionnaire Form, and did not suggest that any of Defendant's actions were retaliatory in the narrative descriptions attached to his EEOC charge and Intake Questionnaire Form. (*See generally* Dkt. No. 206-37; Dkt. No. 238-32.) He does not allege that Defendant retaliated against him on account of his complaints to the EEOC and therefore cannot utilize the Fourth Circuit's exception excusing a plaintiff's failure to exhaust retaliation claims under certain circumstances. (Dkt. No. 135 at 65.) As such, no reasonable jury could find a genuine issue of material fact as to whether Plaintiff exhausted his claim for retaliation based on the evidence of record, even when considering that evidence in the light most favorable to Plaintiff.

While the Court recognizes that EEOC charges "must be construed with utmost liberality" because they often are not completed by lawyers, *Alvarado v. Board of Trustees of Montgomery Community College*, 848 F.2d 457, 460 (4th Cir. 1988) (quoting *Kaplan v. Int'l Alliance of Theatrical & Stage Emps.*, 525 F.2d 1354, 1359 (9th Cir. 1975)), the Court cannot read into administrative charges allegations that they do not contain. *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 408 (4th Cir. 2013). If Plaintiff intended to raise a retaliation claim, he needed to do so in his EEOC charge or file an amended EEOC charge to incorporate his allegations of retaliation. *See* 29 C.F.R. § 1601.12(b); *see also Balas*, 711 F.3d at 408 (noting that "one of the purposes of requiring a party to file charges

with the EEOC is to put the charged party on notice of the claims raised against it"); *see also Danial v. Morgan State Univ.*, No. CCB-cv-17-959, 2018 WL 3625767, at *7 (D. Md. July 27, 2018) (while a series of emails exchanged between complainant and EEO coordinator revealed allegations of discrimination, the court considered only the actual charges in determining the scope of the civil complaint).[16] Because he did not, the undersigned recommends that Plaintiff's retaliation claim be dismissed on account of Plaintiff's failure to exhaust his administrative remedies.[17]

### b. Events Prior to Look-back Period

Defendant next argues that certain of Plaintiff's claims are based on events that occurred outside of the applicable statute of limitations and are therefore time-barred. (Dkt. No. 206 at 28.) As noted above, a plaintiff must file a charge of discrimination with the EEOC prior to filing suit in court for alleged violations of the ADA. *See Sydnor*, 681 F.3d at 593 ("[T]he ADA incorporates [Title VII's] enforcement procedures, including the requirement that a plaintiff must exhaust his administrative remedies by filing a charge with the EEOC before pursuing a suit in federal court." (internal citations omitted)). Generally, "a plaintiff must file an administrative charge with the EEOC within 180 days of the alleged misconduct." *Williams v. Giant Food Inc.*, 370 F.3d 423, 428 (4th Cir. 2004) (citing 42 U.S.C. § 2000e-5(e)(1)); 42 U.S.C. § 12117(a) (incorporating Title VII's

---

[16] Plaintiff argues that emails from June of 2015 "confirm that Plaintiff had complained to Boeing regarding the 'retaliatory' natures of the transfers identified in [his EEOC charge], and their relationship to [on-the-job-training procedures]." (Dkt. No. 237 at 16.) He then explains that he does not contend that the transfer to which these emails relate was in violation of the ADA, but that the emails are relevant "to the extent [they show] negative animus and Boeing bias" and "make[] it more likely that [Boeing] retaliated against [Plaintiff] based on his disability . . . ." (*Id*.) However, as Plaintiff notes, these emails relate to retaliation for complaints regarding on-the-job-training procedures, not retaliation based on Plaintiff's disability. (*Id*.) Further, these emails reiterate that the retaliatory actions of which Plaintiff complains in this lawsuit occurred prior to him filing his EEOC charge and should therefore have been included in his charge to the extent he wished to raise a complaint for retaliation.

[17] As noted *infra*, the undersigned finds that Plaintiff's claim for retaliation also fails on the merits.

enforcement procedures). However, this period is extended to 300 days in a deferral state like South Carolina.[18] *Williams*, 370 F.3d at 428 (describing a deferral state as a state in which "state law proscribes the alleged employment practice and the charge has initially been filed with a state deferral agency"); 42 U.S.C. § 12117(a) (incorporating Title VII's enforcement procedures). After timely filing a charge with the EEOC, a plaintiff has 90 days from the date he receives a right-to-sue letter to file suit in court.[19] 42 U.S.C. § 2000e-5(f)(1); 42 U.S.C. § 12117(a) (incorporating Title VII's enforcement procedures).

Plaintiff filed his charge of discrimination on August 17, 2017 and received his right-to-sue letter on June 13, 2018. (Dkt. No. 237 at 22.) As such, Defendant asserts that "any claims for failure to accommodate and disability discrimination based on events occurring prior to October 21, 2016[][20] should be dismissed with prejudice" because they fall outside of the 300-day look-back period. (Dkt. No. 206 at 29.) On the other hand, Plaintiff argues that Defendant's actions constitute a continuing violation or, in the alterative, that his claims should be equitably tolled. (Dkt. No. 237 at 17–27.)

### i.    Continuing-Violation Doctrine

"The continuing-violation doctrine applies to claims based upon a defendant's ongoing policy or pattern of discrimination rather than discrete acts of discrimination." *Hill v. Hampstead Lester Morton Ct. Partners LP*, 581 F. App'x 178, 181 (4th Cir. 2014) (citing *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219–20 (4th Cir. 2007); *Williams*, 370 F.3d at 429). "In general, to establish a continuing violation[,] the plaintiff must establish

---

[18] The South Carolina Human Affairs Commission enforces the ADA in South Carolina. Accordingly, a complainant has 300 days to file a charge of discrimination under the ADA in this state. *See* 42 U.S.C. § 2000e-5(e)(1); 42 U.S.C. § 12117(a) (incorporating Title VII's enforcement procedures).

[19] Plaintiff did not file the instant civil action within this prescribed period. However, the Court previously addressed this issue and determined that the ninety-day filing period was equitably tolled. (Dkt. No. 36.)

[20] October 21, 2016 is 300 days prior to August 17, 2017.

that the unconstitutional or illegal act was a fixed and continuing practice." *Nat'l Adver. Co. v. City of Raleigh*, 947 F.2d 1158, 1166 (4th Cir. 1991) (brackets, ellipses, internal quotation marks, and citation omitted). Plaintiff argues that Defendant's "Insider's Only Rule" and "Perm Rule"[21] are "textbook applications of the continuing violation rule." (Dkt. No. 237 at 18.) These policies relate to Plaintiff's failure to accommodate claim, as they determine Plaintiff's ability to apply for jobs for reassignment. (*Id*.) Plaintiff contends that these policies "were a fixed and continuing practice occurring during the statute of limitations period." (*Id*.) He further contends that "[d]istrict courts have recognized that the continuing violation doctrine applies to failure to accommodate claims."[22] (*Id*.)

However, the Fourth Circuit has held that "a defendant's failure to accommodate constitutes a discrete act rather than an ongoing omission," and that the continuing-violation doctrine is therefore inapplicable to failure to accommodate claims. *Hill*, 581 F. App'x at 181. The Fourth Circuit has also "'declined to extend the limitations periods for discrete acts of discrimination merely because the plaintiff asserts that such discrete acts occurred as part of a policy of discrimination.'" *Holland*, 487 F.3d at 220 (quoting

---

[21] Plaintiff describes these rules as follows:

> The Insider's Only Rule limits access of employees on [leave of absence] to employment positions called "no post requisitions" and "internal solicitations," not listed on Boeing's Careers website and restricts employees' access while on [leave of absence] to a third group of employment positions, "internal only" requisitions which should have been visible to all employees. . . . The Perm Rule restricts reassignment to employees whose medical restrictions form have a box checked "permanent," even if those same (or other) documents indicate that employee's underlying condition is a long term or permanent disability as was the case with Baker.

(Dkt. No. 237 at 18) (internal citations omitted.)

[22] In support of this argument, Plaintiff cites to two cases from the Northern District of Illinois. (Dkt. No. 237 at 18–19, citing to *Sutton v. Potter*, No. 02 C 2702, 2004 WL 603477, at *1 (N.D. Ill. Mar. 22, 2004) and *Kraus v. Shinseki*, 846 F. Supp. 2d 936, 939 (N.D. Ill. 2012).) The undersigned notes that this Court is not constrained by these out-of-circuit rulings.

18

*Williams*, 370 F.3d at 429); *see also Cherosky v. Henderson*, 330 F.3d 1243, 1248 (9th Cir. 2003) ("[I]f the mere existence of a policy is sufficient to constitute a continuing violation, it is difficult to conceive of a circumstance in which a plaintiff's claim of an unlawful employment policy could be untimely." (internal quotation marks and citation omitted)). Accordingly, the continuing-violation doctrine is inapplicable and cannot save Plaintiff's failure to accommodate claim to the extent it is based on events occurring prior to October 21, 2016.

### ii.     Equitable Tolling

Plaintiff next contends that his claims should be equitably tolled. (Dkt. No. 237 at 16.) Filing "a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in a federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines*, 455 U.S. 385, 393 (1982). "Plaintiffs are entitled to equitable tolling only if they show that they have pursued their rights diligently and extraordinary circumstances prevented them from filing on time." *Raplee v. United States*, 842 F.3d 328, 333 (4th Cir. 2016) (citing *Holland v. Florida*, 560 U.S. 631, 649 (2010) (emphasis removed). Equitable tolling is available in "those rare instances where—due to circumstances external to the party's own conduct— it would be unconscionable to enforce the limitation period against the party and gross injustice would result." *Rouse v. Lee*, 339 F.3d 238, 246 (4th Cir. 2003) (en banc) (internal quotation marks and citation omitted). The plaintiff bears the burden of establishing the elements of equitable tolling. *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005).

Here, Plaintiff argues that equitable tolling is appropriate because Defendant misled him as to his rights under the ADA. (Dkt. No. 237 at 17.) More specifically, Plaintiff asserts

that "Boeing HR employees consistently misled Plaintiff as to his rights to a mandatory reassignment review and reassignment, his entitlement to consideration for *all* vacant positions, and that 'undue hardship' to Baker had to be considered prior to putting him on [a leave of absence]." (*Id*.) Plaintiff asserts that "Boeing arbitrarily shuffled [him] between different HR representatives," and that he "reasonably relied on Boeing's misleading and confusing representations and conduct as positive signals towards an amicable resolution," all of which delayed Plaintiff's filing of his EEOC charge. (*Id*. at 26−27.) He contends that "[h]ad [he] known [of the] facts actively (either intentionally with malice/reckless disregard or negligently) concealed from him by Boeing during the period from June 2015 through October 21, 2016, he would have filed his charge earlier." (*Id*. at 26.)

To the contrary, Defendant contends that Plaintiff was acutely aware of all facts giving rise to his ADA claims well in advance of filing his EEOC charge. (Dkt. No. 206 at 30.) Defendant also argues that it did not mislead Plaintiff with respect to his rights and that Plaintiff never relied on Defendant's representations. (*Id*. at 30–36.) Defendant asserts that this non-reliance is evidenced by Plaintiff's continual complaints about Defendant's reassignment process and the handling of Plaintiff's inquiries. (*Id*.)

Based on the information in the record, the undersigned finds that Plaintiff has failed to satisfy the high threshold required to justify equitable tolling. *Rouse*, 339 F.3d at 246 (stating that equitable tolling is appropriate in rare instances where "it would be *unconscionable* to enforce the limitation period . . . and *gross injustice* would result" (emphasis added)). To invoke equitable tolling, Plaintiff must show: (1) that Defendant attempted to mislead him, and (2) that he reasonably relied on Defendant's misrepresentations by neglecting to file a timely charge. *Mack v. S.C. Dep't of Transp.*,

No. 3:12-cv-2960-MGL-KDW, 2015 WL 1297836, at *5 (D.S.C. Jan. 28, 2015), *adopted*, 2015 WL 1297876 (D.S.C. Mar. 23, 2015) (citing *Lawson v. Burlington Industries, Inc.*, 683 F.2d 862, 864 (4th Cir. 1982); *Coke v. General Adjustment Bureau, Inc.*, 640 F.2d 584, 595 (5th Cir. 1981)). Although Plaintiff provides a lengthy narrative describing the events leading up to Defendant's alleged failure to accommodate him, he has not demonstrated that Defendant actively misled him or prevented him from timely filing an EEOC charge. (Dkt. No. 237 at 16–21.)

Plaintiff's claims center around Defendant's supposed incompetence and lack of knowledge regarding the reassignment process required by the ADA, and the record reflects possible confusion and/or inefficiency on the part of Defendant. (*Id.* at 17–20.) However, nothing in the record supports an inference that Defendant misled Plaintiff for the purpose of preventing him from filing an EEOC complaint. *Olson v. Mobil Oil Corp.*, 904 F.2d 198, 201 (4th Cir. 1990) (en banc) ("Equitable tolling . . . applies only when an employer[] . . . 'wrongfully deceived or misled the plaintiff in order to conceal the existence of the cause of action.'" (quoting *English v. Pabst Brewing Co.*, 828 F.2d 1047, 1050 (4th Cir. 1987))). In fact, most of the misstatements that Plaintiff points to in support of his equitable tolling argument are internal communications amongst employees and internal records from Defendant's human resources department, not communications between Plaintiff and human resources employees that might suggest an intent to mislead him. (*See* Dkt. No. 237 at 23, citing to Dkt. No. 221-2 at ¶¶ 27, 37 and Dkt. No. 135 at ¶¶ 37, 39, 46, 64, 65, 78, 102, 103, 107, 108.)[23]

---

[23] To the extent Plaintiff argues that Defendant failed to provide him with its internal policies relating to reassignment under the ADA, (Dkt. No. 251 at 4–5), the undersigned finds this argument unpersuasive, as the record clearly reflects that such policies were available to Plaintiff via Defendant's online portal. (Dkt. No. 206-16 at 17–18; Dkt. No. 206-20 at 5; Dkt. No. 206-22 at 7; Dkt. No. 206-30 at 7.)

Moreover, even if the record did support an inference that Defendant attempted to mislead Plaintiff, it does not support a finding that Plaintiff "reasonably relied on Defendant's misrepresentations by neglecting to file a timely charge." *Mack*, 2015 WL 1297836, at *5 (citing *Lawson*, 683 F.2d at 864; *Coke*, 640 F.2d at 595). Plaintiff claims that he would have filed his EEOC charge earlier if not for Defendant's misstatements and failure to inform him of his right to a reasonable accommodation. (Dkt. No. 237 at 17–20.) He further states that he had an "epiphany" in November of 2016 when he discovered EEOC Enforcement Guidance through his own independent legal research. (*Id.*; Dkt. No. 135 at 40.) Plaintiff claims that this "epiphany" marked his first realization of Defendant's obligations to him under the ADA. (Dkt. No. 135 at 41.)

However, Plaintiff complained of problems with Defendant's accommodation procedures prior to his "epiphany." (Dkt. No. 206 at 31–33.) For example, in April of 2016 he complained that his concerns "were too major" to be handled by human resources. (Dkt. No. 135 at 35.) He complained generally about Defendant's human resources department— including their lack of timeliness, overall inadequacy, and inability to accommodate him— in March, May, and June of 2016. (*Id.* at 37; Dkt. No. 206 at 32.) In August of 2016, Plaintiff told his human resources representative that "he ha[d] a case [against Defendant] because if he was laid off but work was available then [they] should have brought him back." (Dkt. No. 206-18 at 17.) Plaintiff admits that he was looking for a lawyer—or at least thinking about doing so—as early as September of 2016.[24] (Dkt. No. 206-1 at 29–30.) Nonetheless, Plaintiff did not file his EEOC charge until August 17, 2017—almost a year

---

[24] The undersigned notes that Plaintiff's August 2016 statement that he "had a case" against Defendant and his admission that he was looking for a lawyer in September of 2016 undermine his assertion that he was entirely unaware of his rights under the ADA until his November 2016 "epiphany."

after his November 2016 "epiphany" regarding his rights and a full year after he stated that he "had a case" against Defendant. (*See generally* Dkt. No. 206-18; Dkt. No. 206-37; Dkt. No. 238-32.)

Plaintiff seems to argue that he did not file his charge until August 2017 because he considered Defendant's decision to begin the reassignment process in late 2016 a "positive signal[] towards an amicable resolution." (Dkt. No. 237 at 27.) However, a plaintiff's "resort to internal [] processes to question or challenge employment decisions that [he] regarded as discriminatory does not excuse [his] untimely filing under [] equitable tolling." *Mack*, 2015 WL 1297836, at *9. Further, Plaintiff's "optimistic hope" that he would be reassigned does not show the reliance on Defendant's conduct necessary to justify equitable tolling. *Lawson*, 683 F.2d at 864.

"[I]gnorance in the context of equitable tolling . . . means ignorance of the unlawfulness of the defendant's conduct." *Davis v. Montgomery County Dep't of Transp.*, No. JFM-cv-11-2637, 2012 WL 748392, at *6–7 (D. Md. Mar. 6, 2012) (quoting *Kale v. Combined Insurance Company of America,* 861 F.2d 746, 754 (1st Cir. 1988)). It is clear from the record that Plaintiff knew "of the unlawfulness of the defendant's conduct" beginning in November of 2016, at the latest. Still, he did not file an EEOC charge until August of 2017.[25] This does not suggest that Plaintiff "pursued [his] rights diligently and extraordinary circumstances prevented [him] from filing on time." *Raplee*, 842 F.3d at 333 (emphasis removed). As such, Plaintiff's delay is not the sort that equitable tolling was

---

[25] While the undersigned recognizes that Plaintiff's equitable tolling justification relies largely on Defendant's alleged misstatements prior to his November 2016 "epiphany" and that Plaintiff properly filed his EEOC charge within 300 days of his "epiphany," the undersigned notes that the 300-day look-back period would have encompassed any claims based on events occurring in 2016 if he had filed his EEOC charge shortly after his "epiphany," as opposed to nine months later.

designed to remedy and equitable tolling is not appropriate here. Plaintiff's claims premised on events occurring prior to October 21, 2016 should therefore be dismissed.[26] *Rouse*, 339 F.3d at 246 (noting that equitable tolling is appropriate only in "those rare instances where—due to circumstances external to the party's own conduct—it would be unconscionable to enforce the limitation period against the party and gross injustice would result").

### 2. Failure to Accommodate[27]

Title I of the ADA prohibits employment discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). In doing so, the ADA makes it unlawful for an employer to fail to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee." 42 U.S.C. § 12112(b)(5)(A).

To establish a prima facie showing of failure to accommodate under the ADA, a plaintiff must demonstrate "(1) that he was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of his disability; (3) that with

---

[26] These time-barred claims relate to Plaintiff's initial reassignment to Defendant's material review segregation area in August of 2014; his initial request to be transferred back to the composite fabrication department (or a similar position) in June of 2015; his 2015 "light duty" work assignments; and his initial placement on a medical leave of absence in October of 2015. (Dkt. No. 135; Dkt. No. 206; Dkt. No. 221-2.) Although the undersigned finds that equitable tolling is not appropriate and that Plaintiff's claims relating to these events are time-barred, the undersigned makes no determination as to whether evidence produced in support of those time-barred claims is admissible at trial.

[27] Certain of Plaintiff's allegations with respect to his failure to accommodate claim relate to events occurring before October 21, 2016. (*See* Dkt. No. 135.) Because any claims arising from such events are time-barred, (*see supra* at 16–23), the undersigned has only considered the allegations relating to events after October 21, 2016. As such, the undersigned makes no determination as to whether Plaintiff's initial medical restrictions entitled him to permanent reassignment, or whether Plaintiff was provided a reasonable accommodation prior to entering the reassignment process in late October/early November 2016.

reasonable accommodation he could perform the essential functions of the position . . . ; and (4) that the [employer] refused to make such accommodations." *Rhoads v. F.D.I.C.*, 257 F.3d 373, 387 n.11 (4th Cir. 2001) (quoting *Mitchell v. Washingtonville Central Sch. Dist.*, 190 F.3d 1, 6 (2d Cir. 1999)). Here, Defendant argues that it is entitled to summary judgment as to Plaintiff's failure to accommodate claim because Plaintiff "is unable to carry his burden of proving a *prima facie* case" and "is without evidence that a genuine issue of material fact exists with regard to his claims." (Dkt. No. 206 at 38.) More specifically, Defendant argues that Plaintiff is not a "qualified individual" under the ADA. (Dkt. No. 206 at 44.)

A "qualified individual" is a person who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "A reasonable accommodation is one that 'enables [a qualified] individual with a disability . . . to perform the essential functions of [a] position.'" *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 580 (4th Cir. 2015) (quoting 29 C.F.R. § 1630.2(o)(1)(ii)). A "modification[] or adjustment[] that enable[s] . . . [an] employee with a disability to enjoy equal benefits and privileges of employment" is also a reasonable accommodation. 29 C.F.R. § 1630.2(o)(1)(ii); *see also Clark v. Sch. Dist. Five of Lexington & Richland Counties*, 247 F. Supp. 3d 734, 744 (D.S.C. 2017). A reasonable accommodation may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, . . . and other similar accommodations." 42 U.S.C. § 12111(9). Relevant here, reassignment is an accommodation of "last resort" that should be held "in reserve for unusual circumstances." *Wirtes v. City of Newport News*, No. 19-1780, 2021 WL 1704295, at *5 (4th Cir. Apr. 30,

2021) (citing *Elledge v. Lowe's Home Ctrs., LLC*, 979 F.3d 1004, 1011 (4th Cir. 2020)). Reassignment is inappropriate if an employee wishes to stay in his current position and there is a reasonable accommodation available that would allow him to do so. *Id.* at 6–7.[28]

Practically, "[a] reasonable accommodation is one that is feasible or plausible." *Reyazuddin v. Montgomery County, Md.*, 789 F.3d 407, 414 (4th Cir. 2015). Generally, whether a proposed accommodation is reasonable is a question of fact for the jury. *Id.* at 416 (citing *Pandazides v. Va. Board of Education*, 13 F.3d 823, 833 (4th Cir. 1994)). However, an accommodation is not reasonable as a matter of law if it imposes "undue financial and administrative burdens" on an employer or requires "a fundamental alteration." *Sch. Bd. of Nassau County, Fla. v. Arline*, 480 U.S. 273, 287 n.17 (1987) (internal citations omitted); *see Reyazuddin*, 789 F.3d at 414.

Defendant asserts that Plaintiff is not a "qualified individual" under the ADA because he rejected over twenty vacant positions suggested to him during the reassignment process. (Dkt. No. 206 at 47.) Defendant contends that these vacant positions constitute reasonable accommodations and that Plaintiff's rejection of these reasonable accommodations "thrusts him outside the protections of the ADA and effectively removes his status as a 'qualified individual' under the statute." (*Id.*) In support of this argument, Defendant cites to ADA regulations and Fourth Circuit law holding that "an employee's refusal to take an employer's offered reasonable accommodation disqualifies the employee from 'qualified individual' status under the ADA." (*Id.* at 44, citing to 29 C.F.R. § 1630.9(d) and *Andrews v. Commonwealth of Va.*, 232 F.3d 886 (4th Cir. 2000)).

---

[28] Unlike in *Elledge* and *Wirtes*, it is undisputed that Plaintiff could not perform the essential functions of his job in the material review segregation area without a reasonable accommodation in the form of reassignment. (*See generally* Dkt. No. 206; Dkt. No. 221; Dkt. No. 236; Dkt. No. 237; Dkt. No. 249; Dkt. No. 251.)

To the contrary, Plaintiff contends that he "did not reject a reasonable accommodation because Boeing never offered him a vacant position." (Dkt. No. 237 at 41.) Plaintiff argues that his "reassignment focal" sent these positions to him as suggestions of positions to apply for, but that the positions were never actually offered to him. (*Id*. at 42.) To support this assertion, Plaintiff points to Defendant's statement that Plaintiff "was required to apply for a position so his qualifications for the job could be verified prior to placement," (*id*. at 43, citing to Dkt. No. 206 at 46, n.27), as an "express acknowledgement from Boeing that it did not reassign or offer a vacant position to Baker." (*Id*.) Plaintiff also states that he showed interest in some of the suggested positions "and requested to be placed in at least one of them." (*Id*.)

In response, Defendant asserts that Plaintiff himself admitted that Defendant offered him a position during the reassignment period and admitted that the position he was offered constitutes a reasonable accommodation. (Dkt. No. 249 at 9–10.) Defendant states: "fatal to Plaintiff's failure to accommodate claim is his own admission that he was actually *offered* and *rejected* the Quality Systems Specialist 1 ("QSS1") position in Huntsville, Alabama (Requisition No. 1700000505) – the very same position Plaintiff has stated in his Declaration would have been a reasonable accommodation." (*Id*. at 9) (emphasis in original.) Defendant then references Plaintiff's deposition testimony, which states: ". . . there's a quality systems specialist 1. It's like an intern in Huntsville [Alabama]. That was offered to me." (Dkt. No. 249-1 at 8.) Defendant asserts: "[b]y his *own* sworn statements, Boeing offered Plaintiff the *exact* position he now agrees would have been a reasonable accommodation, and he rejected Boeing's offer." (Dkt. No. 249 at 10) (emphasis in original.)

Defendant is correct that "if [a disabled employee] rejects a reasonable accommodation . . . the individual will not be considered qualified." 29 C.F.R. § 1630.9(d). Nonetheless, the undersigned cannot agree that Plaintiff admitted the QSS1 position in Huntsville, Alabama would have been a reasonable accommodation. Plaintiff's declaration states:

> Given my experience as a QSS4, it almost goes without saying that I could have performed the essential functions of QSS1 and QSS2, entry-level, positions at Boeing. Although of course I would not have wanted to take a pay cut, or accept a demotion, if Boeing had told me during the reassignment period (11/1/16 -- 2/28/17), or at any other time, that the only positions for which I was eligible and would be considered wer[e] QSS1 or QSS2--which of course they never did—I was desperate enough for work and income to have applied. It would have been better to have a job with income than no job and no income, which is what [leave of absence] did to me. Moreover, given my restricted access to the Boeing careers website, I was not aware of any of these positions. I confirm hereby that I could have performed the essential functions of at least the following entry level QSS positions set out on Boeing/B_004867 [including the QSS1 position in Huntsville, Alabama]. . . .
>
> I was not considered for these positions, not informed of them either, but would have preferred to take one of them rather than have my salary cut to zero. Had I known about them, and [been] told either take one of these positions or lose your salary—and go on [leave of absence], obviously I would've preferred to work and would have taken one of them.

(Dkt. No. 212-2 at 4–6.) Accordingly, Plaintiff clearly conceded that he is capable of the essential functions of this job and that he would have preferred this job to an unpaid leave of absence. (*Id.*) However, Plaintiff also stated that he "would not have wanted to take a pay cut, or accept a demotion," as would be required in accepting the QSS1 position in Huntsville. (*Id.* at 4.) He also repeatedly argues that he was overqualified for jobs at the QSS1 and QSS2 levels, and that Defendant should have instead placed him in an available position with comparable skill requirements and a comparable pay grade. (*See generally* Dkt. No. 221-2; Dkt. No. 237.)

A reasonable accommodation must be "effective" for the employee and must allow the employee to attain an equal level of achievement to that which a non-disabled individual in the same position would be able to achieve. *Bryant v. Better Business Bureau of Greater Md.*, 923 F. Supp. 720, 736–37 (D. Md. 1996); 29 C.F.R. 1630.2(o)(1)(i)-(iii). "When reassignment is used, employers 'should reassign the individual to an equivalent position, in terms of pay, status, etc., if the individual is qualified, and if the position is vacant within a reasonable amount of time.'" *Equal Emp. Opportunity Comm'n v. Wal-Mart Stores, Inc.*, No. AMD-cv-06-2514, 2008 WL 11509343, at *12 (D. Md. Mar. 10, 2008) (quoting 29 C.F.R. § 1630, App. 1630.2(o)). As the Fourth Circuit explained in *Reyazuddin*:

> An employer may reasonably accommodate an employee without providing the exact accommodation that the employee requested. Rather, the employer may provide an alternative reasonable accommodation. *See Hankins v. The Gap, Inc.,* 84 F.3d 797, 800 (6th Cir. 1996) ("[T]he employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide.") (quoting EEOC Interpretive Guidance on Title I of the Americans with Disabilities Act, 29 C.F.R. pt. 1630 app. at 406 (2014)). . . . Nonetheless, "*a reasonable accommodation should provide a meaningful equal employment opportunity. Meaningful equal employment opportunity means an opportunity to attain the same level of performance as is available to nondisabled employees having similar skills and abilities*." H.R.Rep. No. 101–485, pt. 2, at 66 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 349.

789 F.3d at 415–16 (emphasis added). In *Reyazuddin*, the Fourth Circuit determined that "the district court erred in finding as a matter of law that the County provided a reasonable accommodation by reassigning [plaintiff] to 'comparable employment.'" *Id*. The Fourth Circuit found that "although Reyazuddin maintained her salary, pay grade, and benefits, the County cobbled together an assortment of 'make-work' tasks that did not amount to full-time employment" and that summary judgment was inappropriate because the record

evidence created "a genuine issue of material fact as to whether the accommodation provided by the County was reasonable." *Id*. (citing *Pandazides*, 13 F.3d at 833).

Here, Plaintiff does not concede that the QSS1 position would have provided an "opportunity to attain the same level of performance available to nondisabled employees having similar skills and abilities," *id*., or allowed him "to enjoy equal benefits and privileges" as similarly situated non-disabled employees. 29 C.F.R. § 1630.2(o)(1)(iii). While Plaintiff conceded that he could complete the essential functions of the QSS1 position, he also stated that he would have applied for the job (entailing a demotion and pay cut) only because he was "desperate." (Dkt. No. 212-2 at 5.) Further, the record indicates that Plaintiff worked as a level Quality Production Specialist, Level 4, ("QPS4") employee at the time he first became disabled, and a QSS4 employee for several years before that. (Dkt. No. 135; Dkt. No. 206-1 at 7–8; Dkt. No. 221-2 at 8.) Accordingly, the QSS1 position would not only have been a demotion but would have also required Plaintiff to regress three position levels. Although "an employer is 'not obligated to provide the accommodation requested or preferred by the employee,'" *Wehner v. Best Buy Stores, L.P.*, No. MJG-cv-15-2163, 2017 WL 952685, at *4–12 (D. Md. Mar. 10, 2017) (quoting *Cravens v. Blue Cross & Blue Shield of Kansas City*, 214 F.3d 1011, 1019 (8th Cir. 2000)), an employer is required to provide an accommodation that is reasonable. *See* 42 U.S.C. § 12111. In the instant case, there is an issue of material fact as to whether this QSS1 position constitutes an effective reasonable accommodation offered to Plaintiff. *See Reyazuddin*, 789 F.3d at 416 (citing *Pandazides*, 13 F.3d at 833) ("Whether an accommodation is reasonable is generally a question of fact for the jury.").

There is also an issue of material fact as to whether Defendant offered Plaintiff any other position that would have been an effective reasonable accommodation. Defendant argues that "[b]oth in his own motion for summary judgment as well as his Response brief . . . , Plaintiff details numerous positions he claims he was qualified to perform, any of which would have been a reasonable accommodation he would have taken" and that "Plaintiff has admitted that Boeing did, in fact, offer him more than one reasonable accommodation." (Dkt. No. 249 at 11–12.) While the undersigned acknowledges that Plaintiff discusses various positions he was qualified to perform, the undersigned cannot agree that Plaintiff admits that Defendant offered him a reasonable accommodation because Plaintiff does not necessarily make this concession anywhere in his briefings. (*See generally* Dkt. No. 221-2; Dkt. No. 237.) Additionally, there are factual questions similar to those described above that bear on whether any other position purportedly offered to Plaintiff could be considered a reasonable accommodation. For example, each of the positions referenced by Defendant constitutes a demotion and/or requires Plaintiff to relocate to a different state. (Dkt. No. 236 at 12–19; Dkt. No. 249 at 11–16.) A reasonable jury could conclude that a position that required Plaintiff to take a significant pay cut, lose standing in his career, and incur the cost of a long-distance move was not an effective reasonable accommodation.  As such, the undersigned cannot find as a matter of law that Defendant offered Plaintiff a reasonable accommodation which he rejected. *See Reyazuddin*, 789 F.3d at 416 (citing *Pandazides*, 13 F.3d at 833) ("Whether an accommodation is reasonable is generally a question of fact for the jury.").[29]

---

[29] Defendant also argues that Plaintiff's unpaid leave of absence during and after his reassignment period constitutes a reasonable accommodation. (Dkt. No. 206 at 48–49.) However, for reasons similar to those set forth above, whether such accommodation was effective and reasonable is a question of fact for the jury. *See Reyazuddin v. Montgomery County, Maryland*, 789 F.3d 407, 416 (4th Cir. 2015) (citing *Pandazides v.*

The undersigned also cannot determine as a matter of law that Plaintiff's claim fails because he is not a "qualified individual" under the ADA and is therefore "thrust outside" of the statute's protections. (Dkt. No. 206 at 47.) If Defendant offered Plaintiff a position that was an effective reasonable accommodation, Plaintiff is not a "qualified individual" under the ADA; if Defendant did not offer Plaintiff a position that was an effective reasonable accommodation, Plaintiff is a "qualified individual" entitled to the protections of the ADA. *See* 29 C.F.R. § 1630.9(d); *see also Andrews*, 232 F.3d at 886. Thus, whether Defendant offered Plaintiff an effective reasonable accommodation is a material factual issue affecting the outcome of the case. *The News & Observer Publ'g Co.*, 597 F.3d at 576. Because an issue of material fact exists with respect to Plaintiff's failure to accommodate claim, summary judgment for either side is inappropriate. *See* Fed. R. Civ. P. 56(a) (explaining that summary judgment shall be granted only where there is no genuine dispute as to any material fact). The undersigned therefore recommends that Plaintiff's Motion for Summary Judgment (Dkt. No. 221) be denied in full, and that Defendant's Motion for Summary Judgment (Dkt. No. 206) be denied as to Plaintiff's failure to accommodate claim.

### 3. Discriminatory Discharge[30]

Defendant next argues it is entitled to summary judgment as to Plaintiff's discriminatory discharge claim. The ADA makes it unlawful for a covered entity to "discriminate against a qualified individual . . . because of the disability of such individual

---

*Va. Board of Education*, 13 F.3d 823, 833 (4th Cir. 1994) ("Whether an accommodation is reasonable is a generally a question of fact for the jury.").

[30] As noted above, certain of Plaintiff's allegations with respect to his discriminatory discharge claim relate to events occurring before October 21, 2016. (*See* Dkt. No. 135.) Because any claims arising from such events are time-barred, (*see supra* at 16–24), the undersigned has focused on those allegations that relate to events occurring after October 21, 2016.

in regard to . . . discharge." 42 U.S.C. § 12112(a). In the Fourth Circuit, discriminatory discharge "may be proven through direct and indirect evidence or through the *McDonnell Douglas* burden-shifting framework."[31] *Jacobs*, 780 F.3d at 572. Under the *McDonnell Douglas* framework, a plaintiff can establish a *prima facie* case of discriminatory discharge by demonstrating that: "(1) he was a qualified individual with a disability; (2) he was discharged; (3) he was fulfilling his employer's legitimate expectations at the time of discharge; and (4) the circumstances of his discharge raise a reasonable inference of unlawful discrimination." *Reynolds v. American Nat'l Red Cross*, 701 F.3d 143, 150 (4th Cir. 2012) (quoting *Rohan v. Networks Presentations LLC*, 375 F.3d 266, 273 n.9 (4th Cir. 2004) (internal quotation marks omitted)). If the plaintiff can establish a *prima facie* case, the burden then shifts to the employer to articulate a legitimate and non-discriminatory reason for its adverse action. *Jacobs*, 780 F.3d at 575–76. If the employer makes this showing, the burden shifts back to the plaintiff to show that the legitimate and non-discriminatory reason is pretextual and that disability discrimination was the real reason for the plaintiff's discharge. *Id.* "Notwithstanding the intricacies of proof schemes, the core of every [discrimination] case remains the same, necessitating resolution of the ultimate question of . . . whether the plaintiff was the victim of intentional discrimination." *Brown v. City of Columbia*, No. 3:10-cv-2860-JFA- PJG, 2012 WL 3835389, at *3 (D.S.C. July 19, 2012), *adopted*, 2012 WL 3838109 (D.S.C. Sept. 4, 2012) (citing *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294–95 (4th Cir. 2010)).

---

[31] Plaintiff argues that John Barnett's testimony (discussed *infra*) constitutes direct evidence in support of his discrimination and retaliation claims. However, for the reasons set forth herein, the undersigned finds this characterization of Mr. Barnett's testimony unfounded. (*See infra* at 35–36, 38.) As such, the undersigned has evaluated Plaintiff's discriminatory discharge and retaliation claims under the *McDonnell Douglas* burden shifting framework.

In the instant case, Defendant asserts that it is entitled to summary judgment on Plaintiff's claim for discriminatory discharge because Plaintiff "lacks sufficient evidence to prove any of the elements of this claim." (Dkt. No. 206 at 51.) First, Defendant argues that Plaintiff is not a "qualified individual" under the ADA and is therefore not entitled to its protections. (Dkt. No. 206 at 51.) As explained above, issues of fact exist as to whether Defendant offered Plaintiff an effective reasonable accommodation that he rejected. (*See supra* at 24–32.) If Defendant offered Plaintiff a reasonable accommodation and Plaintiff rejected it, he is not a "qualified individual" under the ADA and his discriminatory discharge claim fails. *See* 29 C.F.R. § 1630.9(d) ("[I]f [a disabled employee] rejects a reasonable accommodation . . . the individual will not be considered qualified."). If Defendant did not offer Plaintiff a reasonable accommodation, Plaintiff is a "qualified individual" under the statute and his discriminatory discharge claim may survive. *See id.* Because issues of fact exist as to whether Plaintiff is a "qualified individual" under the ADA, the undersigned cannot agree that "[o]n this basis alone, Plaintiff's [discriminatory discharge] claim is legally deficient." (Dkt. No. 206 at 51.)

Defendant next argues that Plaintiff cannot establish the remaining elements of his *prima facie* case and that he "lacks evidence of pretext because he admittedly believes the true impetus for the purported discrimination he suffered was actually his persistent requests to implement an [on-the-job training] program." (*Id*. at 51–57.) Even assuming that Plaintiff could establish a *prima facie* case of discriminatory discharge, the undersigned agrees that Plaintiff's claim must fail because he cannot show pretext.

Once a plaintiff has established a *prima facie* case of discriminatory discharge, the burden shifts to the defendant to show a legitimate, non-discriminatory reason for the

discharge. *Jacobs*, 780 F.3d at 575–76. If the defendant can show such a reason, the burden then shifts back to the plaintiff to prove that the defendant's proffered reason is false and that the true reason for the discharge was discriminatory. *Id*. Here, Defendant argues that Plaintiff was terminated for "poor performance in conjunction with a plant-wide reduction in force." (Dkt. No. 206 at 56.) Plaintiff's layoff notice confirms that he was terminated "[a]s a result of work reductions in [his] job classification/skill." (Dkt. No. 206-36 at 2.) Accordingly, Defendant has met its burden to show a legitimate, non-discriminatory reason for discharging Plaintiff. Plaintiff must therefore provide evidence showing that Defendant's proffered reason is false, and that disability discrimination was the true reason for his discharge.

Plaintiff has provided no such evidence; rather, Plaintiff's own testimony undermines his claim of discriminatory discharge. (Dkt. No. 206-1 at 21–24.) For example:

> Q:     Mr. Baker, do you think your lawsuit is about on-the-job training?
>
> A:     I think that is the reason that I was discriminated against. It was the reason that I was retaliated against, because I kept – I wouldn't let it go. I wouldn't drop it. I was persistent about it. I was a skunk at the picnic, and they . . . got tired of me, and it may be more than that. I don't know. Maybe discovery will tell something more than that.
>
>        But yeah, [on-the-job training], failure to implement [it], . . . that was the starting point for all of this.

(*Id*. at 21.)

Regardless of this testimony, Plaintiff argues that a reasonable jury could conclude that Plaintiff was discharged "not because of poor performance, but negative animus towards Baker based on his disability, since Boeing 'slammed the door' to disabled employees." (Dkt. No. 237 at 64.) In making this argument, Plaintiff references testimony from another Boeing employee, John Barnett, which states that Defendant "pretty much

slammed the door on [disabled employees]" in Charleston. (Dkt. No. 239-7 at 123.) However, Plaintiff neglects that Mr. Barnett also testified that he did not have any personal knowledge as to Defendant's treatment of disabled employees in Charleston and did not "know the law as far as the [ADA]." (*Id*. at 122–23.)

Plaintiff also notes that he received good performance reviews prior to being transferred to his job in MRSA where he could not perform his physical duties.[32] (*Id*. at 22–23.) While this may be true, the fact that Plaintiff received better performance reviews before his transfer does not suggest that Defendant had negative animus in discharging Plaintiff, nor does it show that he was not discharged on account of his "poor performance in conjunction with a plant-wide reduction in force." (Dkt. No. 206 at 56.) Even when viewed in the light most favorable to Plaintiff, his "evidence of pretext" is simply insufficient to raise an inference that Defendant discriminated against him on account of his disability—especially when considered alongside Plaintiff's own testimony that Defendant discriminated against him due to his on-the-job training complaints. Based on the above, Plaintiff cannot meet his burden to show that Defendant's proffered reason for terminating him is false, nor that disability discrimination was the true reason for his discharge. Accordingly, the undersigned recommends that Defendant is entitled to summary judgment on Plaintiff's discriminatory discharge claim.

---

[32] Plaintiff also suggests that there is evidence in the record showing that Mike Tidmore, the manager who was supposedly responsible for choosing who to layoff in connection with Defendant's plant-wide reduction in force, lowered Plaintiff's performance ratings because he was a "problem" employee. (Dkt. No. 237 at 63–64.) However, this testimony actually states: "I have no information on [anybody changing performance ratings for Mr. Baker]." (Dkt. No. 239-7 at 37.)

### 4. Retaliation[33]

Finally, Defendant asserts that it is entitled to summary judgment as to Plaintiff's claim of retaliation in violation of the ADA. (Dkt. No. 206 at 57–60.) The ADA makes it unlawful for a covered entity to "discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C.A. § 12203(a). "In order to prevail on a claim of retaliation, a plaintiff must either offer sufficient direct and indirect evidence of retaliation, or proceed under a burden-shifting method." *Rhoads*, 257 F.3d 373 at 391. Whether a plaintiff proceeds by direct evidence or *McDonnell Douglas* burden-shifting, he must show (i) that he engaged in protected activity and, (ii) because of this, (iii) his employer took an adverse action against him. *Jacobs*, 780 F.3d at 577 (citing *Rhoads*, 257 F.3d 373 at 391). Here, Plaintiff alleges that he engaged in protected activity when he requested reassignment as a reasonable accommodation for his disability, and that he suffered an adverse action when Defendant refused to reassign and eventually discharged him. (Dkt. No. 135 at 64.)

Even considering the facts in the light most favorable to Plaintiff and assuming that he can establish prongs (i) and (iii) of his *prima facie* retaliation claim (that he engaged in protected activity and suffered an adverse action), Plaintiff's retaliation claim must fail because he cannot prove causation. As set forth above, Plaintiff admitted that he believed he was retaliated against on account of his persistent complaints regarding on-the-job

---

[33] As is more fully described above, the undersigned finds that Plaintiff failed to exhaust his administrative remedies with respect to his retaliation claim and therefore recommends that Defendant's Motion for Summary Judgement (Dkt. No. 206) be granted as to this claim. Nonetheless, in an abundance of caution, the undersigned has considered the merits of Plaintiff's retaliation claim.

training, and the record supports such an inference. (*See supra* at 35; Dkt. No. 206-1 at 21.)

Plaintiff therefore cannot establish that Defendant failed to reassign and eventually

discharged him in retaliation for his initial request for reassignment due to his disability.[34]

*Jacobs*, 780 F.3d at 577 (outlining the elements of a valid retaliation claim).

Nonetheless, Plaintiff argues that John Barnett's testimony regarding Defendant's

treatment of disabled employees saves his retaliation claim because such testimony raises

an inference of causation and retaliatory intent. (Dkt. No. 237 at 65.) For the reasons stated

above, the undersigned disagrees with Plaintiff's interpretation of Mr. Barnett's testimony.

(*See supra* at 35.) Plaintiff also argues that his retaliation claim should survive summary

judgment because "temporal proximity can be sufficient evidence of causality." (Dkt. No.

237 at 65.) However, Plaintiff first requested reassignment in June of 2015, entered the

reassignment process in October of 2016, received his layoff notice in June of 2017, and

was not actually discharged until March 2018. (*See supra* at 4–7.) Although Plaintiff argues

that he continued to request reassignment through September 2017, (Dkt. No. 237 at 65,

n.36), the facts of this case do not support a reasonable inference of retaliatory causation

based on the temporal relationship between Plaintiff's request(s) and his discharge. *See*

*Pascual v. Lowe's Home Ctrs.*, 193 Fed. App'x 229, 233 (4th Cir. 2006) (explaining that a

the temporal relationship must be "very close" to support a reasonable inference of

retaliatory causation (quoting *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273

(2001))); *see also Winston v. Maryland*, No. PWG-cv-17-2477, 2018 WL 5786130, at *10

(D. Md. Nov. 5, 2018) (explaining that additional supporting facts are necessary to

---

[34] The undersigned also notes that Plaintiff made this initial request for reassignment in 2015, so his retaliation claim is time-barred to the extent it relies on this pre-October 2016 event. (*See supra* at 5, 16–24; Dkt. No. 221-2 at 12.)

establish a causal connection where more than one or two months have passed between protected activity and adverse action). Thus, Plaintiff cannot show a *prima facie* case of retaliation.

Further, Plaintiff cannot show pretext.[35] As explained above, Plaintiff testified that he believes he was discriminated and retaliated against on account of his complaints about on-the-job training, (*see supra* at 35; Dkt. No. 206-1 at 21–24), and therefore cannot meet his burden to show that Defendant's proffered reason for terminating him is false, nor that retaliation was the true reason for his discharge. (*See supra* at 35–36.) Accordingly, Plaintiff's retaliation claim fails on the merits, even if the Court were to find that such claim was properly exhausted.

### B.  State Law Claim

#### 1.  Breach of Contract

Defendant also contends that it is entitled to summary judgment on Plaintiff's state-law breach of contract claim. (Dkt. No. 275 at 1.) Defendant asserts that Plaintiff's state-law cause of action "suffers from a fatal procedural deficiency, having been filed well outside the applicable statute of limitations." (*Id*.) Defendant further argues that "Plaintiff is without evidence that Boeing's Code of Conduct is an enforceable contract, containing mandatory promises that altered the terms and conditions of his at-will employment status, or that the Code of Conduct was ever breached." (*Id*.) In response, Plaintiff argues that his claim is not barred by the statute of limitations and that "clear disputes of fact" exist as to

---

[35] As noted above, Plaintiff argues that John Barnett's testimony constitutes direct evidence in support of his discrimination and retaliation claims. However, for the reasons set forth herein, the undersigned finds this characterization of Mr. Barnett's testimony unfounded. (*See supra* at 35–36.) As such, the undersigned has evaluated Plaintiff's discriminatory discharge and retaliation claims under the *McDonnell Douglas* burden shifting framework.

whether Defendant's Code of Conduct "was an enforceable contract that altered the at-will employment relationship." (Dkt. No. 278 at 1, 19.) For the reasons set forth below, the undersigned recommends that Defendant's request for summary judgment be granted as to Plaintiff's breach of contract claim.

### a. Timeliness

As noted, Defendant first contends that Plaintiff's breach of contract claim was not timely filed and is therefore statutorily barred. (Dkt. No. 275 at 1, 10.) Plaintiff alleges that Defendant violated its Code of Conduct by retaliating against Plaintiff for filing an ethics complaint relating to the company's on-the-job training practices. (Dkt. No. 135 at 66.) More specifically, Defendant explains that "Plaintiff's entire claim is premised on two alleged violations of Boeing's Code of Conduct: his initial transfer to MRSA in August 2014 and the subsequent refusal to move him back to Composite Fabrication in June of 2015." (Dkt. No. 275 at 10.) Defendant notes that "South Carolina law makes clear that breach of contract claims, including those based on the alleged violation of an employer's policy, are subject to a three-year statute of limitations" and that "Plaintiff failed to formally seek redress of his rights until September 18, 2018 – more than three years later – when he filed this lawsuit." (*Id.*)

By contrast, Plaintiff claims that "Boeing mischaracterizes the allegations in the Second Amended Complaint as a breach of contract merely arising out of Plaintiff being placed on a leave of absence in June 2015. Defendant's breach of contract continued through, and ultimately result in, his termination and being forced out on January 1, 2018, making his September 18, 2018 Complaint well within the three year statute of limitations. (Dkt. No. 278 at 20.) He further claims that "Baker had not been provided any notification

of the results of the investigation into his [ethics] complaint. No finding had been made one way or the other and it was a very real possibility that Boeing could still confirm the allegations made by Baker in his June 15, 2015 ethics complaint. Until he was notified of Boeing's findings one way or the other, Baker was not on notice that Boeing was in breach of its agreement with him not to retaliate against him for reporting unethical or illegal conduct." (*Id*. at 22.)

At the outset, the undersigned notes that Plaintiff's first argument is inconsistent with his contentions that "Boeing's ultimate discharge of Baker was due to his disability." (Dkt. No. 237 at 64, explaining that "Boeing's apparent argument that its negative animus and retaliatory action in transferring Baker to the Cage due to his OJT complaints somehow cancels out its negative animus and discriminatory action in discharging Baker due to his disability is bad math . . . .") Plaintiff simply cannot argue that Defendant failed to accommodate him and discriminatorily discharged him due to his disability, on the one hand, and then argue that Defendant failed to accommodate him and terminated him in retaliation for his ethics complaint, on the other.

Moreover, Plaintiff's Second Amended Complaint states:

Tidmore and/or other supervisors were aware that Baker had made [an ethics complaint], and, in retaliation for such "protected activity," took negative employment action against Baker, including his transfer to the "Cage," and the failure to transfer him back [] when Baker requested a transfer. . . . Such negative employment action substantially damaged Baker. Defendant Boeing instead put Plaintiff on mandatory leave of absence, and then forced him out.

(Dkt. No. 135 at 66.) These allegations make clear that Plaintiff's claim for Defendant's breach of the anti-retaliation policies in its Code of Conduct is based on Plaintiff's initial transfer to MRSA and Defendant's subsequent refusal to transfer him back. (*Id*.) Plaintiff

does not allege that Defendant placed him on extended leave and forced him out in retaliation for his protected activity; rather, he claims that such actions were the damages he suffered as a result of Defendant's retaliatory acts. (*Id.*).

Based on Plaintiff's own allegations and arguments, the undersigned must agree that Plaintiff's claim "is premised on two alleged violations of Boing's Code of Conduct: his initial transfer to MRSA in August 2014 and the subsequent refusal to move him back to Composite Fabrication in June of 2015," (Dkt. No. 275 at 10), as opposed to a continuing breach by Defendant in failing to accommodate and ultimately discharging him (Dkt. No. 278 at 20). Still, the undersigned must agree with Plaintiff's second argument that he was not "on notice" of Defendant's purported breach of its anti-retaliation policy until Defendant confirmed that it was not taking any action with respect to the retaliation Plaintiff reported. (Dkt. No. 278 at 22.)

In South Carolina, a party must commence an action for breach of contract within three years of the date the cause of action arises. S.C. Code Ann. § 15–3–530(1). The statute of limitations "begins to run when the underlying cause of action reasonably ought to have been discovered." *Martin v. Companion Healthcare Corp.*, 357 S.C. 570, 593 S.E.2d 624, 627 (Ct. App. 2004) (citing *Dean v. Ruscon Corp.*, 321 S.C. 360, 468 S.E.2d 645, 647 (1996)). Under this discovery rule, "the three-year clock starts ticking on the date the injured party either knows or should have known by the exercise of reasonable diligence that a cause of action arises from the wrongful conduct." *Id.* at 627 (internal quotation marks and citation omitted); *Prince v. Liberty Life Ins. Co.*, 390 S.C. 166, 700 S.E.2d 280, 282 (Ct. App. 2010) (applying the discovery rule to breach of contract claim). To determine whether the injured party knew or should have known about the cause of action, a court

must consider "whether the circumstances of the case would put a person of common knowledge and experience on notice that some right of his has been invaded, or that some claim against another party might exist." *Young v. S.C. Dep't of Corrections*, 333 S.C. 714, 511 S.E.2d 413, 416 (Ct. App. 1999). Here, Plaintiff's cause of action is primarily based on language in Defendant's Code of Conduct that states "[r]etaliation against employees who come forward to raise genuine concerns will not be tolerated." (*See infra* at 44–45.) As Plaintiff notes, he could not have known whether the retaliation he allegedly experienced was "tolerated" by Defendant "[u]ntil he was notified one way or the other." (Dkt. No. 278 at 20.) The record reflects that Plaintiff was unaware that the inquiry into his ethics complaint regarding retaliation was closed until approximately November 2016. (Dkt. No. 278-16 at 1–2.) He filed this civil action in September 2018.[36] (Dkt. No. 1.) Thus, considering the facts in the light most favorable to Plaintiff, his breach of contract claim is not barred by the three-year statute of limitations.

### b.  Merits

Nonetheless, Plaintiff's claim fails on the merits. Plaintiff must show the existence of a valid contract to sustain his breach of contract claim. To create a valid contract, there must be an offer, acceptance, and valuable consideration. *Roberts v. Gaskins*, 327 S.C. 478, 486 S.E.2d 771, 773 (1997) (citing *Carolina Amusement Co., Inc. v. Connecticut Nat'l Life Ins., Co.*, 313 S.C. 215, 437 S.E.2d 122 (1993)). Plaintiff argues that Defendant's Code of

---

[36] As noted, Plaintiff filed this civil action on September 18, 2018. (Dkt. No. 1.) He did not bring his breach of contract claims until his July 21, 2020 Second Amended Complaint. (Dkt. No. 135.) Nonetheless, Plaintiff's breach of contract claim "arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading," and the relation back doctrine applies. Fed. R. Civ. Pro. 15(c).

Conduct "includes contractual promises" sufficient to establish an enforceable employment contract. (Dkt. No. 135 at 66; Dkt. No. 275 at 15.)

In South Carolina, there is a presumption of at-will employment. *Prescott v. Farmer's Tel. Co-Op., Inc.*, 335 S.C. 330, 516 S.E.2d 923, 927, n.8 (1999). As such, Plaintiff must show that Defendant's Code of Conduct altered the at-will employment relationship in order for his claim to withstand summary judgement. *Id*. "To be enforceable in contract, general policy statements must be definitive in nature, promising specific treatment in specific situations." *Hessenthaler v. Tri–County Sister Help*, 365 S.C. 101, 616 S.E.2d 694, 698 (2005). "[S]uch provisions must be stated in mandatory or promissory terms to create an issue of fact as to whether an implied contract exists." *Bagwell v. Fafard, Inc.*, No. 8:06-cv-02272-GRA, 2007 WL 2022187, at *4 (D.S.C. July 11, 2007) (citing *Horton v. Darby Elec. Co.*, 360 S.C. 58, 599 S.E.2d 456 (2004); *Conner v. City of Forest Acres,* 348 S.C. 454, 560 S.E.2d 606 (2002)). Furthermore, the policy "must restrict the right of an employer to discharge." *Lawrence v. Westinghouse Savannah River Co., Inc.*, 1:03-cv-484-27, 2005 WL 3968031, at *4 (D.S.C. March 31, 2005); *see also Storms v. Goodyear Tire & Rubber Co.*, 775 F. Supp. 862, 867 (D.S.C. 1991) (finding language in the agreement insufficient to form a contract when it is "not couched in mandatory terms and do[es] not contain language that specifically limits [the employer's] right to demote or terminate [plaintiff] without cause").

Defendant's Code of Conduct states, in pertinent part:

Boeing will conduct its business fairly, impartially, in an ethical and proper manner, in full compliance with all applicable laws and regulations, and consistent with Boeing values. . . .

As an employee of The Boeing Company, I will ensure that: . . . Without exception, I will comply with all applicable laws, rules, and regulations. I

will promptly report any illegal or unethical conduct to management or other appropriate authorities (i.e., Ethics, Law, Security, EEO).

Every employee has the responsibility to ask questions, seek guidance, and report suspected violations of this Code of Conduct. Retaliation against employees who come forward to raise genuine concerns will not be tolerated.

(Dkt. No. 275-3 at 2–5; Dkt. No. 278-5 at 1.) Based on this language, Plaintiff claims that "Boeing's code of conduct, *on its face*, limits Boeing's right to terminate employees, even expanding Boeing's prohibition against illicit terminations to include the reporting of 'unethical conduct.'" (Dkt. No. 278 at 17) (emphasis in original.) Plaintiff further contends that "[t]he Boeing Code of Conduct contains an anti-retaliation clause that limits the ability of Boeing to terminate employees. Specifically, it is a promise by Boeing that employees will not face retaliation (including termination and other negative employment actions) for reporting violations of these policies, since the reporting of those violations is mandatory, and the failure to report is itself an infraction meriting discipline." (*Id*. at 18.)

However, the undersigned cannot agree that Defendant's Code of Contract includes such promises and prohibitions. Contrary to Plaintiff's assertions, the Code of Conduct does not guarantee continued employment for those who report illegal or unethical conduct, nor does it guarantee termination of those who retaliate against employees who report such conduct. (Dkt. No. 275-3 at 2–5; Dkt. No. 278-5 at 1.) Rather, the plain language of the Code of Conduct states only that "[r]etaliation . . . will not be tolerated." (Dkt. No. 275-3 at 3–5; Dkt. No. 278-5 at 1.)

This Court has long held that such language is insufficient to overcome the presumption of at-will employment. *See, e.g.*, *Brailsford v. Fresenius Med. Ctr. CNA Kidney Ctrs. LLC*, No. 2:15-cv-04012-DCN, 2017 WL 1214337, at *8 (dismissing claim

for breach of anti-retaliation policy); *Frasier v. Verizon Wireless*, No. 8:08-cv-356-HMH, 2008 WL 724037, at *2 (D.S.C. Mar.17, 2008) ("The Defendant's promises that 'everyone should feel comfortable to speak his or her mind' and that '[defendant] prohibits retaliation against employees who, in good faith, submit or participate in the investigation of any complaints' 'do[] not create an expectation that employment is guaranteed or that a particular process must be complied with before an employee is terminated.'" (citation omitted)); *King v. Marriott Int'l, Inc.*, 520 F. Supp. 2d 748, 756 (D.S.C. 2007) (finding that employer's promise "that 'there will be no discrimination or recrimination' against an employee who asserts a complaint against the Company" was insufficient to alter the employee's at-will employment status). As the court explained in *Hessenthaler*, "a general policy statement of nondiscrimination does not create an expectation that employment is guaranteed for any specific duration or that a particular process must be followed before an employee may be fired." 616 S.E.2d at 698. Instead, an anti-retaliation policy which states that "no disciplinary action or retaliation will be undertaken against those who report certain matters . . . is aspirational in tone and includes no mandatory language." *Yon v. Reg'l Med. Ctr.*, No. 5:14-cv-2098-JMC-KDW, 2016 WL 11410314, at *26 (D.S.C. Feb. 10, 2016), *adopted*, 2016 WL 1178202 (D.S.C. Mar. 28, 2016). Accordingly, Defendant's Code of Conduct simply does not mandate "specific treatment in specific situations," as is required to overcome the presumption of at-will employment and establish an enforceable employment contract. *Hessenthaler*, 616 S.E.2d at 698.[37]

---

[37] Moreover, this case is unlike *Lord v. Kimberly-Clark Corp.*, where the court found that a Code of Conduct stating "[y]ou cannot lose your job . . . for raising a Code of Conduct concern" created "an expectation that employment will not be terminated in retaliation for filing a Code of Conduct complaint." 827 F. Supp. 2d 598, 604 (D.S.C. 2011). Here, Defendant's Code of Conduct does not create such an expectation because it does not mention termination or discipline at all. (*See generally* Dkt. No. 275-3; Dkt. No. 278-5.) Accordingly, its language is not "definitive in nature, promising specific treatment in specific situations." *Hessenthaler v. Tri–County Sister Help*, 365 S.C. 101, 616 S.E.2d 694, 698 (2005).

For the same reasons, Plaintiff cannot overcome summary judgment by arguing that Defendant's Code of Conduct established a unilateral contract. (Dkt. No. 278 at 19.) A unilateral contract requires: (1) a specific offer; (2) communication of that offer to the employee; and (3) performance of employment-related duties in reliance on the offer. *Monroe v. Brawo USA, Inc.*, No. 6:19-cv-2268-HMH-KFM, 2019 WL 5790826, at *2 (D.S.C. Oct. 9, 2019), *adopted*, 2019 WL 5784989 (D.S.C. Nov. 6, 2019) (citing *Prescott*, 516 S.E.2d at 926). Here, Plaintiff seems to argue that Defendant made him a "specific offer" through its Code of Conduct because it "specifically requires employees to report illegal or unethical conduct and specifically prohibits retaliation against an employee for coming forward with those concerns [which] would naturally include a restriction on terminating an employee in retaliation for reporting such concerns." (Dkt. No. 278 at 19.) However, as noted above, the Code of Conduct does not make any such "specific offer" or promise to employees. Rather, the Code of Conduct contains a general policy statement, which "does not create an expectation that employment is guaranteed for any specific duration or that a particular process must be followed before an employee may be fired." *Hessenthaler*, 616 S.E. 2d at 698. Thus, even if Plaintiff relied on the Code of Conduct in performing his employment-related duties, he cannot show that the Code of Conduct created a unilateral contract that altered the terms of his at-will employment.

Based on the above, it is clear as a matter of law that Plaintiff cannot overcome the presumption of at-will employment. Accordingly, his breach of contract claim cannot withstand summary judgment and the undersigned therefore recommends that Defendant's Partial Motion for Summary Judgement (Dkt. No. 275) be granted.

## II.    Defendant's Motion to Strike

Defendant contends that Plaintiff's Notice of Reliance on Supplemental Authority (Dkt. No. 255) should be stricken because it constitutes a "post hoc effort to overcome summary judgment" and because it is "procedurally deficient." (Dkt. No. 256 at 2−5.) More specifically, Defendant argues that "after receiving the benefit of a thorough review of Boeing's Reply brief, . . . Plaintiff now seeks to add two new exhibits into the record, neither of which were submitted during the lengthy briefing period provided for summary judgment, and one of which Boeing was never served with during discovery." (*Id*. at 2−3.) Defendant further argues that "[i]n addition to the inappropriate and untimely content of Plaintiff's Sur Reply,[38] his brief also suffers from fatal procedural defects," including that "Plaintiff failed to request leave of Court prior to filing his brief." (*Id*. at 4.)

On the other hand, Plaintiff contends that his Notice of Supplemental Authority (Dkt. No. 255) should not be stricken because it simply provides additional support for his Motion for Summary Judgment (Dkt. No. 221) and aids the Court's review of his Response in Opposition to Defendant's Motion for Summary Judgment (Dkt. No. 237) and Reply in Support of his Motion for Summary Judgment (Dkt. No. 251). (Dkt. No. 259 at 1−2.) Plaintiff states that he "through oversight failed to attach additional documents" to Exhibit 157 to his Motion for Summary Judgment, and that he therefore filed this Notice of Supplemental Authority. (*Id*. at 4.) He explains that "[t]he information contained in Amended Exhibit 157 . . . simply assists the Court by directing it to corresponding page numbers in Exhibit 157A which are drawn from documents produced by Baker to Boeing

---

[38] Defendant characterizes Plaintiff's Notice of Supplemental Authority as an impermissible sur reply, (Dkt. No. 256 at 1), whereas Plaintiff contends that it is not a sur reply because it contains no new arguments (Dkt. No. 259 at 1).

in the regular course of discovery." (*Id*. at 5.) He further explains that "[n]ot only was Exhibit 157A produced to Boeing, but it is also Boeing's own documents containing job descriptions for positions Baker applied for, which was not (but which should have been) produced by Boeing to Baker." (*Id*.)

As for the additional case citations included in Plaintiff's Notice of Supplemental Authority, he states that "[c]ounsel was aware of them, but failed to include them in the Response or Reply brief." (*Id*. at 6.) Plaintiff argues that because "the District of South Carolina had no [] prohibition for supplemental briefing," his Notice of Supplemental Authority was not improper. (*Id*. at 7.) He then quotes a case from the Northern District of Georgia that states "filing notices of supplemental authorities that come to a party's attention after briefing is complete is a well-established practice . . . [and] such practice is helpful to the Court, which of course always endeavors to apply current authority in resolving the issues before it." *Hornor, Townsend & Kent, Inc. v. Hamilton*, Civ. A. 1:01-cv-2979-J, 2004 WL 2284503, at *11 (N.D. Ga. Sept. 30, 2004). Finally, Plaintiff argues that Defendant is not prejudiced by his filing. (*Id*.)[39]

---

[39] Plaintiff also includes three exhibits to his response to Defendant's Motion to Strike (Dkt. No. 259), claiming that these exhibits are newly found authority in support of his previous arguments that Defendant "has a corporate culture which favors 'profit over candor'" and "condones the covering up of deceptive practices." (*Id*. at 2–3.) He claims that he became aware of these materials after filing his briefs. (*Id*.) He further claims that the exhibits are relevant to his response because they relate to "Boeing's motives as to keep evidence out." (*Id*. at 3–4.) The exhibits include: a New York Times article entitled "Boeing 787 Dreamliner Deliveries Slowed by Quality Concerns," an NPR article entitled "Boeing to Pay $2.5 Billion Over 737 Max Fraud, Faces No Other Charges," and a press release from the Federal Aviation Administration entitled "FAA Proposes $1.25 Million in Civil Penalties Against The Boeing Company." (Dkt. No. 259-1; Dkt. No. 259-2; Dkt. No. 259-3.) Contrary to Plaintiff's contention that these articles are somehow relevant to his response to Defendant's Motion to Strike his Notice of Supplemental Authority (Dkt. No. 259), the undersigned does not see how any of these exhibits relate to Defendant's alleged discrimination on account of Plaintiff's disability, let alone to the specific issue before the Court on Defendant's Motion to Strike: whether Plaintiff untimely or improperly filed additional exhibits and case citations. (*See generally* Dkt. No. 256.) Accordingly, the undersigned must agree with Defendant's assertion that "the documentation filed by Plaintiff with his response is highly inflammatory and intended only to prejudice the Court against Boeing." (Dkt. No. 260 at 4.) Moreover, Plaintiff seems to claim that he was not aware of these documents prior to filing his briefs (and that it is therefore proper to now ask the Court to consider them), however, only one of these exhibits was published after the briefing period for the

The undersigned finds Plaintiff's filing of a Notice of Supplemental Authority (Dkt. No. 255) inappropriate and grants Defendant's Motion to Strike (Dkt. No. 256). As a threshold matter, the exhibits that Plaintiff included with his Notice of Supplemental Authority are not legal authority and cannot be provided to the Court under this misleading premise. (*See* Dkt. No. 255-1; Dkt. No. 255-2; Dkt. No. 255-3.) Moreover, neither the federal nor local civil rules explicitly allow for the filing of a notice of supplemental authority. Accordingly, Plaintiff should have requested leave of the Court before filing such notice. In addition, Plaintiff justifies his filing with a case that states Notices of Supplemental Authority are appropriate when legal authority "come[s] to a party's attention *after* briefing is complete." *Hornor, Townsend & Kent, Inc.*, 2004 WL 2284503, at *11 (emphasis added). However, Plaintiff states that he was aware of all of the information contained in his Notice of Supplemental Authority during the original briefing period for the parties' cross-motions for summary judgment. (Dkt. No. 259 at 4, 6.) Nonetheless, Plaintiff did not file his Notice of Supplemental Authority until eleven days after the original briefing period ended. (*See* Dkt. No. 224, establishing a further modified briefing schedule after allowing a modified briefing schedule to adjust the response/reply deadlines following the dispositive motions deadline set out in the Ninth Amended Scheduling Order.)

As Defendant aptly summarizes,

Plaintiff's purported reasons for [this filing] fail to account for the absence of any legal authority that permits such a filing and his complete failure to request leave of Court before doing so. Plaintiff's assertion that his additional exhibits and materials are somehow proper because they are helpful to the Court disregards the Federal and Local Rules of Civil Procedure, neither of which provide for such filings. Instead, Plaintiff has

---

parties' cross-motions for summary judgment had ended. (*See* Dkt. No. 259-1; Dkt. No. 259-2; Dkt. No. 259-3.)

construed the absence of a specific prohibition in the rules or procedure as tantamount to affirmative permission . . . the Orders issued in this case [] clearly set specific deadlines for the submission of briefs and exhibits with regard to the parties' motions for summary judgment. By Plaintiff's rationale, any such scheduling orders are superfluous, allowing him to make unlimited "supplemental" filings up until the time this Court issues a ruling on summary judgment, which in effect perpetually extends Plaintiff's briefing deadline and deprives Boeing of an opportunity to provide a meaningful response.

(Dkt. No. 260 at 1−3.)

Based on the above, it would indeed be prejudicial to Defendant for the Court to allow Plaintiff's untimely and unauthorized Notice of Supplemental Authority to stand.[40] Accordingly, Defendant's Motion to Strike (Dkt. No. 256) is granted. While the undersigned has not considered Plaintiff's Notice of Supplemental Authority in making the recommendations contained herein, consideration of the Notice would not have changed those recommendations.

## **CONCLUSION**

Based on the foregoing, the undersigned **recommends** that Defendant's Motion for Summary Judgment (Dkt. No. 206) be **granted in part and denied in part**, that Plaintiff's Motion for Summary Judgment (Dkt. No. 221) be **denied**, and that Defendant's Partial Motion for Summary Judgment (Dkt. No. 275) be **granted**. Accordingly, the undersigned recommends **denying** summary judgment as to Plaintiff's failure to accommodate claim (Count II) and **granting** summary judgment as to all other claims (Counts I, III, and V).

The undersigned also **orders** that Defendant's Motion to Strike Plaintiff's Sur Reply (Dkt. No. 256) be **granted**.

---

[40] Plaintiff has already filed three Notices of Errata in connection with the parties' cross-motions for summary judgment. (*See* Dkt. No. 220; Dkt. No. 240; Dkt. No. 250.)

**IT IS SO RECOMMENDED**.

_____
MARY GORDON BAKER
UNITED STATES MAGISTRATE JUDGE

May 19, 2021
Charleston, South Carolina

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.** "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

**Robin L. Blume, Clerk**
**United States District Court**
**Post Office Box 835**
**Charleston, South Carolina 29402**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).